UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DURAVEST, INC.,

              Plaintiff,

      - against -

VISCARDI, AG, WOLLMUTH MAHER &
DEUTSCH, LLP, MASON H. DRAKE, ESQ., BRUCE
O'DONNELL, CPA, BRUCE O' DONNELL
CPA/PFS, P.A., BIOMEDICAL CONSULTANTS SL,
RICHARD MARKOLL, and ERNESTINE BINDER
MARKOLL,

              Defendants.
------------------------------------------------------------------X

**Electronically submitted**

**AMENDED
DECLARATION OF
STEPHEN JACOBS**

07 Civ. 10590 (JSR)

      STEPHEN JACOBS, hereby declares the truth of the following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

      1.    I am an attorney duly admitted to practice law before the United States District Court for the Southern District of New York.

      2.    I am a member of the firm of Landman Corsi Ballaine & Ford P.C., attorneys for defendants Bruce O'Donnell, CPA and Bruce O'Donnell CPA/PFS, P.A., (together, "O'Donnell") and as such, and from a review of the file maintained in defense of this action, I am familiar with the facts and circumstances of this case.

      3.    This declaration is submitted in support of O'Donnell's motion to dismiss (1) the claim of plaintiff Duravest, Inc. under the Racketeer Influenced and Corrupt Organizations Act pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ("FRCP"); (2) plaintiff's three state law claims and the cross-claims of Wollmuth Maher & Deutsch, LLP, and Mason Drake, Esq., against O'Donnell for lack of subject matter jurisdiction, pursuant to FRCP

12(b)(1) and 28 U.S.C. § 1367; and (3) in the alternative, plaintiff's fraud and breach of contract claims for failure to state a claim, pursuant to FRCP 12(b)(6) and 9(b), and for such other and further relief as this Court deems just and proper.

4.    Attached hereto as Exhibit A is a true copy of plaintiff's complaint, which appears as Document Number 1 on the Court's electronic docket for this case.

5.    Attached hereto as Exhibit B is a true copy of the amended answer of defendants Wollmuth Maher & Deutsch, LLP and Mason H. Drake, Esq., which appears as Document Number 12 on the Court's electronic docket for this case.

6.    Attached hereto as Exhibit C is a true copy of "Bio-Magnetic Therapy Systems, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2003 and 2004".

7.    Attached hereto as Exhibit D is a true copy of the Consulting Agreement, dated December 29, 2005, between Bio-Magnetic Therapy Systems, Inc. and Richard Markoll, M.D

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and accurate.

Dated: New York, New York
       February 12, 2008

STEPHEN JACOBS (SJ 4437)

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
DURAVEST, INC.,

|  | |
|---|---|
| Plaintiff, | **COMPLAINT AND**<br>**JURY DEMAND** |

-against-

VISCARDI, AG; WOLLMUTH MAHER & DEUTSCH, LLP;    Docket No.: 07-Civ-10590(JR)
MASON H. DRAKE, ESQ., BRUCE O'DONNELL, CPA,
BRUCE O'DONNELL CPA/PFS, P.A., BIOMEDICAL
CONSULTANT SL, RICHARD MARKOLL, and
ERNESTINE BINDER MARKOLL,

Defendants.
-------------------------------------------------------------------------X

Plaintiff DURAVEST, INC., ("DURAVEST"), by and through its undersigned

attorneys, RAS ASSOCIATES, PLLC, as and for its Complaint and Jury Demand against

Defendants, VISCARDI, AG ("VISCARDI"), WOLLMUTH MAHER & DEUTSCH, LLP

("WOLLMUTH"), MASON H. DRAKE, ESQ. ("Attorney DRAKE"), BRUCE O'DONNELL,

CPA and BRUCE O'DONNELL CPA/PFS, P.A. ("Accountant O'DONNELL"),

BIOMEDICAL CONSULTANT SL ("MARKOLL CONSULTING"), RICHARD MARKOLL ("MR.

MARKOLL"), and ERNESTINE BINDER MARKOLL ("MRS. MARKOLL"), sets forth and

alleges as follows, upon information and belief:

### JURY DEMAND

1.    Plaintiff demands a trial by jury on all issues.

### NATURE OF ACTION AND SUBJECT MATTER JURISDICTION

2.    This action is for monetary damages associated with Plaintiff DURAVEST's

majority purchase of shares of Bio-Magnetic Therapy Systems, INC. ("BMTS, INC.")

between November 2005 and April 2006 ("Purchase"), which the Defendants knew or

should have known were worthless or nearly worthless at the time of the Purchase;

further damages arising from certain Defendants' wrongful transfer and conversion of

post-purchase operating capital provided by DURAVEST and deposited with BMTS;

1

and damages arising from certain Defendants' post-Purchase breach of non-competition provisions in a consulting agreement.

3.    The sale of BMTS, INC. to DURAVEST was consummated by means of various transactions occurring between November 2005 and April 2006.

4.    At all relevant times herein, BMTS, INC. was and is a holding company wholly owned by Plaintiff DURAVEST, which was organized and formed pursuant to the laws of the State of Virginia.  BMTS, INC. was and is a foreign corporation duly authorized to transact business in the State of New York under the name "Bio-Medical Technologies, Inc.", and did conduct substantial business activities in the State of New York.

5.    At all relevant times herein, until conclusion of the Purchase, BMTS, INC. was a privately held corporation, with numerous New York State domiciled shareholders, including John Hall, Charlotte Hall, Fred Ferri, June Ferri, Bruce Heller, Sheila Heller, Sheryl Heller, Harvey Hellering, Richard Joseph, Nancy Kennaugh, Jeffry Ordover, Stanley Sher, Helen Sher, Stanley Sokol, Judith Sokol, Michael Speigel, Dean Yep, and Winnie Yep.

6.    As set forth below, DURAVEST was induced to and did complete the Purchase in reliance upon both the fraudulent, negligent, reckless, false, and otherwise wrongful representations and assertions made by Defendants VISCARDI, O'DONNELL, MARKOLL CONSULTING, MR. MARKOLL and MRS. MARKOLL; and due to the negligent and deficient advice, omissions, lack of proper advice, and deficient due diligence efforts of Defendants WOLLMUTH and DRAKE.

7.    Following the Purchase, beginning in December 2005 and through April 2006, the MARKOLL Defendants wrongfully transferred to themselves and converted a total of approximately Three Million Seventy Thousand Dollars ($3,070,000) in funds

2

which had been transferred by Plaintiff DURAVEST to the account of BMTS for the purposes of serving as operating capital for BMTS, thereby looting the company.

8.    Following the Purchase, Defendants MR. MARKOLL and MRS. MARKOLL also violated certain non-compete agreements with BMTS, thereby depriving Plaintiff DURAVEST of any reasonable opportunity to earn profits from its subsidiary.

9.    By and through the activities set forth herein, prior to and following the Purchase, between May 2005 and April 2006, Defendants O'DONNELL, MR. MARKOLL, and MRS. MARKOLL engaged in a pattern of racketeering activity in violation of 18 U.S.C. §1961; 18 U.S.C. §1962; and 18 U.S.C. §1964(c).

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 18 U.S.C. § 1964 (a) in that RICO claims arise under the laws of the United States.

## PARTIES AND VENUE

11.    Plaintiff DURAVEST is a corporation organized under the laws of the State of Florida, and is duly authorized and registered to transact business as a foreign corporation in New York County, in the State of New York.

12.    At all relevant times herein, Defendant VISCARDI, is and was a corporation organized under the laws of the Federal Republic of Germany, maintaining offices at Brienner Strasse 1, 80333 Munich, Germany.

13.    At all relevant times herein, Defendant VISCARDI was engaged in the business of promoting sales and acquisitions of companies as an investment bank.

14.    At all relevant times herein, Defendant VISCARDI engaged in the business of researching and analyzing private equity companies, and providing such research to third parties for profit and in connection with proposed and promoted transactions to acquire companies.

3

15.     At all relevant times herein, Defendant VISCARDI engaged in the business of financing the equity sales of companies.

16.     At all relevant times herein, Defendant VISCARDI engaged in the business of structuring sales of private equity companies to institutional investors and hedge funds.

17.     At all relevant times herein, Defendant VISCARDI derived fees as commissions for the sales of private equity firms, upon the conclusion of the sales of such companies.

18.     At all relevant times herein, Defendant VISCARDI conducted substantial business activities in the United States of America, and in the Southern District of New York.

19.     At all relevant times herein, Defendant VISCARDI solicited business in the United States of America, and in the Southern District of New York.

20.     At all relevant times herein, Defendant VISCARDI entered into contracts in the United States of America, and in the Southern District of New York.

21.     At all relevant times herein, Defendant VISCARDI derived substantial profits from the sale of companies with business activities in the United States of America, and in the Southern District of New York.

22.     At all relevant times herein, Defendant WOLLMUTH was and is a limited liability partnership engaged in the practice of law in the State of New York, with its principal place of business at 500 Fifth Avenue, New York, New York 10110.

23.     At all relevant times herein, Defendant DRAKE was and is an attorney admitted to the practice of law in the Courts of the State of New York.

24.     At all relevant times herein, DRAKE was a member of, and held an equity interest in, the WOLLMUTH firm.

25.     At all relevant times herein, DRAKE had authority to, and did, bind the WOLLMUTH firm to enter into an attorney-client relationship with DURAVEST.

4

26.     At all relevant times herein, Defendant DRAKE practiced law in relation to corporate matters, including corporate acquisitions, with clients doing business in the State of New York.

27.     At all relevant times herein, Defendants DRAKE and WOLLMUTH were retained to provide services to Plaintiff DURAVEST in connection with the acquisition and purchase of a majority stake in BMTS, INC.

28.     At all relevant times herein, Defendant O'DONNELL was and is a Certified Public Accountant licensed to provide accounting services as a CPA in the State of New York.

29.     At all relevant times herein, defendant O'DONNELL conducted the business of accounting by and through a professional association known as BRUCE O'DONNELL, CPA/PFS, P.A., in the State of New York.

30.     At all relevant times herein, defendant BRUCE O'DONNELL, CPA/PFS, P.A., was a sole proprietorship organized and existing under the laws of the State of Florida.

31.     At all relevant times herein, defendant BRUCE O'DONNELL, CPA/PFS, P.A., was a corporation organized and existing under the laws of the State of Florida.

32.     At all relevant times herein, defendant BRUCE O'DONNELL, CPA/PFS, P.A., was a foreign corporation licensed and registered to conduct business in the State of New York.

33.     At all relevant times herein, defendant BRUCE O'DONNELL, CPA/PFS, P.A., was a sole proprietorship organized and existing under the laws of the State of New York.

34.     At all relevant times herein, defendant BRUCE O'DONNELL, CPA/PFS, P.A., was a corporation organized and existing under the laws of the State of New York.

35.     At all relevant times herein, defendant O'DONNELL and his professional association known as BRUCE O'DONNELL, CPA/PFS, P.A., held themselves out as a firm that provided accounting services in the State of New York.

5

36.    At all relevant times herein, defendant O'DONNELL owned, managed, and controlled Defendant BRUCE O'DONNELL, CPA/PFS, P.A.

37.    At all relevant times herein, defendant O'DONNELL and his professional association known as BRUCE O'DONNELL, CPA/PFS, P.A., did have substantial clients and provide accounting services in the State of New York.

38.    At all relevant times herein, Defendant O'DONNELL provided accounting services for companies located in the State of New York, including BMTS' New York operations d/b/a "Bio-Mechanical Technologies, Inc."

39.    At all relevant times herein, MARKOLL CONSULTING was and is a foreign limited liability company organized and existing under the laws of the Kingdom of Spain, with offices at EL Greco 5, 07157 Puerto Andratx, Mallorca, Spain.

40.    At all relevant times herein, MARKOLL CONSULTING was and is a foreign partnership organized and existing under the laws of the Kingdom of Spain, with offices at EL Greco 5, 07157 Puerto Andratx, Mallorca, Spain.

41.    At all relevant times herein, MARKOLL CONSULTING was and is a foreign corporation organized and existing under the laws of the Kingdom of Spain, with offices at EL Greco 5, 07157 Puerto Andratx, Mallorca, Spain.

42.    At all relevant times herein, MR. MARKOLL and MRS. MARKOLL were and are husband and wife.

43.    At all relevant times herein, Defendants MR. MARKOLL and MRS. MARKOLL, were and are members, shareholders and/or principals of MARKOLL CONSULTING.

44.    At all relevant times herein, Defendant MARKOLL CONSULTING provided consulting services to BMTS, INC.

45.    At all relevant times herein, Defendant MARKOLL CONSULTING provided consulting services to companies which were authorized to do business, and did business, in the State of New York, including BMTS, INC. d/b/a Bio-Medical Technologies, Inc.

46.    At all relevant times herein, Defendants MR. MARKOLL and MRS. MARKOLL are and were residents of the State of Florida, maintaining a residence at 224 Datura St Ste 909, West Palm Beach Fl 33401-5624.

47.    At all relevant times herein, Defendants MR. MARKOLL and MRS. MARKOLL were officers of BMTS, INC.,

48.    At all relevant times herein, Defendants MR. MARKOLL and MRS. MARKOLL conducted business under the name Bio-Medical Technologies, Inc., in the State of New York in Melville, County of Suffolk.

49.    This Court has pendent jurisdiction over the state common law claims asserted herein in that such claims are so related to the RICO claims that they form part of the same case or controversy.

50.    Venue is predicated on 28 U.S.C. §§1391 (b) (2) and (d) in that a substantial part of the events or omissions giving rise to the claim occurred in this district. In addition, pursuant to 18 U.S.C. 1965(a) and (b), venue is proper in this district as defendants transacted their affairs in this district and the ends of justice require that the defendants be brought before this Court.

## FACTUAL BACKGROUND

### BMTS Corporate Pedigree

51.    At all relevant times herein, non-party BMTS, INC. is and was a corporation organized and existing pursuant to the laws of the State of Florida, and duly authorized and registered to do business as "Bio-Medical Technologies, Inc." in the State of New York.

52.    BMTS was founded in or about 1991 by Defendant RICHARD MARKOLL, who became and remained its Chief Executive Officer from the time BMTS was founded, up to and including January 2007.

53.    At all relevant times herein, BMTS, INC. individually and d/b/a "Bio-Medical Technologies, Inc." engaged in substantial business activities in the State of New York.

54.    At all relevant times herein, BMTS, INC. made sales of its biomechanical products and services in the State of New York, maintaining offices in Melville, County of Suffolk.

55.    At all times prior to the Purchase, and up until the time the Purchase was consummated between November 2005 and April 2006, Defendant MR. MARKOLL maintained a majority shareholder stake in BMTS, INC.

56.    At all times prior to the Purchase, and up until the time the Purchase was consummated between November 2005 and April 2006, Defendant MR. MARKOLL and MRS. MARKOLL maintained a majority shareholder stake in MARKOLL CONSULTING, and participated in and controlled its activities.

57.    At all relevant times following the Purchase, MARKOLL CONSULTING acted as a financial conduit for the illicit receipt of operating capital monies wrongfully transferred out of BMTS, INC.

58.    At all relevant times herein, BMTS, INC. acted as a holding company for wholly owned subsidiaries, including BMTS, GmbH and its subsidiaries.

59.    At all relevant times herein, between November 2005 and January 2007, Defendant MR. MARKOLL was the Chief Executive Officer of BMTS, INC., with signing authority on one or more BMTS, GmbH bank accounts at Deutsche Bank, in Munich, Federal Republic of Germany.

60.    At all times hereinafter mentioned, Defendant ERNESTINE MARKOLL was a shareholder in, was employed by, and participated in, the management of BMTS, INC.

61.    At all times hereinafter mentioned, the BMTS INC.'s business model, reputation, and business prospects, were tied to the business and personal reputations, and consulting services, of the MARKOLL Defendants.

62.    At all relevant times herein, BMTS, INC. d/b/a Bio-Medical Technologies, Inc., operated a clinic in Melville, County of Suffolk, New York, for the ostensible treatment of various maladies with magnetic "Pulsed Signal Technology" ("PST").

63.    At all relevant times herein, BMTS, INC. was the sole owner of BMTS, GmbH, a corporation organized and existing under the laws of the Republic of Germany.

64.    At all relevant times herein, BMTS, GmbH was engaged in the business of selling and licensing magnetic medical devices to the medical community, for the ostensible treatment of various maladies with PST.

### Certain Defendants' Wrongful Pre-Purchase Representations

**A.    Individual Professional Backgrounds and Criminal History**

65.    At all relevant times herein, Defendant MR. MARKOLL held himself out as a medical doctor ("M.D.") licensed to practice medicine.

66.    At all relevant times herein, Defendant MR. MARKOLL held himself out as a medical doctor ("M.D.") authorized to practice medicine in all or portions of the United States.

67.    Defendant MR. MARKOLL has never been licensed to practice medicine in any State of the United States.

68.    At all times hereinafter mentioned, and prior to the Purchase, the MARKOLL Defendants held themselves out to be biomedical researchers in good standing and with honorable reputations in the medical and/or medical research community.

9

69.    Prior to the Purchase, on or about May 18, 2001, in U.S. District Court, District of Connecticut, RICHARD MARKOLL plead guilty to, or was convicted of, violations of the Food, Drug, and Cosmetic Act and mail fraud.

70.    The aforesaid guilty plea or conviction of MR. MARKOLL concerned violations of Title 18 U.S.C. § 371 - Conspiracy, and Title 21 U.S.C. § 331(q)(1)(A), 333(a)(2), 360j(g) - failure or refusal to comply (with the intent to defraud) with any requirement prescribed under Title 21 U.S.C. § 360j(g).

71.    Prior to the Purchase, on or about May 18, 2001 MRS. MARKOLL plead guilty to, or was convicted of, misdemeanor violations of Title 18 U.S.C. § 371 - Conspiracy, and Title 21 U.S.C. § 331(q)(1)(A), 333(a)(1), 360j(g) - failure or refusal to comply with any requirement prescribed under Title 21 U.S.C. § 360j(g).

72.    At all relevant times herein, and since the dates of said convictions to the present, the MARKOLL Defendants have fraudulently concealed the true nature of their criminal convictions, as well as the effects of same upon the continuing viability and profitability of BMTS, INC. and other businesses that they have used to market biomagnetic therapy products.

73.    The MARKOLL Defendants failed to disclose and/or concealed their aforementioned criminal convictions and/or guilty pleas from DURAVEST prior to the Purchase.

B.    BMTS Intellectual Property "Rights"

74.    At all times hereinafter mentioned, MR. MARKOLL held himself out as the inventor, author, proprietor, and owner of certain intellectual property used as the basis for various Pulsed Signal Technology ("PST") products which he represented as useful, marketable, and profitable, to treat various maladies in humans, including osteoarthritis, tinnitus, fibromyalgia, and muscle injuries; and similar and other maladies in animals.

10

75.     Unbeknownst to Plaintiff DURAVEST at the time of the Purchase, Defendants MR. and MRS. MARKOLL were aware of various competing third party claims over the intellectual property rights of the aforementioned PST products that existed on and prior to the Purchase ("adverse intellectual property claims").

76.     Prior to the Purchase, Defendants MR. and MRS. MARKOLL concealed and/or failed to disclose one or more previously asserted competing claims to PST Technology, which were in derogation of BMTS' rights to own or use such technology on an exclusive or protectable basis.

77.     At all times hereinafter mentioned, the competing claims for the aforesaid intellectual property rights surrounding PST technology adversely affected and impacted both the inherent value and future business prospects of BMTS, and its ability to operate as a going concern.

78.     Unbeknownst to Plaintiff DURAVEST at the time of the Purchase, MR. MARKOLL was aware that there was limited or no legal, protectable, or recognized registration for the "technology" which formed the basis for the aforementioned PST products that existed on and prior to the Purchase ("adverse intellectual property claims").

79.     At all times hereinafter mentioned, the failure to have protectable and recognized legal registration for PST technology adversely affected and impacted both the inherent value of BMTS, and its ability to operate as a going concern.

### C.     Clinical Studies and Results

80.     At all times hereinafter mentioned, the MARKOLL Defendants and Defendant VISCARDI negligently, fraudulently and inaccurately misrepresented to Plaintiff DURAVEST that the MARKOLL Defendants had participated in and conducted clinical trials of PST technology, and that such clinical trials proved and showed that PST Technology was effective for the purposes marketed by BMTS prior to the purchase.

81.     Unbeknownst to Plaintiff DURAVEST, there were virtually no reliable clinical studies or clinical study results for PST Technology in existence prior to the Purchase.

**D.     BMTS Operating Income**

82.     Prior to the Purchase, on or about May 31, 2005, Defendants O'DONNELL , MR. MARKOLL, and MRS. MARKOLL intentionally and/or negligently and/or recklessly misrepresented BMTS to be profitable insofar as its operating income was restated for 2003 to as to represent that such income exceeded its 2003 operating expenses.

83.     Prior to the Purchase, on or about May 31, 2005, the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI intentionally and/or negligently and/or recklessly misrepresented BMTS to be profitable insofar as its operating income for 2004 in that they represented that such income exceeded its 2004 operating expenses.

84.     The aforestated pre-Purchase representations by the O'DONNELL Defendants, The MARKOLL Defendants, and Defendant VISCARDI that BMTS had earned operating income in fiscal years 2003 and/or 2004 income were without reasonable basis in fact, and these Defendants knew or should have known that such representations were without reasonable basis, contrary to General Accounting Principles ("GAP"), and/or were outright false.

85.     Following the Purchase, on or about April 2006, the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI's, receipt of substantial fees, proceeds, and/or commissions from the Purchase, the O'DONNELL Defendants, and the MARKOLL Defendants, restated 2005 pre-Purchase operating income and expenses for BMTS, so as to disclose for the first time that the company's operating income did not exceed operating expenses, and that BMTS was therefore not profitable dating back to the Purchase date.

**E.     Loans Claimed from BMTS**

86.     Following the Purchase, on or about April 2006, and the O'DONNELL, MARKOLL Defendants, and VISCARDI's receipt of substantial fees, proceeds, and/or commissions from the Purchase, the O'DONNELL Defendants, and the MARKOLL Defendants, for the first time, claimed the existence of "loans" due and payable from BMTS, INC. to the MARKOLL Defendants.

87.    The aforementioned loans to BMTS, INC. were not and have never been documented in amount, date, terms, or otherwise.

88.    The O'DONNELL and MARKOLL Defendants' claims of loans due and payable to the MARKOLL Defendants from BMTS were and are a pretext for the looting of BMTS' operating capital provided by DURAVEST, by means of money wire transfers to the MARKOLL Defendants, in the guise "loan repayments."

### F.    Use of Telephone and Wire Services

89.    On or about November 28, 2005, the MARKOLL Defendants and Defendant VISCARDI caused a correspondence to be sent to Plaintiff DURAVEST by fax, which contained fraudulent material omissions and misrepresentations as to:  the financial condition of BMTS, INC., the stated "lack" of related party transactions between BMTS, INC. and the MARKOLL Defendants in the relevant time period;  the "lack" of claims against BMTS, INC., and otherwise materially misrepresented significant elements of the business, financial condition, and future business prospects of BMTS, INC.

90.    Prior to the Purchase, the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI, caused 2003, 2004 and 2005 financial statements of BMTS. INC. to be issued and disseminated via the mails across state lines and/or faxed across state lines, containing material misrepresentations and/or omissions regarding significant elements of the business, financial condition, and future business prospects of BMTS, INC.

91.    The foregoing material misrepresentations and omissions supported previous oral and written representations, misrepresentations, and omissions made by the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI, regarding significant elements of the business, financial condition, and future business prospects of BMTS, INC.

**Certain Defendants' Wrongful Post-Purchase Acts**

    **A.**    **Failure to Transfer ,and Misuse of , Intellectual Property Rights**

    92.    As a part of and partial consideration for, the Purchase, the MARKOLL Defendants agreed to transfer any and all intellectual property rights previously used by BMTS, INC. , to BMTS, INC., for the use of BMTS, INC. in the conduct of its regular business thereafter.

    93.    Following the Purchase, Plaintiff requested that the MARKOLL Defendants formally transfer their intellectual property rights by written agreement.

    94.    The MARKOLL Defendants have failed to execute any document to transfer any intellectual property rights to BMTS, INC. which were previously used by BMTS, INC. and/or its subsidiaries prior to the Purchase, and which were intended to be, and were, part of the Purchase.

    95.    At all relevant times herein, the MARKOLL Defendants have and continue to diminish the value of the intellectual property rights which were promised to and purchased by Plaintiff Duravest as part of the Purchase, by fraudulently continuing to resell those rights to unrelated third parties without permission.

    **B.**    **Conversion of Transferred Purchase Monies**

    96.    To accomplish the aforesaid share purchase, and provide operating capital to the company, Plaintiff DURAVEST transferred approximately One and One Half Million Dollars ($1,5000,000) to BMTS , GmbH, at a Deutsche Bank branch located at Promenadeplatz 15, 80333 Munich, Federal Republic of Germany, on or about December 1, 2005.

    97.    Two days after the transfer of the One and One half Million Dollars ($1,500,000), on or about December 2, 2005, unbeknownst at the time to Plaintiff Duravest, the MARKOLL Defendants transferred the entire One and One Half Million Dollars ($1,5000,000) to an account maintained and controlled by one or more of the MARKOLL DEFENDANTS, jointly and severally.

    98.    Following the Purchase, between December 2005 and April 2006, the MARKOLL Defendants made several other monetary transfers from corporate accounts intended to hold

14

operating capital, which had been funded by Plaintiff DURAVEST, and which were held by and for the benefit BMTS, GmbH, to accounts controlled by one or more of the MARKOLL Defendants, for amounts totaling an additional One Million Five Hundred Seventy Thousand Dollars ($1,570,000) for, *inter alia*, "loan repayments" and "deferred compensation."

99.     That prior to the Purchase, the MARKOLL Defendants failed to disclose any claimed debts owed to them by BMTS, GmbH, nor did they produce any loan documents to Plaintiff in support of, or explaining or justifying, any such loan amounts.

100.    That prior to the Purchase, the MARKOLL Defendants failed to provide any payroll documentation in support of any claimed "deferred compensation" owed to them, nor any reason why any claimed "deferred" compensation had been previously deferred and would be owing to them following the Purchase.

101.    That the MARKOLL Defendants were not and are not entitled to the aforesaid monies that they transferred to themselves, out of BMTS, GmbH, totaling approximately three million dollars ($3,000,000).

**D.     Violation of Non-Competition Agreements**

102.    On or about December 29, 2005, Defendants RICHARD MARKOLL individually and on behalf of MARKOLL CONSULTING, represented that they entered into a Consulting Agreement with BMTS, INC., and that they were bound by such Agreement at all times while the MARKOLL Defendants continued to perform services for BMTS. INC. following the Purchase, and for a period of time of at least two years following the conclusion of the Purchase.

103.    That the aforesaid Agreement is today in full force and effect.

104.    Unbeknownst to Plaintiff DURAVEST, at the time of or shortly following the completion of the Purchase, the MARKOLL Defendants conspired to, and/or otherwise did, violate the aforesaid non-competition provisions of the aforesaid Agreement, in that they have contacted and spoken to third party competitors of BMTS, INC. and BMTS, GmbH, in an attempt to provide know-how, illicit

licensing of technology, assistance, and business advice to such competitors for profit, in the areas of business that BMTS, INC. and BMTS, GmbH were and are engaged in.

105.    That since the Purchase, the MARKOLL Defendants have or have agreed to receive value from BMTS, INC.'s and/or BMTS, GmbH's competitors for their know-how, intellectual property, client lists, and other items and property that are covered by the non-compete agreements that the MARKOLL Defendants entered into with BMTS, INC. prior to the Purchase and/or the Purchase agreements themselves.

**VISCARDI**

106.    In and prior to the year 2000, and up through and including December of 2005, VISCARDI maintained BMTS, INC. as a client.

107.    In and prior to the year 2000, and up through and including December of 2005, VISCARDI maintained MR. MARKOLL and MRS. MARKOLL as clients.

108.    Beginning in and prior to November 2005, Defendant VISCARDI, by and through its staff, did hold itself out to Plaintiff DURAVEST and the general public as investment bankers and venture capital experts experienced in all aspects of advising, evaluating, and counseling clients in relation to, reputable corporate acquisitions of companies large and small.

109.    Beginning in or prior to the year 2000, and continuously through April of 2006, VISCARDI compiled and disseminated corporate information, data, and research on BMTS, INC. individually and d/b/a Bio-Medical Technologies, Inc., and their subsidiaries.

110.    In or prior to the year 2000, and up through and including 2004, VISCARDI engaged in unsuccessful efforts to find a purchaser for BMTS, INC.

111.    From the year 2000, and up through and including December of 2005, VISCARDI made various presentations to prospective purchasers in an effort to find a purchaser for BMTS, INC.

112.    The aforesaid presentations put forth BMTS, INC. and its subsidiaries as a going concern with significant value and upside potential, based on representations regarding the protectability and usefulness of its technology, which VISCARDI knew or had reason to know were totally or substantially false.

113.    In the year 2005, VISCARDI marketed the sale of BMTS, INC. to DURAVEST, ultimately resulting in the sale of all or substantially all of BMTS, INC. to DURAVEST.

114.    Prior to the Purchase, VISCARDI drafted and created presentation materials for the sale of BMTS, INC.

115.    Prior to the Purchase, VISACARDI gave one or more presentations regarding the actual earnings, clients, value, good will, profitability, and valuation of BMTS, INC. as a company and going concern.

116.    Prior to the Purchase, DURAVEST relied on VISCARDI's presentations in evaluating the suitability of BMTS, INC. for purchase and in evaluating its value, good will, profitability, and valuation as a going concern.

117.    Prior to the Purchase, VSCARDI knew or should have known that its presentation, documentation, and representations regarding the value and valuation were false or substantially false in that BMTS, INC. was of little or no value as a going concern; in that BMTS, INC. held little or no protectable intellectual property interests; in that its profitability, if any, was declining prior to the Purchase so as to render it a money-losing enterprise at or shortly after the Purchase; in that there were little or no clinical studies which supported the business products sold by BMTS, INC. and its subsidiaries at the time of Purchase; and in that the professional reputations of certain key officers of BMTS, INC. at the time of Purchase were tainted by criminal convictions which would and did affect the reputation of the company.

17

118.    The aforesaid fraudulent statements, fraudulent omissions, fraudulent misstatements, and the conspiracies to commit same, were performed via the mails and/or telephone lines, in violation of 18 U.S.C. §§ 1341 and/or 1343.

**Wollmuth**

119.    Beginning in and prior to November 2005, Defendant WOLLMUTH, by and through DRAKE and other attorneys and staff, did act as attorneys for Plaintiff DURAVEST.

120.    Beginning in and prior to November 2005, Defendant WOLLMUTH, by and through DRAKE and other attorneys and staff, did hold themselves out to Plaintiff DURAVEST and the general public as attorneys experienced in all aspects of advising, evaluating, and counseling clients in relation to, corporate acquisitions of companies large and small.

121.    Beginning in and prior to November 2005, Defendant WOLLMUTH, by and through DRAKE and other attorneys and staff, reviewed and prepared documents by which DURAVEST accomplished and agreed to accomplish the Purchase.

122.    Prior to the Purchase, WOLLMUTH and DRAKE, were retained to provide the benefit of their experience to advise and counsel Plaintiff in connection with the Purchase.

123.    At all relevant times herein, prior to the Purchase, WOLLMUTH and DRAKE were retained and expected to, inter alia, review the suitability of BMTS, INC. for purchase.

124.    At all relevant times herein, prior to the Purchase, WOLLMUTH and DRAKE were retained and expected to, inter alia, perform due diligence to review the suitability of BMTS, INC. for purchase.

125.    At all relevant times herein, prior to the Purchase, WOLLMUTH and DRAKE were retained and expected to, inter alia, draft proper agreements to assist Plaintiff in protecting its financial and legal interests in connection with and following the Purchase.

**O'Donnell Defendants**

126.    In and prior to the year 2000, and up through and including December of 2005, the O'Donnell Defendants maintained BMTS, INC. as a client for bookkeeping, auditing, tax, and accounting services.

127.    In and prior to the year 2000, and up through and including December of 2005, the O'DONNELL Defendants maintained MR. MARKOLL and MRS. MARKOLL as clients for bookkeeping, auditing, tax, and accounting services provided to BMTS, INC.

128.    In and prior to the year 2000, and up through and including December of 2005, the O'DONNELL Defendants maintained BMTS, INC. and the MARKOLL defendants as personal clients for bookkeeping, auditing, tax, and accounting services provided to them individually.

129.    In and prior to the year 2000, and up through and including December of 2005, the O'DONNELL Defendants periodically communicated with the MARKOLL Defendants for the purposes of obtaining representations of management regarding the financial condition of BMTS, INC.

130.    In and prior to the year 2000, and up through and including December of 2005, the O'DONNELL Defendants periodically communicated with the MARKOLL Defendants for the purposes of obtaining representations regarding the their personal financial condition, for the purposes of determining their personal taxable income, liabilities and write-offs, including taxable income from BMTS, INC.

131.    Beginning in or prior to the year 2000, and continuously through April of 2006, the O'DONNELL Defendants compiled corporate information, data, and research on BMTS, INC., individually and d/b/a Bio-Medical Technologies, Inc.

132.    In and prior to May of 2005, the O'DONNELL Defendants fraudulently, negligently, carelessly, and/or recklessly issued "restated" financial statements for BMTS, INC. which, by virtue of their

19

contact and relation with BMTS, INC. and its principals, they knew or should have known to be substantially or totally misleading and/or false.

133.    In and prior to May of 2005, the O'DONNELL Defendants conspired with the MARKOLL Defendants to issue "restated" financial statements for BMTS, INC. which, by virtue of their contact and relation with BMTS, INC. and its principals, they knew or should have known to be substantially or totally misleading and/or false.

134.    The "restated" financial statements for BMTS, INC. issued in May 2005 contained material omissions in that certain of the items booked as "liabilities" on behalf of the company were linked to related party transactions that were not stated to be such in the statements.

135.    Prior to the Purchase, the O'DONNELL Defendants knew or should have known that there were none or insufficient proofs for many of the items listed on the financial statements.

136.    Prior to the Purchase, the O'DONNELL Defendants disseminated the "restated" financial statements that they had issued for BMTS, INC. in May 2005, to the Plaintiff DURAVEST, knowing or with reason to know that such financial statements contained material omissions and/or misrepresentations which caused them to be completely or substantially false.

137.    The dissemination of the aforesaid "restated" financial statements was performed via the mails and/or telephone lines, in violation of 18 U.S.C. §§ 1341 and/or 1343.

138.    Prior to the Purchase, the O'DONNELL Defendants knew or had reason to know that BMTS, INC. was being offered or evaluated for sale to third parties, and that such third parties would or did rely on the FY2004 financial Statement issued by the O'DONNELL Defendants in or about May 2005 for information as to the financial condition of BMTS, INC. as of the time of the Purchase.

139.    The aforesaid fraudulent statements, fraudulent omissions, fraudulent misstatements, and the conspiracies to commit same, were performed via the mails and/or telephone lines, in violation of 18 U.S.C. §§ 1341 and/or 1343.

**Markoll Defendants**

140.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants managed, had controlling equity interest in, and otherwise controlled BMTS, INC.

141.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants were aware of the true financial condition of BMTS, INC., including its lack of viability as a going concern.

142.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants failed to disclose the true financial condition of BMTS, INC., including its lack of viability as a going concern.

143.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants were aware of the lack of suitable clinical studies which would support the effectiveness of bio-magnetic therapies and treatments sold by BMTS, INC.

144.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants failed to disclose the lack of suitable clinical studies which would support the effectiveness of bio-magnetic therapies and treatments sold by BMTS, INC.

145.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants conspired amongst themselves, and with other defendants herein, to conceal the lack of suitable clinical studies which would support the effectiveness of bio-magnetic therapies and treatments sold by BMTS, INC.

146.    The lack of positive and available clinical studies affected the viability and value of BMTS, INC. as a going concern.

147.    At all relevant times herein, prior to the Purchase and up until April 2006, the MARKOLL Defendants conspired amongst themselves, and with other defendants herein, to conceal the true financial condition of BMTS, INC.

148.    The true financial picture of BMTS, INC. would have substantially diminished or extinguished its value as a going concern.

149.    At all relevant times herein, prior to the Purchase, the MARKOLL Defendants represented to DURAVEST that they had not entered into any "related party transactions" with BMTS, INC., that were not specifically reflected in the financial statements thereof.

150.    On or about November 28, 2005, the O'DONNELL and MARKOLL Defendants, and defendant VISCARDI caused a letter to be sent to Plaintiff DURAVEST, containing representations which were fraudulent and/or reckless and/or negligent, in that they, amongst other things, denied related party transactions prior to the Purchase; they stood by the "accuracy" of knowingly false financial statements relating to BMTS, INC.; they misrepresented that there were no known litigation or claims against BMTS, INC. at the time of such letter; and they misrepresented the intentions of the MARKOLL Defendants, as members of BMTS, INC. management following the Purchase, to preserve funds received from Plaintiff DURAVEST in the Purchase as operating capital for BMTS, INC. following the Purchase.

151.    The MARKOLL Defendants knew or should have known that their pre-Purchase representations to DURAVEST with regard to related party transactions by and between themselves and BMTS, INC. were false.

152.    Following the Purchase, in 2006, the MARKOLL Defendants represented the existence of approximately Six Hundred Thousand Dollars ($600,000) in loans outstanding and payable to them by BMTS, INC., most or all of which they knew to have been fraudulent and never previously disclosed or documented as loans to the MARKOLL Defendants.

153.    Prior to the Purchase by DURAVEST, the MARKOLL Defendants never disclosed or documented debts in the amount of Six Hundred Thousand Dollars ($600,000) allegedly owed to them by BMTS, INC.

154.    The foregoing alleged debt later claimed by the MARKOLL Defendants as owing from BMTS, INC. following the Purchase was a material and fraudulent omission and misrepresentation in connection with the Purchase.

155.    The MARKOLL Defendants' claim of being owed Six Hundred Thousand Dollars ($600,000) was part and parcel of a fraudulent scheme to serve as a pretext for conversion of post-Purchase conversion of operating capital provided by plaintiff DURAVEST for their won exclusive use and enjoyment.

156.    The aforesaid fraudulent statements, fraudulent omissions, fraudulent misstatements, and the conspiracies to commit same, were performed via the mails and/or telephone lines, in violation of 18 U.S.C. §§ 1341 and/or1343.

**Damages Resulting Directly From Purchase**

157.    To provide operating capital to the company as part of the Purchase, between November and December 0f 2005, DURAVEST purchased all then-authorized shares of BMTS, INC. and transferred approximately One Million Five Hundred Thousand Euros (then worth approximately One Million Eight Hundred twenty Four Thousand Dollars $1,824,000) to BMTS, GmbH account(s) in Deutsche bank, Munich, Federal Republic of Germany.

158.    Following a Special Meeting of the Board of Directors of BMTS, GmbH in December 2005, an additional 2.65 million shares were authorized and issued by BMTS, GmbH.

159.    To provide additional working capital for BMTS, INC., Plaintiff DURAVEST paid an additional Two Million Six Hundred Seventy Six Thousand Dollars ($2,676,000) for the aforesaid additional 2.65 million shares of BMTS, GmbH by transfer to BMTS, GmbH account(s) in January 2006.

160.    In November 2005, Plaintiff DURAVEST paid Eight Hundred Thousand Dollars ($800,000) to Defendant MR. MARKOLL, based on the MARKOLL Defendants' representations as to the value of BMTS, INC., its business prospects, intellectual property rights and assets, the contemplated transfer of

the MARKOLL Defendants' intellectual property rights and assets, and the skills and reputation of its management, all of which were mostly or substantially untrue.

161.    In or about November 2005, Plaintiff DURAVEST paid approximately One Million Two Hundred Thousand Dollars ($1,200,000) to existing shareholders of BMTS, INC. for their shares, based on the MARKOLL Defendants' representations as to the value of BMTS, INC., its business prospects, intellectual property rights and assets, the contemplated transfer of the MARKOLL Defendants' intellectual property rights and assets, and the skills and reputation of its management, all of which were mostly or substantially untrue.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR COMMON LAW FRAUD

162.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "161" above, as if fully set forth at length herein.

163.    The foregoing matters concealed from Plaintiff were material to the value, or lack thereof, of the Purchase.

164.    The foregoing misrepresentations made by the MARKOLL Defendants, the O'DONNELL Defendants, and VISCARDI, were material to the value, or lack thereof, of the Purchase.

165.    By means of the foregoing pre-Purchase material misrepresentations, but-for which the Purchase would not have been made, and which resulted in the Purchase, the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI committed a fraud at common law which damaged Plaintiff DURAVEST.

166.    By means of the foregoing post-Purchase misrepresentations as to the existence of pre-Purchase loans and deferred compensation "debts" owed to the MARKOLL Defendants, and which ultimately resulted in monetary transfers to the MARKOLL Defendants, the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI committed a fraud at common law which damaged Plaintiff DURAVEST.

24

167.    At the time of the Purchase, plaintiff justifiably relied upon the oral representations made by the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI.

168.    Following the Purchase, during the time period that the MARKOLL Defendants held positions of management at BMTS, INC., plaintiff justifiably relied upon the oral representations made by the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI.

169.    Plaintiff was induced to enter into the Purchase based upon the material omissions and misrepresentations of the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI, and would not have entered into the Purchase were it not for such misrepresentations and omissions.

170.    As a result, the O'DONNELL Defendants, the MARKOLL Defendants, and VISCARDI, are liable to DURAVEST for damages therefor, in the amount of Nine Million Five Hundred Thousand Dollars ($9,500,000), plus costs, attorneys' fees, and interest from the dates of omission and commission thereof.

### AS AND FOR A SECOND CAUSE OF ACTION
#### ALLEGING THE EXISTENCE OF A CRIMINAL ENTERPRISE
#### AND DAMAGE THEREFROM IN VIOLATION OF 18 U.S.C. §1962(c) and (d)

171.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "170" above, as if fully set forth at length herein.

172.    The foregoing fraudulent representations and misrepresentations were and have been carried out by the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISACRDI, by means of the international and interstate telephone calls and international and interstate faxed correspondences, thereby constituting acts of fraud committed in interstate commerce.

173.    The foregoing fraudulent and unauthorized monetary transfers were ordered and performed by means of interstate money wires and telephone calls, constituting acts of conversion

committed by and through interstate and international commerce, and affect interstate and international commerce within the meaning of 18 U.S.C. § 1962(c) and (d).

174.     The foregoing fraudulent and unauthorized monetary transfers were in violation of 18 U.S.C. §§ 1341 and/or 1343.

175.     The aforementioned November 28, 2005 correspondence, the FY2004 BMTS, INC. financial statement, the pre-Purchase sale presentations, and the post-Purchase monetary transfers totaling approximately Three Million Dollars ($3,000,000), constituted acts of fraud committed by and through interstate and international commerce, and affected interstate and international commerce within the meaning of 18 U.S.C. § 1962(c) and (d).

176.     The defendants conspired and operated the Enterprise knowingly and intentionally to defraud Plaintiff DURAVEST and others.

177.     At all relevant times herein, and by means of the foregoing activities, the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI , by means of their individual and collective participation therein, constituted "persons," and collectively controlled BMTS, INC. (rendering it an "enterprise" within the meaning of 18 U.S.C. §1962(c) and (d), up to the time of its purchase by Plaintiff when the MARKOLL DEFENDANTS relinquished day- to-day control over it, and during that time engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d).

178.     The MARKOLL Defendants, the O'DONNELL Defendants, and VISCARDI, each, jointly and severally, as set forth above, participated in conducting the affairs of the enterprise, in violation of 18 U.S.C. § 1962(c) and (d).

179.     By means of the foregoing, and In violation of 18 U.S.C. § 1962(d), the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI, conspired to engage in a pattern of racketeering activity, as set forth above.

180.   The numerous and fraudulent acts of the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI, jointly and severally, constitute a pattern of racketeering activity affecting interstate commerce within the meaning of 18 U.S.C. § 1961(5) in that said illegal acts have a relationship to each other by reason of having similar objects, methods of commission, common victims, and similar means of transmission.

181.   At all relevant times herein, the O'DONNELL and MARKOLL Defendants, and Defendant VISCARDI, continue to attempt to market and sell the same biomagnetic technologies that were to have been acquired by Plaintiff DURAVEST and the rights to which were to be turned over to Plaintiff DURAVEST as part of the Purchase.

182.   There is a substantial threat that the Enterprise's racketeering activities will continue, as Defendants continue active in the business of selling biomagnetic therapies, including the fraudulent reselling of biomagnetic technologies which were sold to Plaintiff Duravest as part of the Purchase. The racketeering activities associated with the Enterprise constitute defendants' ordinary method of doing business.

183.   By reason of the aforementioned racketeering Enterprise activities, defendants' ability to defraud Plaintiff DURAVEST was enhanced because the illegal operation of the Enterprise facilitated the fraud and aided its concealment, thereby damaging Plaintiff in its business and property.

184.   By means of the foregoing, the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI damaged Plaintiff DURAVEST.

185.   As a result, the O'DONNELL Defendants, the MARKOLL Defendants, and defendant VISCARDI are liable to DURAVEST pursuant to 18 U.S.C. §1964(c) for treble its actual damages therefor,

in the amount of Twenty Eight Million, Five Hundred Thousand Dollars ($28,500,000), plus costs, attorneys' fees, and interest from the dates of omission and commission thereof.

## AS AND FOR A THIRD CAUSE OF ACTION FOR CONVERSION

186.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "185" above, as if fully set forth at length herein.

187.    The aforesaid post-Purchase monetary transfers by the MARKOLL Defendants constituted conversion, as they are were not made with any legitimate business purpose.

188.    By means of the foregoing, the MARKOLL Defendants damaged Plaintiff DURAVEST.

189.    As a result, the MARKOLL Defendants are liable to DURAVEST for its actual damages therefor, in the amount of Three Million Seventy Thousand Dollars ($3,070,000), plus costs, attorneys' fees, and interest from the dates of omission and commission thereof.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT

190.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "189" above, as if fully set forth at length herein.

191.    The MARKOLL Defendants' aforementioned contacts with, and aid to, competitors of BMTS, INC. following the Purchase violated the terms and provisions of MR. MARKOLL's terms of employment with BMTS, INC., as set forth in a  December 29, 2005 Consulting Agreement.

192.    By means of the concerted actions of the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCARDI leading up to the Purchase, the terms and conditions of the Purchase were violated, constituting a breach of contract.

193.    By means of the foregoing, the MARKOLL Defendants damaged Plaintiff DURAVEST.

194.    As a result, the O'DONNELL Defendants, the MARKOLL Defendants, and Defendant VISCADI are liable to DURAVEST for damages in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000); plus costs, attorneys' fees, and interest from the dates of omission and commission thereof.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR PROFESSIONAL MALPRACTICE

195.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "194" above, as if fully set forth at length herein.

196.    That prior to the Purchase, Defendants DRAKE and WOLLMUTH, as legal counsel, were retained to, but failed to provide and/or render, reasonable and proper and sufficient advice, counsel, and perform proper due diligence, in relation to the Purchase.

197.    That prior to the Purchase, Defendants DRAKE and WOLLMUTH, as legal counsel, were retained to, but failed to provide and/or render, reasonable and proper and sufficient advice, counsel, and perform proper due diligence, so as to warn and advise Plaintiff DURAVEST of the significant shortcomings, financial risk of the Purchase.

198.    That prior to the Purchase, Defendants DRAKE and WOLLMUTH, as legal counsel, were retained to, but failed to provide and/or render, reasonable and proper and sufficient advice, counsel, and perform proper due diligence, in relation to; the lack of legal protection, protectability, and verification of claimed "intellectual property" that was to be part and parcel of the Purchase.

199.    That prior to the Purchase, Defendants DRAKE and WOLLMUTH, as legal counsel, were retained to, but failed to provide and/or render, reasonable and proper and sufficient advice, counsel, and perform proper due diligence, in relation to; the claimed lack of adverse legal claims and suits then existing and/or then noticed and/or contemplated against BMTS, which adversely affected the value of BMTS, INC. prior to and following the Purchase.

200.    That prior to the Purchase, Defendants DRAKE and WOLLMUTH, as legal counsel, were retained to, but failed to provide and/or render, reasonable and proper and sufficient advice, counsel, and draft sufficient and proper documentation to ensure the enforceability, sufficiency, and specificity or pre-Purchase representations by the former principals and sellers of BMTS, INC., so as to provide reasonable legal protection to Plaintiff DURAVEST in areas material to the value of BMTS, INC. as a going concern.

29

201.    By means of the foregoing, the Defendants WOLLMUTH and DRAKE damaged Plaintiff DURAVEST.

202.    As a result, Defendants WOLLMUTH and DRAKE are liable to DURAVEST for damages in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000).

**AS AND FOR A SIXTH CAUSE OF ACTION FOR**
**LIABILITY BASED ON VIOLATION OF 15 U.S.C. §78(J)**

203.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "202" above, as if fully set forth at length herein.

204.    That the foregoing misrepresentations were made by use of the mails, wire and telephone lines, in violation of 18 U.S.C. §§ 1341 and 1343.

205.    That based on the foregoing acts and representations, Plaintiff purchased shares in BMTS, INC.

206.    That by means of the foregoing acts and representations, the MARKOLL Defendants and Defendant VISCARDI violated the Securities and Exchange Act of 1934, Rule 10(b)(5) promulgated thereunder.

207.    That the foregoing acts and misrepresentations hid the real and reasonable value of BMTS, INC., which was far less than the value professed by the MARKOLL Defendants, Defendant VISCARDI, and the O'DONNELL Defendants, and rendered the investment a total or substantial loss.

208.    That by reason of the foregoing, the MARKOLL Defendants and Defendant VISCARDI are liable for said conduct pursuant to the provisions of Section 20(a) of the 1934 Securities and Exchange Act in that they offered and sold to Plaintiff securities within the meaning of the Federal Securities Laws by the use of instrumentalities and communication in interstate and foreign commerce whereby (a) they employed a device, scheme or artifice to defraud the plaintiff; (b) they made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

30

and (c) they engaged in transactions, practices, and a course of business which operated as a fraud or deceit upon Plaintiff.

209.    As a result, the MARKOLL Defendants and Defendant VISCARDI are liable to DURAVEST for damages in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000).

**AS AND FOR A SEVENTH CAUSE OF ACTION FOR**
**LIABILITY BASED ON VIOLATION OF 15 U.S.C. §77(I)**

210.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "209" above, as if fully set forth at length herein.

211.    The Defendants' conduct hereinbefore set forth constituted an offer to sell securities pursuant to 15 U.S.C. §77(I) and the Securities and Exchange Act of 1933 §12(2).

212.    The Defendants' conduct hereinbefore set forth constituted a sale of securities pursuant to 15 U.S.C. §77(I) and the Securities and Exchange Act of 1933 §12(2).

213.    The foregoing representations and misrepresentations of the Defendants contained untrue statements of material facts and/or omitted material facts necessary to make them substantially or reasonably true.

214.    The foregoing representations and misrepresentations of the Defendants were made by means of oral and written communications in interstate commerce, including but not limited to the mails.

215.    Plaintiff reasonably relied on the aforementioned representations and communications of the Defendants.

216.    The foregoing representations and misrepresentations of the Defendants were in violation of 15 U.S.C. §77(I).

217.    As a result of the foregoing, the reasonable share value of BMTS, INC. shares has depreciated.

31

218.    As a result, the MARKOLL Defendants and Defendant VISCARDI are liable to DURAVEST for damages in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000).

### AS AND FOR A EIGHTH CAUSE OF ACTION FOR
### COMMON LAW NEGLIGENCE

219.    Plaintiff repeats and reiterates each and every allegation in the paragraphs numbered "1" through and including "218" above, as if fully set forth at length herein.

220.    That prior to the Purchase, Defendants had a duty to Plaintiff to reasonably and accurately portray the financial value, financial prospects, liabilities and prospective liabilities, accounts payable and accounts receivable of BMTS, INC.

221.    That by means of the foregoing acts, representations, and/or negligent misrepresentations, Defendants breached their duty to reasonably and accurately portray the financial value, financial prospects, good will value, liabilities and prospective liabilities, accounts payable and accounts receivable of BMTS, INC. prior to the Purchase.

222.    That by means of the foregoing acts, representations, and/or negligent misrepresentations, Defendants negligently induced and/or caused Plaintiff DURAVEST to consummate the Purchase.

223.    By means of the foregoing, the Defendants damaged Plaintiff DURAVEST.

224.    As a result, the MARKOLL Defendants, Defendant VISCARDI, and the O'DONNELL Defendants are liable to DURAVEST for damages in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000).

WHEREFORE, Plaintiff DURAVEST demands judgment against defendants, jointly and severally: on the First Cause of Action, in the amount of Nine Million Five Hundred Thousand Dollars ($9,500,000), plus costs, attorneys' fees, and interest from the dates of omission and commission thereof; on the Second Cause of Action, in the amount of Twenty Eight Million, Five Hundred Thousand Dollars ($28,500,000), plus costs, attorneys' fees, and interest from the dates of

omission and commission thereof; on the Third Cause of Action, in the amount of Three Million Seventy Thousand Dollars ($3,070,000), plus costs, attorneys' fees, and interest from the dates of omission and commission thereof; on the Fourth Cause of Action, in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000); plus costs, attorneys' fees, and interest from the dates of omission and commission thereof; on the Fifth Cause of Action, in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000); and on the Sixth Cause of Action, in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000); on the Seventh Cause of Action, in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000); and on the Eighth Cause of Action, in the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000).

Dated:      White Plains, New York
            November 21, 2007

                                        Respectfully submitted,

                                        RAS ASSOCIATES, PLLC
                                        Attorneys for Plaintiff
                                        Ten Bank Street
                                        White Plains, N.Y. 10606
                                        (914) 289-2909

                                        By:_____s/LFR_____
                                            Luis F. Ras (LFR 9989)

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DURAVEST, INC.,                              Docket No.: 07 CIV 10590 (JSR)

                          Plaintiff,         ANSWER AND
                                             CROSS-CLAIMS
        -against-

VISCARDI, AG; WOLLMUTH MAHER &               DEFENDANTS DEMAND
DEUTSCH, LLP.; MASON H. DRAKE,               TRIAL BY JURY
ESQ.; BRUCE O'DONNELL, CPA,
BRUCE O'DONNELL CPA/PFS,
P.A., BIOMEDICAL CONSULTANT SL,
RICHARD MARKOLL, and
ERNESTINE BINDER MARKOLL,

                          Defendants.

--------------------------------------------------------x

        Defendants WOLLMUTH MAHER & DEUTSCH LLP

("WOLLMUTH") and MASON H. DRAKE, ESQ. ("DRAKE"), by their attorneys,

ABRAMS, GORELICK, FRIEDMAN & JACOBSON, P.C., as and for their Answer and

Cross-Claims to plaintiff's Complaint allege, upon information and belief, as follows:

                          JURY DEMAND

        1.      Neither admits nor denies each and every allegation set forth in

paragraph "1" of the Complaint as no response is required to an allegation demanding a

jury trial.

        NATURE OF ACTION AND SUBJECT MATTER JURISDICTION

        2.      Deny each and every allegation set forth in paragraph "2" of the

Complaint.

3.      Deny each and every allegation set forth in paragraph "3" of the Complaint and refer to the contents of the documents.

4.      Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "4" of the Complaint.

5       Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "5" of the Complaint.

6.      Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraph "6" of the Complaint, except deny each and every allegation set forth in paragraph "6" of the Complaint concerning WOLLMUTH and DRAKE.

7.      Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "7" of the Complaint.

8.      Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "8" of the Complaint.

9.      Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "9" of the Complaint.

10.     Deny each and every allegation set forth in paragraph "10" of the Complaint and refer all questions of law to the Court.

PARTIES AND VENUE

11.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "11" of the Complaint.

12.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "12" of the Complaint.

2

13. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "13" of the Complaint.

14. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "14" of the Complaint.

15 Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "15" of the Complaint.

16. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "16" of the Complaint.

17. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "17" of the Complaint.

18. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "18" of the Complaint.

19. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "19" of the Complaint.

20. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "20" of the Complaint.

21. Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "21" of the Complaint.

22. Admit the allegations contained in paragraph "22" of the Complaint.

22. Admit the allegations contained in paragraph "23" of the Complaint.

24.     Deny each and every allegation set forth in paragraph "24" of the Complaint, except admit that at all relevant times, DRAKE was a contract partner employee at the WOLLMUTH firm but held no equity interest.

25.     Deny each and every allegation set forth in paragraph "25" of the Complaint, except admit that at times, DRAKE and WOLLMUTH did perform certain legal services for DURAVEST.

26.     Deny each and every allegation set forth in paragraph "26" of the Complaint, except admit that at times, DRAKE did perform certain legal services for DURAVEST.

27.     Deny each and every allegation set forth in paragraph "27" of the Complaint, except admit that at times, DRAKE and WOLLMUTH performed certain legal services for DURAVEST.

28.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "28" of the Complaint.

29.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "29" of the Complaint.

30.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "30" of the Complaint.

31.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "31" of the Complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "32" of the Complaint.

33.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "33" of the Complaint.

34.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "34" of the Complaint.

35.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "35" of the Complaint.

36.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "36" of the Complaint.

37.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "37" of the Complaint.

38.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "38" of the Complaint.

39.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "39" of the Complaint.

40.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "40" of the Complaint.

41.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "41" of the Complaint.

42.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "42" of the Complaint.

43.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "43" of the Complaint.

44.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "44" of the Complaint.

45.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "45" of the Complaint.

46.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "46" of the Complaint.

47.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "47" of the Complaint.

48.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "48" of the Complaint.

49.     Deny each and every allegation set forth in paragraph "49" of the Complaint and refers all questions of law to the Court.

50.     Deny each and every allegation set forth in paragraph "50" of the Complaint and refer all questions of law to the Court.

## FACTUAL BACKGROUND

### BMTS Corporate Pedigree

51.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "51" of the Complaint.

52.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "52" of the Complaint.

53.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "53" of the Complaint.

54.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "54" of the Complaint.

55.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "55" of the Complaint.

56.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "56" of the Complaint.

57.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "57 of the Complaint.

58.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "58" of the Complaint.

59.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "59" of the Complaint.

60.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "60" of the Complaint.

61.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "61" of the Complaint.

62.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "62" of the Complaint.

63.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "63" of the Complaint.

64.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "64" of the Complaint.

Certain Defendants' Wrongful Pre-Purchase Representations

A.    Individual Professional Backgrounds and Criminal History

65.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "65" of the Complaint.

66.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "66" of the Complaint.

67.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "67" of the Complaint.

68.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "68" of the Complaint.

69.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "69" of the Complaint.

70.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "70" of the Complaint.

71.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "71" of the Complaint.

72.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "72" of the Complaint.

73.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "73" of the Complaint.

B.    BMTS Intellectual Property "Rights"

74.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "74" of the Complaint.

8

75.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "75" of the Complaint.

76.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "76" of the Complaint.

77.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "77" of the Complaint.

78.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "78" of the Complaint.

79.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "79" of the Complaint.

C.    Clinical Studies and Results

80.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "80" of the Complaint.

81.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "81" of the Complaint.

D.    BMTS Operating Income

82.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "82" of the Complaint.

83.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "83" of the Complaint.

84.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "84" of the Complaint.

85.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "85" of the Complaint.

E.    Loans Claimed from BMTS

86.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "86" of the Complaint.

87.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "87" of the Complaint.

88.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "88" of the Complaint.

F.    Use of Telephone and Wire Services

89.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "89" of the Complaint.

90.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "90" of the Complaint.

91.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "91" of the Complaint.

Certain Defendants' Wrongful Post-Purchase Acts

A.    Failure to Transfer, and Misuse of, Intellectual Property Rights

92.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "92" of the Complaint.

93.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "93" of the Complaint.

10

94.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "94" of the Complaint.

95.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "95" of the Complaint.

B.    Conversion of Transferred Purchase Monies

96.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "96" of the Complaint.

97.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "97" of the Complaint.

98.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "98" of the Complaint.

99.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "99" of the Complaint.

100.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "100" of the Complaint.

101.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "101" of the Complaint.

D.    Violation of Non-Competition Agreements

102.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "102" of the Complaint.

103.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "103" of the Complaint.

104.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "104" of the Complaint.

105.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "105" of the Complaint.

VISCARDI

106.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "106" of the Complaint.

107.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "107" of the Complaint.

108.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "108" of the Complaint.

109.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "109" of the Complaint.

110.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "110" of the Complaint.

111.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "111" of the Complaint.

112.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "112" of the Complaint.

113.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "113" of the Complaint.

114.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "114" of the Complaint.

115.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "115" of the Complaint.

116.     Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "116" of the Complaint.

117.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "117" of the Complaint.

118.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "118" of the Complaint.

<u>Wollmuth</u>

119.    Deny each and every allegation set forth in paragraph "119" of the Complaint, except admit that, at times, WOLLMUTH and DRAKE did provide certain legal services to plaintiff.

120.    Deny each and every allegation set forth in paragraph "120" of the Complaint, except admit that WOLLMUTH and DRAKE were attorneys licensed to practice law in New York, whose practice included corporate matters.

121.    Deny each and every allegation set forth in paragraph "121" of the Complaint, except admit that, at times, WOLLMUTH and DRAKE did provide certain legal services to plaintiff.

122.    Deny each and every allegation set forth in paragraph "122" of the Complaint, except admit that, at times, WOLLMUTH and DRAKE did provide certain legal services to plaintiff.

123.    Deny each and every allegation set forth in paragraph "123" of the Complaint.

124.    Deny each and every allegation set forth in paragraph "124" of the Complaint.

125.    Deny each and every allegation set forth in paragraph "125" of the Complaint, except admit that, at times, WOLLMUTH and DRAKE did provide certain legal services to plaintiff.

O'Donnell Defendants

126.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "126" of the Complaint.

127.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "127" of the Complaint.

128.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "128" of the Complaint.

129.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "129" of the Complaint.

130.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "130" of the Complaint.

131.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "131" of the Complaint.

132.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "132" of the Complaint.

133.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "133" of the Complaint.

134.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "134" of the Complaint.

135.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "135" of the Complaint.

136.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "136" of the Complaint.

137.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "137" of the Complaint.

138.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "138" of the Complaint.

139.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "139" of the Complaint.

<u>Markoll Defendants</u>

140.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "140" of the Complaint.

141.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "141" of the Complaint.

142.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "142" of the Complaint.

143.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "143" of the Complaint.

144.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "144" of the Complaint.

145.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "145" of the Complaint.

146.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "146" of the Complaint.

147.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "147" of the Complaint.

148.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "148" of the Complaint.

149.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "149" of the Complaint.

150.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "150" of the Complaint.

151.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "151" of the Complaint.

152.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "152" of the Complaint.

153.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "153" of the Complaint.

154.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "154" of the Complaint.

155.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "155" of the Complaint.

156.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "156" of the Complaint.

Damages Resulting Directly From Purchase

157.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "157" of the Complaint and respectfully refer the Court to the documents memorializing the transaction.

158.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "158" of the Complaint and respectfully refer the Court to the documents memorializing the transaction.

159.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "159" of the Complaint and respectfully refer the Court to the documents memorializing the transaction.

160.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "160" of the Complaint and respectfully refer the Court to the documents memorializing the transaction.

161.    Deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "161" of the Complaint and respectfully refer the Court to the documents memorializing the transaction.

AS AND FOR AN ANSWER TO THE FIRST CAUSE OF ACTION
FOR COMMON LAW FRAUD

162.    Repeat, reiterate and reallege each and every response to paragraphs "1" through "161", inclusive, of the Complaint in answer to paragraph "162" of the Complaint, with the same force and effect as if fully set forth herein.

163.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "163" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these

18

answering defendants deny each and every allegation set forth in paragraph "163" of the Complaint.

164.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "164" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "164" of the Complaint.

165.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "165" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "165" of the Complaint.

166.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "166" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "166" of the Complaint.

167.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "167" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "167" of the Complaint.

168.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "168" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "168" of the Complaint.

169.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "169" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "169" of the Complaint.

170.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "170" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "170" of the Complaint.

AS AND FOR AN ANSWER TO THE SECOND CAUSE OF ACTION
ALLEGING THE EXISTENCE OF A CRIMINAL ENTERPRISE
AND DAMAGE THEREFROM IN VIOLATION OF 18 U.S.C. §1962(c) and (d)

171.    Repeat, reiterate and reallege each and every response to paragraphs "1" through "170", inclusive, of the Complaint in answer to paragraph "171" of the Complaint, with the same force and effect as if fully set forth herein.

172.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "171" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these

20

answering defendants deny  knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "172" of the Complaint.

173.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "173" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "173" of the Complaint and refer all questions of law to the Court.

174.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "174" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "174" of the Complaint and refer all questions of law to the Court.

175.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "175" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "175" of the Complaint and refer all questions of law to the Court.

176.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "176" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny each and every allegation set forth in paragraph "176" of the Complaint.

177.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "177" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "177" of the Complaint and refer all questions of law to the Court.

178.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "178" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "178" of the Complaint and refer all questions of law to the Court.

179.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "179" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "179" of the Complaint and refer all questions of law to the Court.

180.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "180" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these

22

answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "180" of the Complaint and refer all questions of law to the Court.

181.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "181" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "181" of the Complaint.

182.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "182" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "182" of the Complaint.

183.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "183" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraph "183" of the Complaint.

184.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "184" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "184" of the Complaint.

185.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "185" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "185" of the Complaint and refer all questions of law to the Court.

AS AND FOR AN ANSWER TO THE THIRD CAUSE OF ACTION<br>FOR CONVERSION

186.    Repeat, reiterate and reallege each and every response to paragraphs "1" through "185", inclusive, of the Complaint in answer to paragraph "186" of the Complaint, with the same force and effect as if fully set forth herein.

187.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "187" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "187" of the Complaint.

188.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "188" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "188" of the Complaint.

189.    These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "189" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "189" of the Complaint.

AS AND FOR AN ANSWER TO THE FOURTH CAUSE OF ACTION<br>FOR BREACH OF CONTRACT

190.    Repeat, reiterate and reallege each and every response to

paragraphs "1" through "189", inclusive, of the Complaint in answer to paragraph "190"

of the Complaint, with the same force and effect as if fully set forth herein.

191.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "191" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "191" of the Complaint.

192.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "192" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "192" of the Complaint.

193.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "193" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "193" of the Complaint.

194.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "194" because the allegations do not make any claims

25

against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraph "194" of the Complaint.

AS AND FOR AN ANSWER TO THE FIFTH CAUSE OF ACTION
FOR PROFESSIONAL MALPRACTICE

195.    Repeat, reiterate and reallege each and every response to paragraphs "1" through "194", inclusive, of the Complaint in answer to paragraph "195" of the Complaint, with the same force and effect as if fully set forth herein.

196.    Deny each and every allegation set forth in paragraph "196" of the Complaint.

197.    Deny each and every allegation set forth in paragraph "197" of the Complaint.

198.    Deny each and every allegation set forth in paragraph "198" of the Complaint.

199.    Deny each and every allegation set forth in paragraph "199" of the Complaint.

200.    Deny each and every allegation set forth in paragraph "200" of the Complaint.

201.    Deny each and every allegation set forth in paragraph "201" of the Complaint.

202.    Deny each and every allegation set forth in paragraph "202" of the Complaint.

AS AND FOR AN ANSWER TO THE SIXTH CAUSE OF ACTION
FOR LIABILITY BASED ON VIOLATION OF 15 U.S.C. §78(J)

203.    Repeat, reiterate and reallege each and every response to

paragraphs "1" through "202", inclusive, of the Complaint in answer to paragraph "203"

of the Complaint, with the same force and effect as if fully set forth herein.

204.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "204" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "204" of the Complaint and refer

all questions of law to the Court.

205.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "205" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "205" of the Complaint.

206.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "206" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "206" of the Complaint and refer

all questions of law to the Court.

207.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "207" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "207" of the Complaint.

208.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "208" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "208" of the Complaint and refer

all questions of law to the Court.

209.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "209" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "209" of the Complaint.

AS AND FOR A SEVENTH CAUSE OF ACTION FOR
LIABILITY BASED ON VIOLATION OF 15 U.S.C. §77(1)

210.    Repeat, reiterate and reallege each and every response to

paragraphs "1" through "209", inclusive, of the Complaint in answer to paragraph "210"

of the Complaint, with the same force and effect as if fully set forth herein.

211.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "211" because the allegations do not make any claims

against WOLLMUTH and DRAKE.  To the extent a response is required, these

answering defendants deny each and every allegation set forth in paragraph "211" of the

Complaint and refer all questions of law to the Court.

212.     These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "212" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraph "212" of the Complaint and refer all questions of law to the Court.

213.     These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "213" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraph "213" of the Complaint.

214.     These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "214" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraph "214" of the Complaint.

215.     These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "215" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraph "215" of the Complaint.

216.     These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "216" because the allegations do not make any claims against WOLLMUTH and DRAKE.  To the extent a response is required, these

29

answering defendants deny each and every allegation set forth in paragraph "216" of the

Complaint and refer all questions of law to the Court.

217.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "217" because the allegations do not make any claims

against WOLLMUTH and DRAKE. To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "217" of the Complaint.

218.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "218" because the allegations do not make any claims

against WOLLMUTH and DRAKE. To the extent a response is required, these

answering defendants deny knowledge or information sufficient to form a belief as to the

truth of each and every allegation set forth in paragraph "218" of the Complaint.

### AS AND FOR AN ANSWER TO THE EIGHTH CAUSE OF ACTION
### FOR COMMON LAW NEGLIGENCE

219.    Repeat, reiterate and reallege each and every response to

paragraphs "1" through "218", inclusive, of the Complaint in answer to paragraph "219"

of the Complaint, with the same force and effect as if fully set forth herein.

220.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "220" because the allegations do not make any claims

against WOLLMUTH and DRAKE. To the extent a response is required, these

answering defendants deny each and every allegation set forth in paragraph "220" of the

Complaint and refer all questions of law to the Court.

221.    These answering defendants neither admit nor deny the truth of the

allegations contained in paragraph "221" because the allegations do not make any claims

30

against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraphs "221" of the Complaint.

   222. These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "222" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraphs "222" of the Complaint.

   223. These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "223" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny each and every allegation set forth in paragraphs "223" of the Complaint.

   224. These answering defendants neither admit nor deny the truth of the allegations contained in paragraph "224" because the allegations do not make any claims against WOLLMUTH and DRAKE. To the extent a response is required, these answering defendants deny knowledge or information sufficient to form a belief as to the truth of each and every allegation set forth in paragraphs "224" of the Complaint.

## AS AND FOR A FIRST DEFENSE

225.    This Court lacks subject matter jurisdiction over this matter, and as a result, this Court should not exercise supplemental jurisdiction over the claims asserted against these answering defendants.

## AS AND FOR A SECOND DEFENSE

226.    At the time that these answering defendants were contacted in connection with DURAVEST's proposed acquisition of BMTS, a Subscription Agreement that outlined the key terms of the acquisition had already been prepared by others.

## AS AND FOR A THIRD DEFENSE

227.    At the time these answering defendants were first substantively contacted in connection with DURAVEST's proposed acquisition of BMTS, a Subscription Agreement which outlined the key terms of the agreement, prepared by others, had been signed on November 25, 2005, by Ogan Gurel, M.D., on behalf of DURAVEST, and by RICHARD MARKOLL, M.D., on behalf of BMTS.

## AS AND FOR A FOURTH DEFENSE

228.    Prior to the signing of the Subscription Agreement, due diligence regarding the transaction and an analysis of the transaction, had been completed by others.

## AS AND FOR A FIFTH DEFENSE

229.    Paragraph 4 of the signed Subscription Agreement is entitled "Representations," and includes representations and warranties of Subscriber DURAVEST with regard to its independent investigation and analysis of the investment

32

in BMTS. Paragraph 4(a) of the signed Subscription Agreement is entitled "Analysis of

Investment". Those sections, together, state as follows:

> "4.    Representations
>
> In connection with the Subscriber's subscription for Shares and becoming a holder of Shares, the Subscriber hereby represents, warrants, acknowledges, covenants and agrees as follows:
>
> a.    Analysis of Investment. The undersigned has (i) analyzed and reviewed the investment, and (ii) had an opportunity to ask questions of and receive answers from BMTS officers and directors concerning subscription, and to obtain any additional information which BMTS possesses or can acquire that is necessary to verify the accuracy of the information furnished. In particular, the Subscriber acknowledges and agrees that the Subscriber has been given access to, or has been furnished with, all material books and records of BMTS and all material contracts and documents. All questions have been answered, and all additional information has been provided, all to the full satisfaction of the undersigned."

In addition, paragraph 4(i) of the Subscription Agreement, entitled "Risk

of Loss," contains the following representation and warranty of plaintiff Subscriber

DURAVEST:

> "The Subscriber recognizes that an investment in the Shares is highly speculative and involves a substantial risk of loss of the entire investment, and involves significant and material risks."

<u>AS AND FOR A SIXTH DEFENSE</u>

230.    Based on the representation in the Subscription Agreement, set

forth in the immediately preceding affirmative defense, these answering defendants were

justified in relying on those Representations, e.g., that due diligence had been performed

by others, prior to the execution of the Subscription Agreement.

<u>AS AND FOR A SEVENTH DEFENSE</u>

231.    These answering defendants also had been advised by and had

relied upon statements made by Ogan Gurel of DURAVEST that due diligence has been

completed by VISCARDI.

<u>AS AND FOR AN EIGHTH DEFENSE</u>

232.    After review of the signed subscription agreement, which

contained no representations from BMTS to DURAVEST, DRAKE counseled

DURAVEST to secure Representations and Warranties from BMTS.  In furtherance of

that counsel, DRAKE forwarded an e-mail to Martin Schaffer, Esq. of the law firm of

Shulman, Rogers, Gandal, Pordy and Ecker, P.A., counsel for BMTS, requesting

Representations and Warranties to DURAVEST.  That e-mail, dated November 28, 2005,

3:40 p.m. (CST), provided the following:

> "Martin – I'm a lawyer representing Duravest and only just had a
> chance after the Thanksgiving holiday to review the Subscription
> Agreement in any detail.  From a due diligence perspective, it does
> not contain the usual reps and warranties I would expect from an
> issuer such as existence, authorization, no conflicts, capitalization,
> absence of litigation, financials, etc.  I do not propose making these
> onerous but I do think it necessary that we either amend the
> Subscription Agreement to contain them or fashion a side letter to
> the Subscription Agreement.
>
> Please let me know if this is acceptable to you and I'll draft a set of
> the relevant provisions.
>
> Best regards,
>
> Max Drake"

## AS AND FOR A NINTH DEFENSE

233.    Upon receipt of the e-mail, referred to in the immediately

preceding affirmative defense, counsel for BMTS responded by e-mail dated November

28, 2005 2:49 p.m. (EST).  The responding e-mail constitutes an admission that due

diligence for the proposed acquisition had been completed by the VISCARDI GROUP.

The e-mail provided:

> "Max,
>
> I did not include those reps or warranties because Viscardi Group
> had already undertaken that review.  Nonetheless, if you are
> suggesting some basic reps and it will help to move this transaction
> along, I am sure we can reach an agreement.  Please send me your
> proposal."

The foregoing reliance on VISCARDI by plaintiff DURAVEST with respect to the due

diligence analysis of BMTS was independently confirmed orally to DRAKE by Dr. Ogan

Gurel, CEO of DURAVEST, and certain legal due diligence due diligence documents of

BMTS being in the possession of and transmitted to DRAKE by VISCARDI and its in-

house lawyer.

## AS AND FOR A TENTH DEFENSE

234.    When DURAVEST initially contacted WOLLMUTH and

DRAKE, DURAVEST directed that WOLLMUTH and DRAKE work solely to draft the

promissory notes necessary to provide for the financing of the proposed acquisition.  Said

promissory notes were prepared by DRAKE on November 28, 2005.

## AS AND FOR AN ELEVENTH DEFENSE

235.    The defendants WOLLMUTH and DRAKE have not breached

any duty that they may have owed to plaintiff DURAVEST.

## AS AND FOR A TWELFTH DEFENSE

236.    There were no actual or ascertainable damages sustained by plaintiff DURAVEST proximately caused by the conduct of the defendants WOLLMUTH and DRAKE.

## AS AND FOR A THIRTEENTH DEFENSE

237.    Plaintiff DURAVEST is unable to establish that but for the alleged professional negligence of WOLLMUTH and DRAKE, it would not have sustained actual or ascertainable damages and/or that, the result would have been more favorable to it.

## **AS AND FOR A FOURTEENTH DEFENSE**

238.    That if the accident, injuries and damages occurred as alleged by DURAVEST in its Complaint, said injuries and/or damages were, in whole or in part, attributable to the culpable conduct of DURAVEST including, but not limited to, negligence, carelessness, recklessness and/or assumption of risk.

239.    By reason of the foregoing, this answering defendants demand that any damages recovered or any judgment recovered by plaintiff against said defendants be reduced accordingly, pursuant to the common law and CPLR § 1411, in the proportion which the culpable conduct attributable to plaintiff bears to the culpable conduct, if any, of said defendant.

## **AS AND FOR A FIFTEENTH DEFENSE**

240.    Plaintiff's Complaint fails to state a cause of action upon which relief may be granted against these answering defendants.

## **AS AND FOR A SIXTEENTH DEFENSE**

36

241.    That, to the extent that the alleged damages and/or injuries of plaintiff, if any, were caused or contributed to, in whole or in part, by intervening and superseding causative factors, the claims of plaintiff against this answering defendants should be barred.

### AS AND FOR A SEVENTEENTH DEFENSE

242.    Pursuant to the limited liability provisions of § 1601 of the Civil Practice Law and Rules, these answering defendants' liability, if any, shall be limited to their respective equitable share of the total liability.

### AS AND FOR AN EIGHTEENTH DEFENSE

243.    If the plaintiff was damaged as alleged in its Complaint, which damages are expressly denied, then such damages were the result, in whole or in part, of the conduct of the plaintiff and/or others over whom the answering defendants exercised no influence or control and to the extent that the answering defendants may be liable to the plaintiff, such liability should be in proportion to the percentage that the answering defendants' conduct relates to the conduct of the plaintiff and/or others in causing the damage, and apportioned pursuant to Articles 14 and 16 of the CPLR.

### AS AND FOR A NINETEENTH DEFENSE

244.    Plaintiff DURAVEST has failed to take the necessary steps to mitigate their damages.

### AS AND FOR A TWENTIETH DEFENSE

245.    The damages which plaintiff claims to have sustained were not reasonably foreseeable to these answering defendants.

246.     These answering defendants reserve their rights to assert additional

defenses as they arise during this litigation.

## AS AND FOR A FIRST CROSS-CLAIM
## AGAINST VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL

247.     That if the plaintiff was caused to sustain injuries and/or damages at the time and place and in the manner set forth in the plaintiff's Complaint through any carelessness, recklessness, negligence, acts, omissions, and/or breaches of duty and/or warranty and/or contract and/or statute, other than the plaintiff's own negligence, carelessness, recklessness, or other culpable conduct, said damages were sustained by reason of the carelessness, recklessness, negligence and/or affirmative acts of omission and commission including, but not limited to, breach of contract, and/or warranty and/or statute by the co-defendants, VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL, their agents, servants and/or employees, without any negligence or other culpable conduct on the part of the answering defendant contributing thereto.

248.     That by reason of the foregoing, the answering defendants will not be liable to the plaintiff or the co-defendants in the event and in the amount of recovery herein by the plaintiff, and the answering defendants are entitled to indemnification from the co-defendants, VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL.

## AS AND FOR A SECOND CROSS-CLAIM
## AGAINST VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL

249.    That if the plaintiff was caused to sustain injuries and/or damages

at the time and place and in the manner set forth in the plaintiff's Complaint through any

carelessness, recklessness, negligence, acts, omissions, and/or breaches of duty and/or

warranty and/or contract and/or statute, or other culpable conduct, other than the

plaintiff's own negligence, carelessness, recklessness, or other culpable conduct, and if

plaintiff should recover a verdict or judgment against the answering defendant, they will

be damaged thereby, and such injuries or damages and verdict or judgment will have

been brought about, cause and sustained by reason of the active and/or primary and/or

affirmative carelessness, recklessness, negligence, culpable conduct and/or affirmative

acts of omission and commission including, but not limited to, breach of contract, and/or

warranty and/or statute and/or wrongdoing by the co-defendants, VISCARDI, AG,

BRUCE O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL

CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL,

their agents, servants and/or employees, without any negligence on the part of the

answering defendant contributing thereto or with the negligence, if any, on the part of the

answering defendant, which is specifically denied, being merely passive, secondary

and/or derivative in nature.  By reason of the foregoing, the answering defendants are

entitled to indemnification by said co-defendants, VISCARDI, AG, BRUCE

O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL

CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL.

250.    By reason of the foregoing, if plaintiff recovers any verdict or

judgment against the answering defendants, the co-defendants, VISCARDI, AG, BRUCE

O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL

CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL,

will be liable to the answering defendant under the doctrine of apportionment,

contribution and/or indemnification for the full amount of any verdict and judgment, or

for a proportionment share thereof, that plaintiff may recover against or from the

answering defendant, including, but not limited to, the costs of investigation and

attorneys' fees and disbursements incurred in the defense of this action and the

prosecution of this cross-claim, and the answering defendant will not be liable to the co-

defendants, VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL,

CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and

ERNESTINE BINDER MARKOLL, in the event and in the amount of any recovery

herein by the plaintiff.

WHEREFORE, the answering defendants, WOLLMUTH MAHER &

DEUTSCH LLP and MASON H. DRAKE, ESQ., demand judgment dismissing the

Complaint as to them, together with the costs and disbursements of this action, or, in the

alternative, demand that the ultimate rights of the plaintiff, answering defendants, and co-

defendants, VISCARDI, AG, BRUCE O'DONNELL, CPA, BRUCE O'DONNELL,

CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL, RICHARD MARKOLL and

ERNESTINE BINDER MARKOLL, be determined in this action with regard to all

claims, and cross-claims and that the answering defendants have judgment over and

against the plaintiff, and the co-defendants, VISCARDI, AG, BRUCE O'DONNELL,

41

CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL CONSULTANT SL,

RICHARD MARKOLL and ERNESTINE BINDER MARKOLL, each of them, in the

proportion that each of their culpable conduct bears to the entire culpable conduct

involved in the occurrence, and have judgment over and against, and indemnity from the

plaintiff, DURAVEST, INC. and the co-defendants, VISCARDI, AG, BRUCE

O'DONNELL, CPA, BRUCE O'DONNELL, CPA/PFS, P.A. BIOMEDICAL

CONSULTANT SL, RICHARD MARKOLL and ERNESTINE BINDER MARKOLL,

together with the costs and disbursements of this action, and with such other relief as this

Court deems just and proper.

Dated: New York, New York
    February 1, 2008

                          ABRAMS, GORELICK, FRIEDMAN &
                          JACOBSON, P.C.
                          Attorneys for Defendant
                          Wollmuth Maher & Deutsch LLP
                          and Mason H. Drake, Esq.

                          By:_____
                              Barry Jacobs (BJ-0216)
                          One Battery Park Plaza – 4th Floor
                          New York, New York  10004
                          (212) 422-1200

EXHIBIT C

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2003 AND 2004**

**BIO-MAGNETIC THERAPY SYSTEMS, INC.
AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2003 and 2004**

|  | Page |
|---|---|
| Accountants Compilation Report | 1 |
| Financial Statements | |
|    Consolidated Balance Sheets | 2 |
|    Consolidated Statements of Operations | 3 |
|    Consolidated Statements of Stockholders' (Deficit) | 4 |
|    Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-11 |

## BRUCE J. O'DONNELL, CPA/PFS, PA

*Certified Public Accountant*
*Personal Financial Specialist*

**MEMBER**
Florida Institute of
Certified Public Accountants
American Institute of
Certified Public Accountants

21301 Powerline Road
Suite #102
Boca Raton, Fl 33433-2309
(561) 883-1210
Fax (561) 883-1252
Email bod@cpapfs.net

**LICENSED**
In Florida
and New York

To the Board of Directors and
Stockholders of
Bio-Magnetic Therapy Systems, Inc.
And Subsidiaries

### ACCOUNTANTS REPORT

We have compiled the accompanying consolidated balance sheets of Bio-Magnetic Therapy Systems, Inc and Subsidiaries as of December 31, 2003 and 2004 and the related consolidated statements of operations, stockholders' (deficit) and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting, in the form of financial statements, information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

*B od CPA PA*

Bruce J. O'Donnell, C.P.A., P.A.
May 31, 2005

Securities offered through Medallion Investment Services, Inc.*
Member NASD/SIPC (410) 544-8400
271 53rd Circle, Vero Beach, Fl 32968
Investment Advice offered through Medallion Advisory Services, LLC*
Registered Investment Advisor
*Wholly owned subsidiary of TMG Holding Company, Inc.
T/A The Medallion Group

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
### AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
December 31, 2003 and 2004

|  | RESTATED 2003 | 2004 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents (Note 2b) | $739,443 | $876,610 |
| Accounts Receivable net of allowance of $887,898 for 2003 and 2004 (Note 3, 15) | 878,544 | 952,695 |
| Inventories (Note 2c) | 343,646 | 612,559 |
| Prepaid and other assets | 18,130 | 1,427 |
| Total Current Assets | 1,979,763 | 2,443,291 |
| Property and Equipment (Note 4) | 114,411 | 102,590 |
| Other Assets | | |
| Other Receivables net of allowance of $328,155 for 2003 (Note 13) | 580,103 | 0 |
| Patents (Note 5) | 0 | 619,334 |
| Total Current Assets | 580,103 | 619,334 |
| TOTAL ASSETS | $2,674,277 | $3,165,215 |

### LIABILITIES AND STOCKHOLDERS' DEFICIT

|  | 2003 | 2004 |
|---|---|---|
| Current Liabilities | | |
| Accounts payable and accrued expenses (Note 6, 12) | $1,755,037 | $1,557,208 |
| Deferred Compensation (Note 10) | 656,261 | 826,261 |
| Deferred revenue - current portion | 1,130 | 49,357 |
| Accrued Litigation Settlement - current portion (Note 12) | 34,000 | 0 |
| Notes payable - current portion (Note 7) | 1,685,000 | 695,870 |
| Total Current Liabilities | 4,131,428 | 3,128,696 |
| Long-Term Liabilities | | |
| Accrued Litigation Settlement (Note 12) | 475,000 | 475,000 |
| Total Long-Term Liabilities | 475,000 | 475,000 |
| Stockholders' Deficit | | |
| Common Stock, par value $.01, 15,000,000 shares authorized, 9,276,549 shares issued and outstanding for 2003 and 2004 | 92,765 | 92,765 |
| Paid in Capital | 6,965,207 | 6,965,207 |
| Accumulated Deficit | (9,076,425) | (7,733,041) |
| Foreign currency translation adjustment (Note 2h) | 86,302 | 236,588 |
| Total Stockholders' Deficit | (1,932,151) | (438,481) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $2,674,277 | $3,165,215 |

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Years Ended December 31, 2003 and 2004**

|  | RESTATED 2003 | 2004 |
|---|---|---|
| Revenue | $5,700,560 | $8,164,343 |
| Cost of Goods Sold | 261,938 | 1,085,521 |
| Gross Margin | 5,438,622 | 7,078,822 |
| Operating Expenses |  |  |
| Cost of Operations | 2,996,423 | 3,051,641 |
| Payroll and related items | 1,391,532 | 2,648,157 |
| Depreciation and Amortization (Notes 4, 5) | 36,040 | 90,927 |
| Total Operating Expenses | 4,423,995 | 5,790,725 |
| Other (Expenses)Income |  |  |
| Interest (Expense) | (132,738) | (144,210) |
| Interest Income | 1,383 | 1,805 |
| Other (Expenses) Income (Notes 2g, 13) | (263,418) | 197,692 |
| Total Other (Expenses)Income - Net | (394,773) | 55,287 |
| Net Income | 619,854 | 1,343,384 |
| Other Comprehensive Income |  |  |
| Foreign Currency Translation | 67,867 | 150,286 |
| Total Comprehensive Net Income | $687,721 | $1,493,670 |

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' (DEFICIT)**
**For the Years Ended December 31, 2003 and 2004**

| | Common Stock | Stock Subscription Receivable | Accumulated Deficit | Foreign Currency Translation Adjustment | Paid-In Capital | Total Stockholders' (Deficit) |
|---|---|---|---|---|---|---|
| December 31, 2002 | $92,765 | $0 | ($9,696,279) | $18,435 | $6,965,207 | ($2,619,872) |
| Issuance of Stock | - | - | - | - | - | 0 |
| Net Income | - | - | 619,854 | - | - | 619,854 |
| Translation Adjustment | - | - | - | 67,867 | - | 67,867 |
| December 31, 2003 | 92,765 | 0 | (9,076,425) | 86,302 | 6,965,207 | (1,932,151) |
| Issuance of Stock | - | - | - | - | - | 0 |
| Net Income | - | - | 1,343,384 | - | - | 1,343,384 |
| Translation Adjustment | - | - | - | 150,286 | - | 150,286 |
| December 31, 2004 | $92,765 | $0 | ($7,733,041) | $236,588 | $6,965,207 | ($438,481) |

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Years Ended December 31, 2003 and 2004**

| | RESTATED 2003 | 2004 |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Net Income | $619,854 | $1,343,384 |
| | | |
| Adjustments to reconcile net income | | |
| to cash provided by operating activities: | | |
| Depreciation | 36,040 | 90,927 |
| Changes in assets and liabilities: | | |
| (Increase)Decrease in accounts receivable | (779,236) | (74,151) |
| (Increase)Decrease in inventory | (167,507) | (268,913) |
| (Increase)Decrease in prepaid expenses | 15,107 | 16,703 |
| (Increase)Decrease in other receivable and other assets | (580,103) | (41,827) |
| (Increase)Decrease in property and equipment - write off of devices | 2,062,835 | 9,411 |
| Increase(Decrease) in accounts payable and accrued expenses | 839,622 | (231,829) |
| Increase(Decrease) in deferred compensation | 170,000 | 170,000 |
| Increase(Decrease) in deferred revenue | (1,812,630) | 48,227 |
| | | |
| Total Adjustments | (215,872) | (281,452) |
| | | |
| Net cash provided by operating activities | 403,982 | 1,061,932 |
| | | |
| Cash flows (used for) provided by investing activities: | | |
| Capital expenditures | (107,284) | (85,921) |
| | | |
| Net cash (used for) investing activities | (107,284) | (85,921) |
| | | |
| Cash flows (used for) provided by financing activities: | | |
| Proceeds (payments) of notes payable | (58,320) | (989,130) |
| | | |
| Net cash (used for) provided by investing activities | (58,320) | (989,130) |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | 67,867 | 150,286 |
| | | |
| Net increase(decrease) in cash and cash equivalents | 306,245 | 137,167 |
| | | |
| Cash and cash equivalents at beginning of year | 433,198 | 739,443 |
| | | |
| Cash and cash equivalents at end of year | $739,443 | $876,610 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $     481 | $    5,429 |

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2003 AND 2004

### NOTE 1 – NATURE OF BUSINESS

BIO-MAGNETIC THERAPY SYSTEMS, INC. (the "Company" or "BMTS") is a Virginia corporation engaged in the development and production and commercialization of proprietary technology based on extremely low frequency magnetic field pulses to treat osteoarthritis, sports-type injuries, and other degenerative joint and neurological disorders.

The Company owns a number of United States process patents in addition to other foreign patents that utilize pulse electromagnetic fields ("PEMF") to treat arthritis, sports-type injuries, and other degenerative joint and neurological disorders. #5,131,904 for the "Treatment of Arthritis with Magnetic Field Therapy and Apparatus; #5,387,176 for the "Treatment of acute Diseases as Caused by Sport-type Injuries of the Musculoskeletal System Excluding Fractures with Magnetic Field Therapy"; #5,453,073 for the "Apparatus for Treatment of Diseased Body Organs with Magnetic Field Therapy" ; #5,669,868 for the "Treatment of Wrinkled, Discolored of Aging skin with Magnetic Field Therapy"; #5,665,049 for the "Treatment of Acute Diseases as Caused by Sports-type Injuries of the Musculoskeletal System (excluding fractures) with magnetic Field Therapy" (even broader than #5,387,176); #5,842,966 for the "Treatment of Disease including Degenerative and Inflammatory Conditions of the Musculoskeletal System and…(Enhanced Coverage on Arthritis Treatment)"; #407/809 for "Design patent for treatment bed"; #6,119,631 for "Coil cabinet for treating animals with magnetic field therapy"; #6,048,302 for "New Periodontal device"; #6,524,233 for the "Electromagnetic Stimulation of Cartilage Tissue"; and #111 9393B1(issued by the European Patent Office) for the "Electromagnetic Stimulation of Cartilage Tissue".  The Company also holds numerous other foreign patents in this field.

Further, the Company has been granted an exclusive worldwide, royalty-free license by Dr. Richard Markoll, the Company's chairman and the primary developer of these intended processes, to use, manufacture and lease the proprietary device used to administer PEMF in these processes.  In addition, the Company has an option to acquire all technology rights from Dr. Markoll in return for certain royalty payments on these leases.

In 2004 the Company moved its US corporate office from Boca Raton, Florida to Germany where most of the Companies activity are centralized.

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### 2a)  PRINCIPLES OF CONSOLIDATION
The financial statements include the accounts of Bio-Magnetic Therapy Systems, GmbH a wholly owned German subsidiary and its subsidiaries Signal Medizin Vertriebs, GmbH and PST SMV Italy, GmbH.  All significant transactions and balances between the Companies and its subsidiaries have been eliminated in consolidation.

#### 2b)  CASH AND CASH EQUIVALENTS
Cash equivalents consist of short-term liquid investments, which are readily convertible into cash, and have maturities of three months or less.

BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2003 AND 2004

2c) INVENTORIES

Inventories consist of treatment devices and accessories assembled for leasing. The inventories are stated at the lower of cost or market. The cost is determined by specific identification method.

2d) REVENUES

The Company's revenue is derived from the lease of devices, sale of activation cards used by these devices, and maintenance fees for each device in operation.

2e) DEPRECIATION

Depreciation is provided on a straight-line method over the estimated useful lives of the related assets. Leasehold improvements are expensed over the period of the respective leases.

2f) AMORTIZATION

The cost of patent rights acquired is being amortized on the straight-line method over a 20-year period.

2g) DEFERRED EARNINGS

Prior to 2003, the Company's deferred earnings represent leases of the treatment devices to operating clinics throughout Germany. Under the terms of the lease arrangements, the Company leases the treatment devices for a period of three to five years. Ownership of the device remains with the Company. Proceeds from the financing of the devices are received in advance from the lessee and income associated with these leases is recognized over the lease term. During 2003 all deferred revenue was recognized and all related devices were written off and is included in other income. Due to new regulations, beginning in 2004 the Company reports all revenue immediately. The Company also transfers ownership of the component parts of the devices to the financing company for the period financed.

2h) INCOME TAXES

Effective October 1, 1992, the Company adopted Statement of Financial Standards (SFAS) N. 109, Accounting for income Taxes.

2i) FOREIGN CURRENCY TRANSLATION

Foreign currency balance sheet accounts are translated into United States dollars at the exchange rate in effect at year end. Income statement accounts are translated at the average rate of exchange in effect during the year. The resulting translation adjustments are recorded as a separate component of stockholders' equity.

2j) USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assents and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2003 AND 2004**

2k) <u>LONG-LIVED ASSETS</u>
Long-lived assets are reviewed on an ongoing basis for impairment based on comparison of carrying value against undiscounted future cash flows. If an impairment is identified, the asset carrying amount is adjusted to fair value.

NOTE 3 – ACCOUNTS RECEIVABLE

Management believes that the accounts receivable from PST Holdings/International as of December 31, 2003 and 2004 are uncollectible, and an allowance for doubtful accounts of $887,898 was recorded.

NOTE 4 – PROPERTY AND EQUIPMENT

Property and equipment at cost consist of the following:

|  | 2003 | 2004 |
|---|---|---|
| Furniture and Equipment | $  195,804 | $  246,366 |
| Leasehold Improvements | 18,363 | 18,363 |
| Vehicles | 7,198 | -0- |
|  | 221,365 | 264,729 |
| Less: Accumulated Depreciation | (106,954) | (166,906) |
| Total Property and Equipment | $  114,411 | $  102,590 |

Depreciation expense was $36,040 and $88,331 for the years ended December 31, 2003 and 2004, respectively.

NOTE 5 – PATENTS

Patents at cost consist of the following:

| | | |
|---|---|---|
| Patent Rights | $  -0- | $  621,930 |
| Less: Accumulated Amortization | -0- | (2,596) |
| Total Property and Equipment | $  -0- | $  619,334 |

Amortization expense was $0 and $2,596 for the years ended December 31, 2003 and 2004, respectively.

NOTE 6 – INVESTMENT IN UNCONSOLIDATED SUBSIDIARY

In 1996, the Company acquired a 22% interest in PST Holdings(PST) in exchange for the granting of a distribution Agreement/Franchise Rights for the promotion, use and sale of the device developed by the Company used to treat arthritis and sports type injuries. This franchise

**BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2003 AND 2004**

right was valued at $3 million by PST Holdings and is amortized over a 20 year period. PST owns approximately 10.8% of the outstanding shares of the Company. Due to the related party nature of this transaction, the share of earnings and losses from date of acquisition adjusted for related amortization taken by PST is recognized by the Company. However, the Company has discontinued using this equity method to account for its investment in PST since the investment was at zero value as of December 31, 2003 and 2004, respectively.

In June 2002, PST investors made loans to PST in order that PST could pay down amounts owed under its franchise agreement to the Company. In return, the Company guaranteed certain PST investors repayment of their loan if PST defaulted. Debt assumed by the Company on behalf of PST was due to the Company in full on October 1, 2003 but was never received. The Company has accrued $521,115 and $498,006 as a liability for these loans as of December 31, 2003 and 2004 respectively.

On March 27, 2003 BMTS and PST entered into an agreement that modified the distribution and licensing agreement by restricting the PST territory to France, Italy, Switzerland, Portugal and Spain. As a result, BMTS, GmbH assumed certain activities of PST relating to the operations in Germany and Austria effective April 1, 2003. Those territories, aforesaid, were on an exclusive basis to PST, however, all other countries including Germany and Austria were removed from the original agreement. The term was reduced to one year with one year extensions only if PST achieved certain minimum performance standards. On January 1, 2004, PST did not fulfill its agreement and all territories reverted back to the BMTS, GmbH.

NOTE 7 – NOTES PAYABLE

| Notes Payable consists of: | 2003 | 2004 |
|---|---|---|
| Note Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | $ 100,000 | $ 100,000 |
| Note Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | 50,000 | -0- |
| Notes payable, due upon demand with all unpaid Interest payable at 8% and is Collateralized by all assets of the Company. | 1,535,000 | 595,870 |
| Total Notes Payable | 1,685,000 | 695,870 |
| Less Current Portion | (1,685,000) | ( 695,870) |
| Total Long-Term Debt | $    -0- | $    -0- |

9

BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2003 AND 2004

NOTE 8 – STOCK OPTION PLANS

On September 30, 1994, the company established a non-qualified stock option plan. The plan was amended and restated on January 31, 1996 and again on May 21, 1997 to authorize the issuance of options to purchase up to 3,175,077 shares of common stock, subject to certain anti-

dilution requirements. Any option issued entitles the holder to purchase the shares of Class A common stock subject to the option at a purchase price of $1.85 per share. On April 8, 1997, the Company established the 1997 stock option plan. The 1997 stock option plan established the issuance of options to purchase up to 700,000 shares subject to certain dilution requirements. Options have been issued for the purchase of 3,285,635 shares as of December 31, 2003 and 2004. A total of 2,196,135 and 2,754,944 options have expired as of December 31, 2003 and 2004 respectively and 1,191 options have been exercised.

NOTE 9 – OPERATING LEASE

The Company leases office space, warehouse space, and equipment under operating leases that expire through 2008. Annual rent expense under these operating leases amounted to $163,424 and $529,297 for the years ended December 31, 2003 and 2004, respectively.

At December 31, 2004, the future minimum lease payments approximated the following:

| | |
|---|---|
| 2005 | $556,034 |
| 2006 | 481,443 |
| 2007 | 375,674 |
| 2008 | 259,500 |
| 2009 | 82 |
| Total future minimum lease payments | $ 1,672,733 |

NOTE 10 – DEFERRED COMPENSATION

The Company entered into an employment agreement with its chairman, which requires a minimum annual salary $250,000 for each of the years ended December 31, 2003 and 2004. The salary is payable $150,000 on an annualized bases and $100,000 payable at the discretion of the Company's board of directors. The Company has also deferred salary agreement with another officer in the amount of $20,000 annually. Any salary amounts not paid in the year earned, shall be carried forward to subsequent years and must be paid by the termination date of the agreement. Bonus amounts not paid in the current year are also carried forward. These unpaid obligations are recorded as deferred compensation. As of December 31, 2003 and 2004 deferred compensation was $656,261 and $826,261 respectively.

**BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2003 AND 2004**

NOTE 11 – INCOME TAXES

As of December 31, 2003 and 2004 the Company had net operating loss carryforwards available to offset future taxable income of approximately $6,300,000 and $3,900,000, respectively. These carryforwards begin to expire in 2011. Due to the uncertainty of the future utilization of these net operating losses, no deferred tax assets have been recorded.

NOTE 12 – LITIGATION SETTELEMENTS

In 2001, Eugene Heller, Magnetic Treatment Medical Services, P. C. and Magnetic Treatment Center, P.C. filed a lawsuit against the Company and Dr. Richard Markoll for monetary damages incurred as a result of the investigation by the United States Attorney's office for the District of Connecticut in regards to a possible Medicare/Medicaid violation. The Company has recorded $475,000 as an accrued liability to settle this matter.

In 2002 the Company settled a claim with a former clinic physician and agreed to pay a total of $62,000 in eight monthly payments beginning in October 2003. The unpaid balance of this claim was $34,000 and $0 as of December 31, 2003 and 2004 respectively.

NOTE 13 – RELATED PARTY RECEIVABLES

The Company has receivables due, for overhead charges, funds advanced, and sale of chipcards from Tinnitus Signal Medizin GmbH, Institute for Innovative Medizin GmbH (INFINOMED), and Innovatis EV in the amounts of 973,182 and $210,256 as of December 31, 2003 and 2004 respectively. An allowance for doubtful accounts of $393,079 and $210,256 was recorded as of December 31, 2003 and 2004 respectively.

The patents and trademarks developed by Tinnitus Signal Medizin, GmbH were transferred to BMTS, GmbH in 2004 for a purchase price of $621,930. The purchase price was calculated using the outstanding amounts due for overhead charges and funds advanced. Shareholders owning a substantial portion of the outstanding stock of the Company controlled this company until the end of 2004. All the shares of Tinnitus Signal Medizin, GmbH and Institute for Innovative Medizin, GmbH (INFINOMED) were transferred to BMTS, GmbH in 2005.

NOTE 14 – RESTATEMENT

An error resulting in the understatement of previously reported income for the year ended December 31, 2003 was discovered and accordingly, the accompanying 2003 financial statements have been restated to correct this error.

NOTE 15 – SUBSEQUENT EVENTS

Management believes that they will be successful in acquiring a portion of the 1,003,333 shares of BMTS, Inc. stock that PST holds in satisfaction of amounts owed. (See notes 3 and 6)

EXHIBIT D

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "Agreement") is made and entered into as of this 29th day of December 2005, by and between **BIO-MAGNETIC THERAPY SYSTEMS, INC.,** a Virginia corporation with an address at 6 Kapellenweg, 81371 Munich, Germany (the "Company'), and **RICHARD MARKOLL, M.D.,** an individual with an address at 104 Denningerstr. 91825 Munich, Germany ("Consultant"), and provides:

## RECITALS:

A.    The Company is engaged in the business of developing and marketing certain processes and apparatus using pulsed magnetic therapy for the treatment of musculoskeletal disorders and injuries (such as osteoarthritis, sports-type injuries, temporomandibular joint disorder) wrinkled, aging and/or discolored skin, and certain neurological disorders (the "Business").

B.    Consultant is currently the Chairman, CEO and Scientific Director of the Company, and has been employed pursuant to an Employment Agreement dated August 1, 2003 (the "Predecessor Employment Agreement") which shall survive the execution of this Agreement.

C.    Consultant shall remained employed by the Company in accordance with the Predecessor Employment Agreement through March 31, 2006, and retain his current positions with the Company pursuant to the Predecessor Employment Agreement, and this Agreement shall be binding on the parties as of the date hereof but shall govern the relationship between the Consultant and the Company as provided herein effective only on and after April 1, 2006.

D.    The Board of Directors of the Company (the "Board of Directors") has determined that it is in its best interests to continue Consultant's employment as a consultant with the Company on the terms and conditions set forth below, and Consultant is agreeable to such continued consulting employment.

## AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants set forth below, the Company and Consultant agree as follows:

1.    **Employment.** Upon the terms and subject to the conditions herein set forth, the Company hereby employs Consultant, and Consultant hereby accepts such employment, as Consultant and member of the Board of Directors of the Company, during the Term (as hereinafter defined), unless sooner terminated as herein provided.

2.    **Term.** Subject to termination of the employment of Consultant hereunder as herein provided, the term of this Agreement and the employment of Consultant hereunder shall begin on April 1, 2006, and shall continue until March 31, 2009 (the "Term"). The parties may

1

further extend or renew this Agreement on such terms and conditions as may be agreed upon by the parties.

3.    **Duties and Extent of Services.**

(A)    During the Term, Consultant shall be available 10 days per month. In the event it is necessary, Consultant shall be available beyond the 10 days per month in a mutually agreeable fashion. If the Consultant provides services more than 14 days per month (as reviewed annually) the Company, at Consultant's discretion, will either compensate Consultant for the increased availability for the prior year within thirty (30) days after the end of that year, or the increased availability will be deducted from Consultant's availability for the following year without adjustment in compensation. The Company will provide for the election of the Consultant as a member of the Company's Board of Directors and the Consultant will be available for Board meetings. The Consultant, on the 10 days per month of his availability to the Company, shall be available, to the extent requested by the Company, to devote substantially all his business time, attention, and efforts to the business and affairs of the Company in accordance with general business practices of the Company, except as otherwise set forth in this Agreement. Consultant shall be available (subject to the time limitations set forth above) for consulting in matters of the research and development of processes, apparatus, patents and products of the Business for the Company, as well as in areas of manufacturing operations, medical and technical development of the Business, and shall be available for medical and scientific conventions and liaising with Company clients at the Company's request subject to the time limitations set forth above. Consultant is not expected to travel extensively. At any time while Consultant is providing services to the Company, he shall use his knowledge, skills, experience and scientific and business contacts to assist and advise the Company in the promotion and development of its Business all with utmost loyalty and good faith and with full regard for the careful, efficient and economic conduct of such Business.

(B)    During the Term, Consultant shall be available in Munich, Germany or Mallorca, Spain. Consultant shall perform his duties hereunder during normal business hours, together with such additional periods as may be appropriate or necessary to perform properly such duties specified under Section 3 (A) above.

4.    **Compensation.**

(A)    *Base Salary.* During the Term, the Company shall pay to Consultant as compensation for his services hereunder a salary at the rate of €170,000 per year (the "Salary") as follows: (i) €170,000 per year payable in periodic installments no less frequently than once monthly.

(B)    *Previously-Accrued Deferred Compensation and loans.* The Company and Consultant each acknowledge that the Company is indebted to Consultant in an amount as reflected on the books and records of the Company as of the date hereof for accrued but unpaid compensation under the Predecessor Employment Agreement and all loans made by Consultant to the Company. The Company and Consultant further acknowledge and agree that all such compensation that is accrued but unpaid as of the date hereof pursuant to the Predecessor

Employment Agreement and all such unpaid loans shall be payable in full no later than January 13, 2006.

(C)    *Withholding*.    The Company shall withhold from each installment of Salary or other compensation payable to the Consultant any and all taxes, payroll deductions or other payments required to be withheld under applicable law.

5.    **Reimbursement of Certain Expenses.**    During the Term, the Company shall pay or reimburse Consultant for all reasonable, ordinary and necessary expenses paid or incurred by Consultant in connection with the performance of his services hereunder. The Company will reimburse expenses paid or incurred by Consultant in connection with his performance / services after receiving vouchers, receipts or other documentation of such expenses. All individual expenses exceeding €1,000 should be discussed with the Company in advance.

It is acknowledged and agreed that Consultant's posting at the Company's facility in Munich, Germany is for the express benefit of the Company, and as a consequence all reasonable housing rental or co-op costs incurred by the Consultant shall be reimbursed by the Company for the first six months of the consulting agreement.

Consultant shall be entitled to travel in Business Class (or First Class if Business Class is unavailable) for all air travel of the Consultant necessitated by Company business, and the Company shall reimburse Consultant for all such air travel expense.

6.    **Benefits.**
The Consultant defined his total costs of his current health insurance coverage in the amount of €11,620.20 p.a. (€968.35 per month). The Company will pay the amount of the health insurance costs to the Consultant on yearly basis during the Term. During the Term, Consultant shall have use of a CLK Mercedes Benz or other medium-sized luxury vehicle leased on his behalf by the Company under the 1% employment payment rule.

7.    **Clinic Development Rights.**    Consultant shall have the right to establish, develop, own, operate and commercialize on his own behalf, either directly or through a corporation, partnership or other entity controlled by him, an unlimited number of clinics located in Mallorca, Spain as long as any such clinics are developed prior to December 31, 2008. The Consultant's right to establish, develop, own, operate and commercialize such clinics in Mallorca, Spain shall be exclusive through the later of December 31, 2008 or thirty-six (36) months after the opening of each such clinic. For use in those clinics, Consultant, at his request, may receive the two new, current model PST devices and 200 treatment cards without cost or expense to Consultant.    Any additional PST devices for such clinics will be provided to Consultant at the Company's manufacturing costs of each such PST devise plus 10% of such manufacturing cost. Additional treatment cards for use by clinic patients will be provided to Consultant at €50 per card.    The rights of Consultant under this Section are personal to Consultant, and shall terminate immediately as to any clinic he or his wife Ernestine J. Binder-Markoll no longer owns directly or through a controlled entity.

8.    **Confidential Information.**

3

(A)    Consultant shall not at any time during the Term or after the expiration of the Term or the earlier termination of the employment of Consultant hereunder, with or without cause, directly or indirectly disclose or use any Confidential Information (as hereinafter defined), except when Consultant is required to disclose or use such Confidential Information (i) in the proper course of his employment hereunder for the benefit of the Company or any of its affiliates, or (ii) pursuant to any law, court order or similar process or proceeding. As used in this Agreement, affiliates of the Company shall include only those entities that are substantially owned and controlled by the Company.

(B)    Upon request by the Company at any time and from time to time during the Term or from and after the expiration of the Term or the earlier termination of the employment of Consultant hereunder, with or without cause, Consultant shall promptly deliver to the Company all books, records, papers, documents and other materials relating to the Company and its affiliates, and all copies thereof then in the possession or control of Consultant. In addition, upon such expiration or earlier termination, Consultant shall promptly convey to the appropriate officers of the Company such other material information and knowledge pertaining to the Business of the Company or any of its affiliates that is not contained in such books, records, papers, documents and other materials.

(C)    As used in this Agreement, the term "Confidential Information" shall mean all confidential information, trade secrets or other proprietary data of the Company or any of its affiliates that is not otherwise in the public domain or known to persons engaged in businesses similar to that of the Company, including, without limitation, any and all such information concerning the processes, apparatus, patents and products of the Company or any of its affiliates or concerning the directors, officers, shareholders, partners, joint venturers, investors, owners, beneficiaries, employees, independent contractors, representatives, assets, liabilities, contracts, operations, customers, prospects, opportunities or financial information of the Company or any of its affiliates of a confidential or proprietary nature.

(D)    The provisions of this Section shall survive the termination or non-renewal of this Agreement.

9.    **Restrictive Covenants.**

(A)    During the Term and two years after termination of the term, Consultant shall not engage directly or indirectly, as principal, agent, employer, employee, director, officer, stockholder, partner or other equity owner or in any other individual or representative capacity, in any business activity or investment, either directly or indirectly, which is engaged in the Business or is otherwise competitive with the Business, or the rights or interests of the Company or any of its affiliates, whether or not such business activity or investment is pursued for gain, profit or other monetary advantage (other than in his capacity as a consultant hereunder for the benefit of the Company or its affiliates). Nothing herein contained, however, shall be construed to prohibit Consultant from directly or indirectly engaging in passive investments in any securities not exceeding five percent of all outstanding securities of any corporation or other business entity that is publicly listed on a recognized stock exchange (including "over the counter"), provided

4

that Consultant shall not render any services of any kind to the issuer thereof, whether in connection with such investment or otherwise.

(B)    During the Term, and for a period of two years after the expiration of the Term or the earlier termination of the employment of Consultant hereunder with cause, Consultant shall not directly or indirectly, as principal, agent, employer, employee, director, officer, stockholder, partner or other equity owner or in any other individual or representative capacity, disrupt, damage, impair, interfere with or solicit in any way whatsoever any of the employees of the Company or any of its affiliates.

(C)    The provisions of this Section shall survive the termination or non-renewal of this Agreement.

10.    **Termination.**

(A)    The Company shall have the right to terminate the employment of Consultant hereunder, without prejudice to any of its other rights or remedies, immediately upon notice to Consultant if Consultant commits any of the following events during the Term ("Termination for Cause"):

(i)    any act of embezzlement relating to his employment with the Company;

(ii)    conviction of any morally reprehensible act that carries such social opprobrium that Consultant's continued association with the Company would have a material adverse effect on the reputation of the Company);

(iii)    failure to materially perform his obligations under this Agreement without Adequate Justification, which default or failure is not remedied within 30 days after written notice thereof to Consultant from the Company;

(iv)    any act or acts in the performance of his duties under this Agreement amounting to gross negligence or willful misconduct; or

(v)    the entry by any court or regulatory body or an order or decree prohibiting or enjoining Consultant from performing his responsibilities under this Agreement.

(B)    The employment of Consultant hereunder shall terminate automatically upon the death of Consultant, without requirement of any notice given by the Company.

(C)    Upon Termination for Cause without Adequate Justification, Consultant shall be entitled to all accrued and unpaid salary, bonuses and vacation pay or other compensation hereunder and reimbursement of expenses, each through and including the date of the termination. The determination of whether the termination of the employment of Consultant hereunder is Termination for Cause is reserved to the sole judgment of the Company's Board of

Directors. If during the Term, Consultant's employment with the Company is terminated by the Company other than for Good Cause without Adequate Justification, or if Consultant terminates Consultant's employment with the Company with Adequate Justification, then the Company shall pay Consultant upon termination all amounts that will be due to Consultant hereunder during the Term including Salary, the value of benefits, and the value of all other compensation.

(D)    For purposes of this Agreement, "Adequate Justification" shall mean:

(i)    the Company's material breach of this Agreement (after failure to cure within thirty (30) after notice thereof);

(ii)    Consultant's assignment without his consent to a position, responsibilities, or duties of a materially lesser status or degree of responsibility than his position, responsibilities or duties as of April 1, 2006; or

(iii)    relocation of Consultant's principal place of work more than fifty (50) miles without Consultant's consent.

11.    **Resignations.**  Upon the expiration of the Term or the earlier termination of the employment of Consultant hereunder, with or without cause, and whether or not such termination is disputed, upon the request of the Company or Consultant, Consultant shall be deemed to have resigned from each position that he may have as a consultant of the Company or as a director or officer of the Company or any of its affiliates. In such event, Consultant and the Company forthwith shall execute and deliver any and all documents to evidence such resignation as reasonably may be request from time to time consistent with the terms of this Agreement.

12.    **Termination of Predecessor Employment Agreement.**  The parties shall, and hereby do, terminate the Predecessor Employment Agreement as of April 1, 2006, provided that such termination shall not affect the obligations of the Company thereunder to pay to Consultant the amount of all accrued and unpaid salary (other than accrued but unpaid salary which has become an obligation of the Company under this Agreement as specifically provided in Section 4(B) above), bonuses and vacation pay or other compensation thereunder and reimbursement of expenses through the date of such termination. With the termination of Predecessor Employment Agreement, Consultant resigns from the office of CEO of the Company as well as director or officer of any of its affiliates. Termination of the Predecessor Employment Agreement for any reason whatsoever shall not serve as a basis for termination of this Agreement, and shall not terminate this Agreement or the employment of Consultant hereunder, even if occurring on or before April 1, 2006.

13.    **Assignment and Successors; Binding Effect.**  The rights and obligations of the Consultant under this Agreement shall not be assigned, transferred, pledged or otherwise encumbered by Consultant (or his representative) without the prior written consent of the Company, this Agreement being intended to secure the personal services of Consultant. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal and personal representatives, successors and permitted assigns.

6

14. **Governing Law.** The parties acknowledge that the Company is a Virginia corporation, and accordingly the respective rights, obligations and remedies of the parties hereunder, the interpretation hereof and all controversies, disputes and claims arising out of or related to this Agreement or the relationship between the parties created hereby shall be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia, without reference to its principles of conflict of laws.

15. **Integration.** This Agreement sets forth all, and is intended by all parties to be an integration of all, of the promises, agreements, understandings, warranties, representations and covenants with respect to the subject matter hereof. This Agreement supersedes any and all draft and/or letters of intent between the Company and Consultant relating to the subject matter of this Agreement.

16. **Recitals.** The Recitals set forth as the introduction to this Agreement are hereby incorporated into this Agreement as fully as if set forth in full herein.

17. **Non-Waiver.** The failure of any party at any time to require performance by the other party of any provision of this Agreement shall in no way affect the right of such failing party to enforce such provision nor shall any waiver by either party of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

18. **Severability.** Should any part of this Agreement be held or declared to be invalid or ineffectual, in whole or in part, for any reason, by any court of competent jurisdiction, neither the remaining portion of this Agreement nor any other term or terms contained herein shall be invalidated, impaired or affected thereby and, in such event, this Agreement shall be construed as if such invalid or ineffectual part had not been contained herein.

19. **Gender.** Where the text requires, words in the singular shall be deemed to include the plural and vice versa, and words of any gender shall be deemed to include all genders.

20. **Headings.** Any heading preceding the text of the Articles or Sections of this Agreement are inserted solely for the convenience of reference and shall not constitute part of this Agreement, nor shall they affect its meaning, construction or effect.

21. **Notice.** All notices pertaining to this Agreement shall be either (i) hand-delivered, (ii) sent by first-class mail or express mail, (iii) telecopied (to be promptly followed by an original copy), or (iv) sent by a reputable overnight delivery service such as Federal Express ("Courier"), (1) if to the Company, then to 6 Kapellenweg, 81371 Munich, Germany, and (2) if to Consultant then to 104 Denningerstr. 91825 Munich, Germany. Either party may change such address (effective upon receipt) to such other address as such party shall designate by written notice to the other party pursuant to this Section. Time periods shall commence on the date of hand delivery, mailing, telecopy or delivery to the Courier, as the case may be. Any notice which is required to be given within a stated period of time shall be considered timely if either hand delivered, postmarked, telecopied or delivered to a Courier on or before midnight of the last day of such period.

22.   **Amendment.**  Neither this Agreement nor any provision hereof may be amended, modified, changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the amendment, modification, change, waiver, discharge or termination is sought.

23.   **Binding.**  The terms and provisions of this Consulting Agreement shall be binding upon, inure to the benefit of and be enforceable by the successors and assigns, heirs and personal or legal representatives of the parties.

24.   **References.**  References in this Agreement to numbered or lettered Sections refer to Sections of this Agreement unless otherwise expressly stated.  The words "herein," "hereof," "hereunder," "hereby," "this Agreement" and other similar references shall be construed to mean and include this Agreement, as amended, modified or supplemented from time to time, and all Exhibits, Appendices and Schedules to this Agreement, if any, as amended, modified or supplemented from time to time, all Schedules to such Appendices, if any, and all amendments to any of them, unless the context shall clearly indicate or require otherwise.

25.   **Construction.**  This Agreement shall not be construed more strictly against either party hereto regardless of which party is responsible for its preparation, it being agreed that this Agreement was fully negotiated by both parties.

26.   **Entire Agreement.**  This Agreement contains all of the agreements and understandings between the parties hereto with respect to the subject matter hereof, and no oral agreements or written instrument, document or correspondence shall be held to affect the provisions of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on the date first above written.

COMPANY:
BIO-MAGNETIC THERAPY SYSTEMS, INC.

By: _____
    **Hans Rolf Käse, CEO**

CONSULTANT: _____

    **Richard Markoll, M.D.**

8