UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DURAVEST, INC.,

                              Plaintiff,               **AFFIDAVIT IN OPPOSITION**

           -against-

VISCARDI, AG; WOLLMUTH MAHER & DEUTSCH, LLP;    Docket No.:  07-Civ-10590(JR)
MASON H. DRAKE, ESQ., BRUCE O'DONNELL, CPA,
BRUCE O'DONNELL CPA/PFS, P.A., BIOMEDICAL
CONSULTANT SL, RICHARD MARKOLL, and
ERNESTINE BINDER MARKOLL,

                          Defendants.
------------------------------------------------------------------------x

       LUIS F. RAS, an attorney duly admitted to practice law in the Courts of the

State of New York and the federal district court for the Southern District of New

York, states as follows under the penalties of perjury:

       1.      I am a member of the firm of RAS ASSOCIATES, PLLC, attorneys for

Plaintiff in the above captioned matter.

       2.      As counsel of record in this matter, I am familiar the facts and

circumstances of the claims.

       3.      Defendants' within Motion must be denied, as their contentions

regarding the sufficiency of Plaintiff's Complaint and Jury Demand

("Complaint") are all more properly characterized as factual disputes, and such

disputes should be left for another time in this litigation after a full and fair

exchange of discovery.   The arguments of Plaintiff are set forth in the

accompanying Memorandum of Law.

       4.      The moving Defendants' overall contentions that the Complaint is

in any way incomplete, non-specific, or insufficient are curious in that their

motion papers demonstrate that they are aware of the crux of Plaintiff's claims

against them. That they participated in the operation of a criminal enterprise by fraudulently issuing financial statements that they knew or should have known to be substantially and materially false [¶ 82-84, 126-139, 141, 142, 147-150, 163, 207].

5.      The O'Donnell Defendants do not deny the lengthy personal relationship between Defendants Bruce O'Donnell, C.P.A., a/k/a Bruce O'Donnell, C.P.A./PFS, and Defendants Richard Markoll, Ernestine Binder Markoll, and Biomedical Consultant, S.L. ("Markoll Defendants") going back at least as far as the year 2000.   Indeed, Mr. O'Donnell's own marketing materials **(Exhibit "A")** describe him as a "**Personal** Financial Specialist" – the genesis of his company's "P.F.S." and a preparer of individual tax returns.

6.      Plaintiff alleges that Mr. O'Donnell's personal relationship with the Markoll Defendants [¶ 126-129] conferred him, at the very least, with knowledge of the Markoll Defendants' personal finances, which would have showed significant profit from the Markolls' position as the managing principals of a claimed-to-be-thriving company, BMTS.  Discovery will demonstrate that the two experiences do not square, and that the contradicting documentation showed a fraud.

7.      Given the length of their personal relationship with the Markolls, the O'Donnell Defendants were aware at the time of their May 31, 2005 'restatement' of 2003 income, that the Markolls had either plead guilty to, or were convicted of, Medicare fraud **(Exhibit "B")** in 2001, and that Mr. Markoll often referred to himself as a medical doctor when he was not so licensed.

8.      Similarly, the O'Donnell Defendants do not deny knowledge that the Markolls' company, BMTS, was being marketed for sale in the year 2005,

when they issued the 'restated' financial statement for fiscal 2003.  It is no surprise that the O'Donnell Defendants chose not to provide their counsel or the Court with the previous **(Exhibit "C")** financial statement, nor the subsequent one **(Exhibit "D")**, which show BMTS to have been "profitable" only at the time Plaintiff was considering it for purchase.

9.    Since BMTS was not truly profitable at the time it was being marketed for sale to Plaintiff [as admitted by the prior and subsequent financial statements issued by the O'Donnell Defendants], its real purpose was as a vehicle for attracting investment dollars.   Thus, it is also significant that Mr. O'Donnell markets himself and his firm as an ***investment*** advisory office – "Medallion Advisory Services, LLC."   This also tends to show that the O'Donnell Defendants "participated" in the core of the business – an investment vehicle enterprise based on material misinformation.

10.    In sum, Plaintiff has set forth a *prima facie* case against the O'Donnell Defendants, which should be decided on its merits following proper exchange of discovery.   Plaintiff does not assert any breach of contract claim against the O'Donnell Defendants.  The O'Donnell Defendants' moving papers do not include any request to dismiss Plaintiff's negligence cause of action against them, and Plaintiff respectfully submits that as the pleading of this claim is not contested, it must survive.

11.    We respectfully refer the Court to the annexed Exhibits and Plaintiff's accompanying Memorandum of Law, which sets forth a more complete summary of relevant facts.  The O'Donnell Defendants' Motion must be denied for the reasons set forth above, and in the Memorandum of Law.

WHEREFORE, Plaintiff respectfully requests that the O'Donnell Defendants'
within Motion be denied in its entirety, together with such other and further relief
as this Court may deem just and proper.

Dated:          White Plains, New York
                March 2, 2008


                                        _____s/LFR_____
                                        Luis F. Ras



# Bruce O'Donnell CPA/PFS
At Every Stage of Your Financial Life a CPA Can Help You!





About Us
Services
Tax Tips
Links
Contact
Home

What Sets Us Apart is Our Services

Are you looking for a firm large enough to offer a full array of accounting, taxation, financial services and consulting services at reasonable rates, but small enough to know you on a personal level? Then look no further. Whether you need accounting, tax planning, tax return preparation, personal financial planning, estate and trust, small business consulting, or a full complement of other individualized services, we will give you the full resources you would expect only from a quality accounting firm while maintaining the personal touch.

Accreditations
Member American Institute of CPAs (AICPA)
Member Florida Institute of CPAs (FICPA)
Certified Public Accountant(CPA)
Personal Financial Specialist(PFS)
Registered Investment Advisor(RIA)
Licensed Real Estate Agent
Licensed Life, Health & Variable Annuity Agent

Securities offered through Medallion Investment Services, Inc.
* Member NASD/SIPC (410)544-8400 271 53rd Circle, Vero Beach, FL 32968
Investment Advice offered through Medallion Advisory Services, LLC
* Registered Investment Advisor *Wholly owned subsidiary of TMG Holding Company, Inc.

http://cpapfs.net/                                                           3/2/2008



About Us    Solutions    Services    Associate Search

## About Us



Client Accounts

**Legal Disclaimer**

Client Disclosures

Rule 11Ac1-5,
Execution Quality
Analysis (December)
Principal Only
Prinicipal & Agent

Rule11Ac1-6,
Quarterly Report (4th Q)

 Logout

**The Medallion Group** is headquartered in Severna Park, Maryland. **The Medallion Group** is comprised of three wholly-owned subsidiaries:

- **Medallion Advisory Services LLC,** a federally Registered Investment Advisor with the Securities Exchange Commission (SEC) licensed in 38 states.
- **Medallion Investment Services, Inc.**, a full service broker/dealer registered in 49 states.
- **Medallion Insurance Services LLC,** a full-service insurance agency licensed in over 20 states.

**The Medallion Group** is dedicated to recommending investments from a financial planning point of view. We provide quality products, excellent services and strong ongoing product review, or due diligence.

Our financial advisors have the freedom and flexibility in determining which program and services to provide to their clients. They own and operate their own businesses and can help people meet their investment objectives through a complete array of financial products, including stocks, bonds, mutual funds, fixed and variable annuities, fee-based asset management and insurance products.

Your relationship with a financial advisor is of primary importance in establishing and following your investment strategy. Working together, you and your financial advisor identify your financial goals, develop strategies to meet your needs and select the investment vehicles to support those strategies. **The Medallion Group's** OSJ Branch Managers, along with the home office staff, provides the daily individual guidance, training and support to nurture the growth and development of new and experienced affiliates. OSJ Branch managers provide solutions to affiliates' questions, marketing and product information, as well as the review of client transactions.

**The Medallion Group** has worked conscientiously toward its goal of becoming a premier independent financial services firm since its origin in 1996 as a group of ten individuals with a vision.

If you would like to work with one of our financial advisors click here.

*Securities Offered Through Medallion Investment Services, Inc.\*, Member NASD & SIPC
811 Governor Ritchie Highway, Suite 25 / Severna Park, MD 21146 (410) 544-8400
Investment advisory services offered through Medallion Advisory Services, LLC\*
Insurance products offered through Medallion Insurance Services, LLC\* Wholly
\*-owned subsidiary of TMG Holding Company, Inc., T/A The Medallion Group
Questions: Comments: Problems: webmaster@medalliongroup.net*

*The investment advisor or investment advisor representative may only transact
business in the state it is registered, or in states where registration is excluded, or
where a registration exemption may apply. Follow-up, or individualized responses to individuals*

Case 1:07-cv-10590-JSR      Document 20-2      Filed 03/03/2008      Page 3 of 3

by the investment advisor or investment advisor representative that involve either the effecting or
attempting to effect the rendering of personalized investment advice for compensation, will not
be made unless the advisor is in compliance with registration requirements or an applicable
exemption or exclusion exists. This web page does not attempt to effect transactions
in securities, or render personalized investment advice for compensation, but is
limited to the dissemination of general information on products and services.





Office of
Regulatory Affairs
Compliance, Science, Protection

ORA Start Page  |  Search  |  News  |  About ORA  |  FDA - Centers

Enforcement
Story

U.S. Food and Drug Administration

ORA Search Form
search
ORA

Enforcement Story TOC

Enforcement Story

Contents:

• Foreword

• Chapter 1 CBER

Charts

• Chapter 2 CDRH

Charts

• Chapter 3 CDER

Charts

• Chapter 4 CFSAN

Charts

• Chapter 5 CVM

Charts

• Chapter 6 OCI

• Chapter 7 Court Updates

• Chapter 8 Leverage

• Chapter 9 Defintions

• Chapter 10 Enforcement

Statistics

Links to: The Enforcement Story Start Page
<Prev        Next>

About ORA: Activities
Enforcement Story

## Chapter 6

### Office of Criminal Investigation continued

Last Update: August 07, 2003

# Center for Devices and Radiological Health

**Medicare Billed for Unapproved Electro-Magnetic Therapy**

**Court Orders Magnetic Therapy Firm to Pay $4 Million to Reimburse Government**

This investigation initiated from information received from the Federal Bureau of Investigation (FBI), New Haven, Connecticut. The FBI had been contacted by Medicare concerning complaints that they had received from Medicare beneficiaries about being billed for participating in a clinical study of an electro-magnetic therapy device. Investigation exposed conduct by Richard Markoll, Ernestine Binder Markoll, and Dr. David Trock involving their treating patients as part of a clinical study with an unapproved electro-magnetic device and without an approved Investigational Device Exemption in place. The Markolls then fraudulently billed Medicare, using billing codes that were approved for ultrasound and electrical stimulation treatments, to recoup the costs of the electro-magnetic treatments.

On May 18, 2001, in U.S. District Court, District of Connecticut, the Markolls were convicted of violations of the Food, Drug, and Cosmetic Act and mail fraud. Richard Markoll was convicted of felony violations of Title 18 U.S.C. § 371 - Conspiracy, and Title 21 U.S.C. § 331(q)(1)(A), 333(a)(2), 360j(g) - failure or refusal to comply (with the intent to defraud) with any requirement prescribed under Title 21 U.S.C. § 360j(g) [Exemption for Investigational Device].

Ernestine Binder Markoll was convicted of misdemeanor violations of Title 18 U.S.C. § 371 - Conspiracy, and Title 21 U.S.C. § 331(q)(1)(A), 333(a)(1), 360j(g) - failure or refusal to comply with any requirement prescribed under Title 21

U.S.C. § 360j(g) [Exemption for Investigational Device].

Richard Markoll, principle shareholder of Bio-Magnetic Therapy Systems, doing business as Magnetic Therapy Scovill Street, Incorporated, entered a guilty plea on behalf of the corporation to violations of Title 18 U.S.C. § 1341 - Mail Fraud, and Title 18 U.S.C. § 2 - Aiding and Abetting.

On June 20, 2001, Dr. Trock was sentenced in U. S. District Court, District of Connecticut, for a misdemeanor violation of the Investigational Device Exemption regulations. Dr. Trock was sentenced to six months probation and was ordered to reimburse the Government $35,250.00.

On August 14, 2001, Richard Markoll, Ernestine Binder Markoll, and Bio-Magnetic Therapy Systems, doing business as Magnetic Therapy Scovill Street, Incorporated, were sentenced in U.S. District Court, District of Connecticut.

Richard Markoll was sentenced to 3 years probation and ordered to pay a fine of $4,000.00. Binder Markoll was sentenced to 2 years probation and ordered to pay a fine of $1,000.00.

Bio-Magnetic Therapy Systems, doing business as Magnetic Therapy Scovill Street, Incorporated, was ordered to reimburse the Government $4,000,000.00.

This case was investigated jointly by the Federal Bureau of Investigation, the Department of Defense, Defense Criminal Investigative Service, the United States Postal Inspection Service, and FDA's Office of Criminal Investigations.

### Partial Shipment of Rejected Medical Gloves Entered into Interstate Commerce

**Firms Falsely Documents Return of Medical Gloves Rejected by FDA**

This case, investigated jointly by the U.S. Customs Service and FDA's Office of Criminal Investigations, was initiated upon information provided by the FDA Cincinnati District Office. This information alleged that Tradex International, Inc., was shipping overseas only part of a shipment of medical gloves that had been determined to be adulterated and refused admission to the U.S.

On May 11, 2001, Saji Daniel and his company, Tradex International, Inc., appeared in U.S. District Court, Northern District of Ohio. Daniel was convicted of violating Title 49 U.S.C. §80116(2)(A) for causing a fraudulent bill of lading to be prepared which falsely documented the return of 2,213 cases of adulterated medical gloves that had been rejected by the Food and Drug Administration, knowing the shipment was only a partial return of the rejected gloves.

On August 24, 2001, Daniel was sentenced to 6 months home detention followed by six months supervised probation, and ordered to pay a $20,000.00 fine.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

C
U.S. v. Markoll
D.Conn.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
UNITED STATES OF AMERICA
v.
**Richard MARKOLL**, Ernestine Binder, a/k/a/
Ernestine Binder Markoll, and Bio-Magnetic Ther-
apy Systems, Inc. Defendants.
**No. 300CR133(EBB).**

Jan. 24, 2001.

*Omnibus Ruling on Defendants' Motion to Strike
and Motions to Dismiss*

BURNS, Senior J.
   **\*1** Defendants, **Richard Markoll** ["**Markoll**"],
Ernestine Binder (a/k/a Ernestine Binder Markoll)
["Binder"], and Bio-Magnetic Therapy Systems,
Inc. ["BMTS"], move, pursuant to Fed.R.Crim.P.
7(d), to strike certain "highly prejudicial surplus-
age" from the Superceding Indictment [doc. # 43].
Defendants also move, pursuant to Fed.R.Crim.P.
12(b), to dismiss counts 1 through 14 of the Super-
ceding Indictment on the grounds that they 1) fail
to state a crime [doc. # 46], and 2) are unconstitu-
tionally vague [doc. # 44]. For the reasons set forth
below, Defendants' motions are DENIED.

I. BACKGROUND

   On October 25, 2000, a grand jury returned a
fifteen-count Superceding Indictment [hereinafter
the "Indictment"] against Markoll, Binder, and
BMTS. The Indictment charged Defendants with
fourteen counts of mail fraud [hereinafter the "Mail
Fraud Counts"] in violation of 18 U.S.C. § 1341,
and one count of conspiracy to commit offenses
against the United States in violation of 18 U.S.C. §
371. Specifically, Defendants are charged with
fraudulently submitting claims to Medicare for re-

imbursement of services under inaccurate billing
codes. The facts as alleged in the Indictment are
summarized here.

   Markoll invented a device called the Electro-
Magnetic Induction Treatment System, Model
30/40 ("EMIT Device"), for which he obtained U.S.
patents for various uses. Markoll held a medical
doctor degree (M.D.), but was not licensed to prac-
tice medicine. The EMIT Device, by directing elec-
tric current through an air coil, created a pulsed
electro-magnetic field for the purpose of treating
arthritis. Although use of the EMIT Device in-
volved placing the affected joint into the electro-
magnetic field, it did not involve the use of elec-
trodes directly contacting the skin, or the use of ul-
trasonic energy. Beginning in 1989, Defendants
sought FDA approval for commercial applications
of the EMIT Device, but never successfully secured
approval.

   At all relevant times, Markoll and Binder
served on the Board of Directors and owned or con-
trolled a majority of the shares of BMTS. Markoll
and Binder also acted as officers of BMTS' subsidi-
ary and predecessor corporations, Magnetic Ther-
apy, Inc., and Magnetic Therapy, Scovill Street,
Inc., respectively. In 1990 and 1991, through Mag-
netic Therapy, Scovill Street, Inc., Defendants
began operating three clinics for the purpose of
conducting clinical trials of the EMIT Device under
the research protocols of two hospitals' Institutional
Review Boards. Defendants' clinics provided no
services other than the ones set forth in the research
protocols, and, significantly, neither possessed nor
utilized either "ultrasound" or "electrical stimula-
tion" devices. Various state-licensed physicians
were employed by Defendants on a part-time basis
to perform evaluations.

   Part B of the Medicare Act [hereinafter
"Medicare"] is a voluntary program that provides
medical insurance benefits to aged or disabled per-
sons. *See* 42 U.S.C. 1395j-95w.[FN1] Physicians seek-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing reimbursement from health insurance plans under Medicare were required to submit claims on a Health Insurance Claim Form [hereinafter "Claim Form"], and indicate each service or procedure administered using a five-digit code from the Physicians' Current Procedural Terminology Manual [hereinafter "CPT Code"]. The Government alleges that no CPT Code was specifically designated for treatment using the EMIT Device. Reimbursement claims for evaluation and management services also require, among other things, that 1) the services indicated by the CPT Code be performed (at least in part) by the physician in whose name the claim is made, 2) the physician describe the exact service by using the appropriate CPT Code or by selecting the "unlisted procedure" code and providing a description of the service provided, and 3) the physician certify that the medical services for which reimbursement is claimed were actually performed, and were personally provided by, or under the direct supervision of, the physician making the claim. Furthermore, the government alleges, at all relevant times, reimbursement for medical devices not approved by the FDA were denied because they were considered "investigational" by health insurance programs, and, as such, not "reasonable" or "necessary" for diagnosis or treatment of illness or injury.

> FN1. Medicare is a federally funded program intended to provide insurance benefits for medically necessary services to elderly and disabled people. The United States Department of Health and Human Services, though the Health Care Financing Administration ["HCFA"], administered the Medicare program. HCFA contracted with private insurance companies, Medicare carriers, to administer the Medicare program.

**\*2** Under the Mail Fraud Counts, the Government alleges that Defendants devised a plan to defraud four insurance providers, Medicare FN2 and Civilian Health and Medical Program of the Uni-

formed Services ["CHAMPUS"] (both federal programs), and Blue Cross and Blue Shield of Connecticut ["Blue Cross"] and Metropolitan Insurance Company ["Metropolitan"] (both private companies). Specifically, the Government alleges that Defendants executed their scheme by fraudulently certifying on their Claim Forms that 1) EMIT Device treatments constituted reimbursable ultrasound treatments under CPT Code 97128, 2) EMIT Device treatments constituted reimbursable manual electrical stimulation under CPT Code 97118, and 3) unsupervised non-physician patient evaluations constituted reimbursable evaluations personally performed by the billing physician. Counts 1 through 14 each allege a mailing of a Medicare payment check induced by Defendants' scheme.

> FN2. At all relevant times, Travelers Insurance Company was the Medicare carrier for Connecticut, and Empire Blue Cross and Blue Shield was the carrier for New York.

### III. DISCUSSION

#### A. Motion to Strike Surplusage

Defendants move, pursuant to Fed.R.Crim.P. 7(d), to strike all references to CHAMPUS, to Blue Cross, to Metropolitan, and to ultrasound treatment under CPT Code 97128, from the Mail Fraud Counts as "highly prejudicial surplusage" since Defendants are not charged with any specific offenses as to those companies or as to that CPT Code and procedure. The Government opposes the motion, arguing that the references are relevant and necessary background material to expose the full scope of Defendants' scheme.

Rule 7(d) provides that "[t]he court on motion of the defendant may strike surplusage from the indictment or information."Fed.R.Crim.P. 7(d). A motion to strike surplusage is "only granted where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cial." ' *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (quoting *United States v. Napolitano,* 552 F.Supp. 465, 480 (S.D.N.Y.1982)); *seealsoUnited States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996) (quoting *Scarpa* ). "If evidence of the allegation is admissible and relevant to the charge, than regardless of how prejudicial the language is, it may not be stricken." *Scarpa,* 913 F.2d at 1013 (quoting *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978)); *seealsoUnited States v. Langella,* 776 F.2d 1078, 1081 (2d Cir.1985). Further, under Fed.R.Evid. 404(b) "evidence of other crimes, wrongs, or acts" is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In *Scarpa,* the Second Circuit upheld the district court's refusal to strike reference to a notorious organized crime family because the defendants' group in that case was allegedly a branch of the crime family. The *Scarpa* court noted that in RICO cases, "courts have refused to strike allegations of organized crime connections that 'serve to identify the enterprise' and the means by which its members and associates conduct various criminal activities .'" *Scarpa,* 913 F.2d at 1013 (quoting *Napolitano,* 552 F.Supp. at 480).

**\*3** Similarly, in *Hernandez,* the Second Circuit affirmed the district court's refusal to strike references to the defendant's cocaine-related activity when the defendant was charged with a heroin conspiracy because it was relevant to the organizational structure, method of operation, and nature of relationships between the defendants. *SeeHernandez,* 85 F.3d at 1030;*accordUnited States v. Montour,* 944 F.2d 1019, 1026 (2d Cir.1991) ("[A]s long as the overt acts alleged are relevant to the conspiracy charge, the trial judge's refusal to strike is not error.").

Here, the issue is whether references in the prefatory section of the Indictment concerning other insurance companies affected by Defendants' alleged mail fraud scheme, and other CPT Codes used by Defendants' to execute the scheme are relevant and admissible when the fourteen charged counts only involve mailings to and from Medicare under the CPT Code for "electrical stimulation," CPT Code 97118. Defendants argue that these additional allegations constitute highly prejudicial surplusage because they are not charged in the Indictment, and, therefore, would tend to confuse the jury, leading to speculation of guilt as to the charged accounts. The Government, however, urges that evidence of similar billings submitted to other insurance companies, and billings using another inaccurate CPT Code, would constitute direct evidence of the mail fraud scheme perpetrated in the fourteen charged counts, and, as such, should not be stricken.

Applying the standards set forth above, the Court finds the challenged references to be both relevant and admissible. Section 1341 of Title 18 of the United States Code prohibits the

devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money ... by means of false or fraudulent pretenses, representations, or promises ... [and] for the purpose of executing such scheme ... [the placing] in any post office ... any matter or thing whatever to be sent or delivered by the Postal service.

18 U.S.C. § 1341. In other words, federal law is violated when the mails are used to effectuate a fraudulent scheme. Evidence of Defendants' submissions to other insurance companies, and submissions using the ultrasound CPT Code, therefore, are relevant as proof of a scheme in the charged counts. Just as the defendants' uncharged cocaine activity in *Hernandez* was found relevant to the charged heroin conspiracy as showing the defendants' organizational structure and method of operation, the additional alleged claim submissions here are relevant to Defendants' alleged method of submitting claims for reimbursement of EMIT Device treatment by using inaccurate codes. Furthermore, the challenged references would likely be admissible under Rule 404(b) as proof of motive, preparation,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

plan, and/or absence of mistake or accident. Accordingly, Defendants' motion to strike is denied.

## B. Motions to Dismiss

**\*4** Defendants next move, pursuant to Fed.R.Crim.P. 12(b), to dismiss the Mail Fraud Counts on the grounds that they 1) fail to state a crime, and 2) are unconstitutionally vague. In reviewing a motion to dismiss pursuant to Fed.R.Crim.P. 12(b), a court must accept all factual allegations in the indictment as true. *SeeCostello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956)."[W]here a grand jury has determined that there is probable cause to believe that a fact constituting an element of a crime has occurred, and where this fact is alleged in an indictment, a defendant may not challenge this factual assertion short of a trial on the merits."*United States v. Bicoastal Corp.,* 819 F.Supp. 156, 158 (N.D.N.Y.1993); *seealsoUnited States v. Martinez,* No. S1 94cr219(RPP), 1995 WL 10849, at \*2 (S.D.N.Y. Jan. 12, 1995).

### 1. Failure to State a Crime

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."An indictment "need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."*United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998) (quoting *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992)). The Second Circuit has made clear that an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charge against him, and enables him to plead an acquittal or a conviction which bars future prosecution for that same offense. *SeeUnited States v. Pirro,* 212 F.3d 86, 91-92 (2d Cir.2000) (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590

).

Rule 12(b), governing criminal pretrial motions, provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion."Fed.R.Crim.P. 12(b). In the Second Circuit, dismissal of an indictment is justified either "to eliminate prejudice to a defendant; or, to prevent prosecutorial impairment of the grand jury's independent role."*United States v.. Hogan,* 712 F.2d 757, 761 (2d Cir.1993).

There is no doubt, and Defendants do not challenge, that the Indictment here meets these basic pleading requirements in that it provides sufficient factual detail to permit Defendants to prepare their defense and to bar future prosecutions for the same offense. Defendants instead argue that the Mail Fraud Counts must be dismissed because they fail to allege the violation of any law, and accordingly, operated to misinform the grand jury, thereby fatally infecting its charging function. Specifically, Defendants insist that the Government misstated significant legal standards governing how Medicare claims are submitted and processed. Contrary to the Government's assertions in the Indictment, Defendants' claim that 1) FDA approval was not necessary for Medicare reimbursement, 2) investigational treatments or services were not automatically precluded from Medicare reimbursement, 3) CPT Codes, as a matter of law, are not applied with absolute precision in that i) HCFA regulations required that only the most accurate code, not the exact code, be used, and ii) since they are undefined, the scope of the ultrasound and electrical stimulation CPT Codes is uncertain, and 4) the billing physician's certification does not certify that all services were personally performed by the billing physician. The Government counters that these challenges to the Indictment reflect a misconstrual of the mail fraud scheme alleged in the Indictment, and/or constitute factual arguments not appropriately decided on a motion to dismiss.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

a. FDA Approval and Investigational Devices

**\*5** Defendants assert that the gravamen of the
Mail Fraud Counts rests on the erroneous legal pro-
position that FDA approval of a service or treat-
ment was required for Medicare reimbursement.
The Government urges, however, that the mail
fraud scheme, at its core, alleges that Defendants
chose to bill for their EMIT Device treatments as
either ultrasound or electrical stimulation treat-
ments, which, according to the Government, they
are not. Therefore, regardless of whether Medicare
required FDA approval or permitted reimbursement
for investigational devices, billing for EMIT Device
treatments using CPT Codes for other devices
would be fraudulent. As the Government points out,
whether FDA approval was required and reimburse-
ment for investigational devices was prohibited
could speak to Defendants' motive for utilizing the
alternative CPT Codes, but are not essential to the
alleged fraudulent scheme. Therefore, the issue of
whether, as a matter of law, FDA approval was re-
quired and reimbursement for investigational
devices was prohibited between 1990 and 1994 is
not reached by the Court at this time.

Defendants' arguments, therefore, based on a
recent Institute of Medicine Report, that Medicare
Carriers were in fact reimbursing for services re-
lated to investigational devices is also inapposite
since Defendants are not charged with simply
billing for investigational devices. As discussed
above, Defendants are charged with concealing the
fact that their services were performed with an in-
vestigational device (the EMIT Device), by billing
Medicare for ultrasound and electrical stimulation
treatments that, the Government alleges, were not
actually performed.

b. CPT Codes

Defendants next argue that the CPT Codes, as a
matter of law, are not applied with the precision al-
leged in the Indictment, that they are undefined and
allow flexibility, and therefore, that the Govern-

ment's criminalization of Defendants' billing prac-
tices must fail. The Government urges, however,
that these arguments again misconstrue the charged
mail fraud scheme, and, anyway, are factual argu-
ments not appropriately decided on a motion to dis-
miss. The Court agrees.

Much is made by Defendants of the fact that
the Indictment alleges that physicians claiming re-
imbursement from Medicare must "describe the ex-
act service or procedure provided using the CPT
Code designated for that service or procedure,"
(Indictment at ¶ 21), when the CPT guidelines only
call for using the CPT Code "most accurately"
identifying the procedure. Defendants, however, are
not charged with mistakenly utilizing the ultra-
sound and electrical stimulation codes to bill for
EMIT Device treatment. Rather, the Government
alleges that Defendants intentionally utilized these
alternative codes knowing that they did not prop-
erly describe the EMIT Device treatment.

As discussed above, in reviewing a motion to
dismiss pursuant to Fed.R.Crim.P. 12(b), a court
must accept all factual allegations in the Indictment
as true. See*Costello v. United States,* 350 U.S. 359,
363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United
States v. Bicoastal Corp.,* 819 F.Supp. 156, 158
(N.D.N.Y.1993). Therefore, regardless of whether
the CPT Codes apply an "exact" or "most accurate"
standard, the Government's allegations that the
EMIT Device does not constitute either an ultra-
sound or electrical stimulation service, and that De-
fendants knowingly and fraudulently billed for
them anyway, must be accepted as true, and are suf-
ficient to state a crime. "A deliberate misleading
use of a particular code, would, of course, support a
criminal fraud charge under various federal stat-
utes. See, e.g., 18 U.S.C. § 1341."*Siddigi v. United
States,* 98 F.3d 1427, 1428 (2d Cir.1996). Further-
more, the issues of whether or not the EMIT Device
constitutes some form of either ultrasound or elec-
trical stimulation treatment sufficient to justify the
use of such codes (likely requiring the assistance of
experts), and whether Defendants intended to sub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

mit false claims using these codes, are questions of fact to be determined at trial, and therefore, not appropriately determined in a pretrial motion. *See Alfonso,* 143 F.3d at 777 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."); *United States v. Snead,* 822 F.Supp. 885, 887 (D.Conn.1993) ( "Dismissal of an indictment is [only] proper when the determination can be made based solely upon issues of law.").

c. Physician Certification

**\*6** Lastly, Defendants claim that the Government misstated the certification on the back of the Claim Form when it alleged in the Indictment that "it was further part of the scheme and artifice to defraud that the defendants submitted ... claims to Medicare-Part B for evaluations that were certified as being personally performed, in whole or in part, by the billing physician, when such evaluations were not so performed."(Indictment ¶ 62.) The signature portion of the Claim Form requires the billing physician to certify that the billed services were "personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."(Defs.' Mem. in Supp. of Mot. to Dismiss for Failure to State a Crime [hereinafter "Defs.' Crime Mem ."], Attach. 2 at 4.) Defendants, therefore, claim that the Government's omission of the language allowing for billing of services provided by the physician's employee "fatally infects the criminal allegations in counts 1-14."(Defs.' Crime Mem. at 14.) The Court disagrees.

Semantics aside, the certification represents that the billing physician either personally performed or personally supervised the services being billed. Therefore, the Government's qualification in the Indictment that Defendants certified that the services were personally performed "in whole or in part," covers this discrepancy. The Court finds, therefore, that the Government's omission of the supervisory portion is not a clear misstatement and does not fatally infect the mail fraud counts. The bottom line in the certification is some degree of personal participation by the billing physician.

The Government alleges that Defendants hired two doctors part-time and obtained provider numbers in the names of those two doctors to enable themselves to bill for services under those two doctors' provider numbers. By billing under these provider numbers, Defendants represented that these physicians personally performed or personally supervised the treatments. The Indictment alleges that as part-time employees, these physicians neither personally performed nor personally supervised many of the billed services. As such, these allegations would constitute further evidence of defendants overall fraudulent scheme. Whether in fact the billing physicians actually supervised or performed the services billed is a question of fact for the jury.

In sum, Defendants' motion to dismiss the Mail Fraud Counts on the ground that the Government failed to state a crime is denied.

2. Unconstitutionally Vague

Defendants' third and final motion seeks dismissal of the Mail Fraud Counts on the ground that, as applied, the statute is unconstitutionally vague. The Government contends that the relevant regulations are clear and that Defendants fail to demonstrate how their conduct was based on any ambiguity or lack of guidance in the law.

The Supreme Court has held that the void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."*Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also United States v. Dauray,* 215 F.3d 257, 264 (2d Cir.2000) ("Due process requires that a criminal statute give fair warning of the conduct that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

makes a crime."(quoting *Bouie v. City of Columbia,* 378 U.S. 347, 350-51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)))."The touchstone inquiry is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."*United States v. Velasequi,* 199 F.3d 590, 593 (2d Cir.1999). In criminal prosecutions, the rule of lenity requires that "ambiguities in the statute be resolved in the defendant's favor."*United States v. Plaza Health Laboratories, Inc.,* 3 F.3d 643, 649 (2d Cir.1993)."Because the meaning of language is inherently contextual," however, the Supreme Court has "declined to deem a statute 'ambiguous' for purposes of lenity merely because it was possible to articulate a construction more narrow than that urged by the Government."*Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). Rather, it is a "doctrine of last resort." *Dauray,* 215 F.3d at 264. Finally, it is well established that vagueness challenges other than in the First Amendment context "must be examined in light of the facts of the case, on an as-applied basis."*United States v. Whittaker,* 999 F.2d 38, 42 (2d Cir.1993); *seealsoUnited States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1997).

*7 Here, Defendants do not argue that the mail fraud statute itself is unconstitutionally vague. Rather, Defendants argue that, as applied to this case, the mail fraud charges incorporate provisions from the Medicare program which lack the precision of the criminal code. Specifically, Defendants claim that the Medicare statutes', regulations', and program instructions' lack of standards on proper billing procedures, and lack of guidance on interpreting CPT Codes, preclude the imposition of criminal liability for misusing those terms. The Government, however, again urges that this is not a case about unintentional coding errors on Medicare claim submissions. Rather, as reiterated above, Defendants are charged with intentionally falsifying claims by using inaccurate codes to bill for treatment with an investigational device not yet ap-

proved by the FDA, because they knew that treatment with the EMIT Device was not reimbursable. Moreover, the Government urges that the relevant CPT Codes are neither uncertain nor complex, and that no industry standard would sanction the use of these codes for the EMIT Device.

In support of their argument, Defendants rely on *Siddigi v. United States,* 98 F.3d 1427 (2d Cir.1996), for the general proposition that all CPT Codes are inherently ambiguous, do not provide clear guidance on what services are reimbursable, and, therefore, cannot serve as a basis for criminal liability. The Court finds this interpretation to be over broad. In *Siddigi,* uncontradicted expert and lay testimony indicated that there was widespread confusion concerning a specific chemotherapy code, and that the defendant's conduct was standard practice among physicians. *Seeid.* at 1430, 1439.The Second Circuit criticized the Government's inability to cite any authority indicating that the defendant's conduct was excludable as a compensable service under the disputed code. *Seeid.* at 1436-39.This holding, however, cannot be generalized for the proposition that all charges based on mail fraud violations arising from submission of fraudulent CPT Codes are necessarily ambiguous.

Here, while it is true that the Government has not pointed to a specific rule excluding the EMIT Device as a billable form of ultrasound or electrical stimulation treatment, Defendants have yet to claim that the EMIT Device in fact constitutes either of those services. Instead, Defendants make the general assertion that all CPT Codes are vague and uncertain. While the Court is mindful that it must not permit the Government to "ambush" a defendant with ambiguities in Medicare regulations, the Court also notes that "Medicare and Medicaid fraud constitute a great drain on a limited source of social funding. Those who perpetrate such fraud deserve relentless prosecution and severe punishment, and ... should not be ... allow[ed] ... to hide behind the ambiguities of bureaucratic regulations."*United States v. Siddigi,* 959 F.2d 1167, 1174 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

Cir.1992) (citations omitted).

**\*8** Applying the standards set forth above, the Court finds that the Mail Fraud Counts, as applied in this case, are not unconstitutionally vague. The mail fraud statute requires the Government to show that Defendants devised a scheme to defraud it of money, and used the mail to execute such scheme. The relevant Medicare regulations tell physicians that 1) they are only permitted to bill for "reasonable and necessary services," (Program Compliance Guidelines of Inspector General at 10-11, Defs.' Vagueness Memo., Attach. 2); 2) that they must utilize the CPT Code most accurately identifying the service or procedure performed, (Physicians Current Procedural Terminology at xi, Defs.' Failure Memo., Attach. 7); 3) that "unlisted" codes were available for use when billing for procedure or services not listed in the CPT manual, (*Id.* at xiv), and 4) that they were on notice that "they may be subject to criminal, civil, and administrative penalties for signing a certification when they know that the information is false or for signing a certification with reckless disregard as to the truth of the information."(Program Compliance Guidelines of Inspector General at 25, Defs.' Vagueness Memo., Attach. 2.) In the Court's view, these combined regulations gave fair warning of the conduct that they made a crime. As applied, this collective statute does not appear vague when the charge is devising and executing a scheme to defraud Medicare by intentionally billing Medicare for reimbursement under CPT Codes Defendants knew to be improper. To succeed, of course, the Government will have to prove both fraudulent intent and the inaccuracy of the CPT Codes as applied to the EMIT Device. As discussed above, however, these are issues of fact reserved for trial; not ambiguities in the law to be decided on a motion to dismiss. Accordingly, Defendants' motion to dismiss the Mail Fraud Counts on the ground of vagueness is denied.

## IV. CONCLUSION

In sum, and for the reasons set forth above, Defendants' Motion to Strike [doc. # 43], Defendants' Motion to Dismiss Counts 1 through 14 of the Superceding Indictment for Failure to State a Crime [doc. # 46], and Defendants' Motion to Dismiss Counts 1 through 14 of the Superceding Indictment as Unconstitutionally Vague [doc. # 44], are DENIED.

So ordered.

D.Conn.,2001.
U.S. v. Markoll
Not Reported in F.Supp.2d, 2001 WL 173763 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**BIO-MAGNETIC THERAPY SYSTEMS, INC.
AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2002 AND 2003**

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
### AND SUBSIDIARIES
### CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2002 and 2003

| | Page |
|---|---|
| Accountants Compilation Report | 1 |
| Financial Statements | |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Stockholders' (Deficit) | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-11 |

**Certified Public Accountant**
**Personal Financial Specialist**
21301 Powerline Road
Suite #102
Boca Raton, Fl 33433-2309
(561) 883-1210
Fax (561) 883-1252
Email bod@cpapfs.net

**MEMBER**
Florida Institute of
Certified Public Accountants
American Institute of
Certified Public Accountants

**LICENSED**
In Florida
and New York

To the Board of Directors and
Stockholders of
Bio-Magnetic Therapy Systems, Inc.
And Subsidiaries

## ACCOUNTANTS REPORT

We have compiled the accompanying consolidated balance sheets of Bio-Magnetic Therapy Systems, Inc and Subsidiaries as of December 31, 2002and 2003 and the related consolidated statements of operations, stockholders' (deficit) and cash flows for the years then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting, in the form of financial statements, information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Bruce J. O'Donnell, C.P.A., P.A.
December 28, 2004

Securities offered through Medallion Investment Services, Inc.*
Member NASD/SIPC (410) 544-8400
271 53rd Circle, Vero Beach, Fl 32968
Investment Advice offered through Medallion Advisory Services, LLC*
Registered Investment Advisor
*Wholly owned subsidiary of TMG Holding Company, Inc.
T/A The Medallion Group
1

# BIO-MAGNETIC THERAPY SYSTEMS, INC.
## AND SUBSIDIARY
## CONSOLIDATED BALANCE SHEETS
*December 31, 2002 and 2003*

| ASSETS | 2002 | 2003 |
|---|---|---|
| **Current Assets** | | |
| Cash and cash equivalents (Note 2b) | $433,198 | $739,443 |
| Acounts Receivable net of allowance of $887,898 for 2002 and 2003 (Note 2c) | 99,308 | 878,544 |
| Inventories (Note 2d) | 176,139 | 343,646 |
| Prepaid and other assets | 33,237 | 18,130 |
| Total Current Assets | 741,882 | 1,979,763 |
| Property and Equipment (Note 3) | 2,106,002 | 114,411 |
| **Other Assets** | | |
| Other Receivables net of allowance of $328,155 for 2002 and 2003 (Note 11) | 0 | 580,103 |
| TOTAL ASSETS | $2,847,884 | $2,674,277 |

**LIABILITIES AND STOCKHOLDERS' DEFICIT**

| | 2002 | 2003 |
|---|---|---|
| **Current Liabilities** | | |
| Accounts payable and accrued expenses (Note 4, 10) | $949,415 | $2,677,965 |
| Deferred Compensation (Note 8) | 486,261 | 656,261 |
| Deferred revenue - current portion (Note 2f) | 558,489 | 0 |
| Accrued Litigation Settlement - current portion (Note 10) | 0 | 34,000 |
| Notes payable - current portion (Note 5) | 1,743,320 | 1,685,000 |
| Total Current Liabilities | 3,737,485 | 5,053,226 |
| **Long-Term Liabilities** | | |
| Deferred Revenue (Note 2f) | 1,255,271 | 0 |
| Accrued Litigation Settlement (Note 10) | 475,000 | 475,000 |
| Total Long-Term Liabilities | 1,730,271 | 475,000 |
| **Stockholders' Deficit** | | |
| Common Stock, par value $.01, 15,000,000 shares authorized, 9,276,549 shares issued and outstanding for 2002 and 2003 | 92,765 | 92,765 |
| Paid in Capital | 6,965,207 | 6,965,207 |
| Accumulated Deficit | (9,696,279) | (9,907,475) |
| Foreign currency translation adjustment (Note 2i) | 18,435 | (4,446) |
| Total Stockholders' Deficit | (2,619,872) | (2,853,949) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $2,847,884 | $2,674,277 |

See Accompanying Notes and Accountant's Report

2

# BIO-MAGNETIC THERAPY SYSTEMS, INC.
## AND SUBSIDIARY
### CONSOLIDATED STATEMENTS OF OPERATIONS
For the Years Ended December 31, 2002 and 2003

|                                         | 2002        | 2003        |
| --------------------------------------- | ----------- | ----------- |
| Revenue                                 | $4,087,644  | $6,812,329  |
| Cost of Goods Sold                      | 57,949      | 2,204,757   |
| Gross Margin                            | 4,029,695   | 4,607,572   |
| **Operating Expenses**                  |             |             |
| Cost of Operations                      | 1,710,538   | 2,996,423   |
| Payroll and related items               | 1,087,379   | 1,391,532   |
| Depreciation (Note 3)                   | 321,338     | 36,040      |
| Total Operating Expenses                | 3,119,255   | 4,423,995   |
| **Other (Expenses) Income**             |             |             |
| Interest (Expense)                      | (138,179)   | (132,738)   |
| Interest Income                         | 0           | 1,383       |
| Other (Expenses)(Notes 2f, 11)          | (114,362)   | (263,418)   |
| Total Other (Expenses) - Net            | (252,541)   | (394,773)   |
| Net Income (Loss)                       | 657,899     | (211,196)   |
| **Other Comprehensive (Loss)**          |             |             |
| Foreign Currency Translation            | (346,254)   | (22,881)    |
| Total Comprehensive Net Income (Loss)   | $311,645    | ($234,077)  |

See Accompanying Notes and Accountant's Report

3

# BIO-MAGNETIC THERAPY SYSTEMS, INC.
## AND SUBSIDIARY
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' (DEFICIT)
#### For theYears Ended December 31, 2002 and 2003

| | Common Stock | Stock Subscription Receivable | Accumulated Deficit | Foreign Currency Translation Adjustment | Paid-In Capital | Total Stockholders' (Deficit) |
|---|---|---|---|---|---|---|
| December 31, 2001 | $92,765 | ($27,750) | ($10,354,178) | $364,689 | $6,252,957 | ($3,671,517) |
| Issuance of Stock | - | 27,750 | - | - | 712,250 | 740,000 |
| Net Income | - | - | 657,899 | - | - | 657,899 |
| Translation Adjustment | - | - | - | (346,254) | - | (346,254) |
| December 31, 2002 | 92,765 | 0 | (9,696,279) | 18,435 | 6,965,207 | (2,619,872) |
| Issuance of Stock | - | - | - | - | - | 0 |
| Net Income | - | - | (211,196) | - | - | (211,196) |
| Translation Adjustment | - | - | - | (22,881) | - | (22,881) |
| December 31, 2003 | $92,765 | $0 | ($9,907,475) | ($4,446) | $6,965,207 | ($2,853,949) |

See Accompanying Notes and Accountant's Report

4

BIOSMACNETIC THERAPY SYSTEMS, INC.
AND SUBSIDIARY
CONSOLIDATED STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 2002 and 2003

|  | 2002 | 2003 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net Income (Loss) | $657,899 | ($211,196) |
| | | |
| Adjustments to reconcile net income | | |
| to cash provided by operating activities: | | |
| Depreciation | 321,338 | 36,040 |
| Changes in assets and liabilities: | | |
| (Increase)Decrease in accounts receivable | 605,759 | (779,236) |
| (Increase)Decrease in inventory | 31,752 | (167,507) |
| (Increase)Decrease in prepaid expenses and other assets | 51,878 | 15,107 |
| (Increase)Decrease in other receivable | 0 | (580,103) |
| (Increase)Decrease in property and equipment - write off of devices | 0 | 2,062,835 |
| Increase(Decrease) in accounts payable and accrued expenses | (1,365,382) | 1,762,550 |
| Increase(Decrease) in deferred compensation | 170,000 | 170,000 |
| Increase(Decrease) in deferred revenue | (579,145) | (1,813,760) |
| | | |
| Total Adjustments | (763,800) | 705,926 |
| | | |
| Net cash provided by operating activities | (105,901) | 494,730 |
| | | |
| **Cash flows (used for) provided by investing activities:** | | |
| Capital expenditures | (163,334) | (107,284) |
| | | |
| Net cash (used for) investing activities | (163,334) | (107,284) |
| | | |
| **Cash flows (used for) provided by financing activities:** | | |
| Proceeds from stock transactions | 740,000 | 0 |
| Proceeds (payments) of notes payable | 37,500 | (58,320) |
| | | |
| Net cash (used for) provided by investing activities | 777,500 | (58,320) |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | (346,254) | (22,881) |
| | | |
| Net increase(decrease) in cash and cash equivalents | 162,011 | 306,245 |
| | | |
| Cash and cash equivalents at beginning of year | 271,187 | 433,198 |
| | | |
| Cash and cash equivalents at end of year | $433,198 | $739,443 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 6,079 | $ 481 |

See Accompanying Notes and Accountant's Report

5

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2002 AND 2003

### NOTE 1 – NATURE OF BUSINESS

BIO-MAGNETIC THERAPY SYSTEMS, INC. (the "Company" or "BMTS") is a Virginia corporation engaged in the development and production and commercialization of proprietary technology based on extremely low frequency magnetic field pulses to treat osteoarthritis, sports-type injuries, and other degenerative joint and neurological disorders.

The Company owns a number of United States process patents in addition to other foreign patents that utilize pulse electromagnetic fields ("PEMF") to treat arthritis, sports-type injuries, and other degenerative joint and neurological disorders. #5,131,904 for the "Treatment of Arthritis with Magnetic Field Therapy and Apparatus; #5,387,176 for the "Treatment of acute Diseases as Caused by Sport-type Injuries of the Musculoskeletal System Excluding Fractures with Magnetic Field Therapy"; #5,453,073 for the "Apparatus for Treatment of Diseased Body Organs with Magnetic Field Therapy" ; #5,669,868 for the "Treatment of Wrinkled, Discolored of Aging skin with Magnetic Field Therapy"; #5,665,049 for the "Treatment of Acute Diseases as Caused by Sports-type Injuries of the Musculoskeletal System (excluding fractures) with magnetic Field Therapy" (even broader than #5,387,176); #5,842,966 for the "Treatment of Disease including Degenerative and Inflammatory Conditions of the Musculoskeletal System and…(Enhanced Coverage on Arthritis Treatment)"; #407/809 for "Design patent for treatment bed"; #6,119,631 for "Coil cabinet for treating animals with magnetic field therapy"; #6,048,302 for "New Periodontal device"; #6,524,233 for the "Electromagnetic Stimulation of Cartilage Tissue"; and #111 9393B1(issued by the European Patent Office) for the "Electromagnetic Stimulation of Cartilage Tissue". The Company also holds numerous other foreign patents in this field.

Further, the Company has been granted an exclusive worldwide, royalty-free license by Dr. Richard Markoll, the Company's chairman and the primary developer of these intended processes, to use, manufacture and lease the proprietary device used to administer PEMF in these processes. In addition, the Company has an option to acquire all technology rights from Dr. Markoll in return for certain royalty payments on these leases.

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

#### 2a) PRINCIPLES OF CONSOLIDATION
The financial statements include the accounts of Bio-Magnetic Therapy Systems, GmbH a wholly owned German subsidiary and its subsidiary Signal Medizin Vertriebs, GmbH. All significant transactions and balances between the Companies and its subsidiaries have been eliminated in consolidation.

#### 2b) CASH AND CASH EQUIVALENTS
Cash equivalents consist of short-term liquid investments, which are readily convertible into cash, and have maturities of three months or less.

#### 2c) ACCOUNTS RECEIVABLE
Management believes that the accounts receivable from PST Holdings/International as of December 31, 2002 and 2003 was uncollectible, and an allowance for doubtful accounts of $887,898 was recorded. Management also believes that they will be successful in acquiring a portion of the 1,003,333 shares of BMTS, Inc. stock that PST holds in satisfaction of this amount.

6

**BIO-MAGNETIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2002 AND 2003**

#### 2d) INVENTORIES
Inventories consist of treatment devices and accessories assembled for leasing. The inventories are stated at the lower of cost or market. The cost is determined by specific identification method.

#### 2e) REVENUES
The Company's revenue is derived from the lease of devices, sale of activation cards used by these devices, and maintenance fees for each device in operation.

#### 2f) DEFERRED EARNINGS
Prior to 2003, the Company's deferred earnings represent leases of the treatment devices to operating clinics throughout Germany. Under the terms of the lease arrangements, the Company leases the treatment devices for a period of three to five years. Ownership of the device remains with the Company. Proceeds from the financing of the devices are received in advance from the lessee and income associated with these leases is recognized over the lease term. During 2003 all deferred revenue was recognized and all related devices were written off and is included in other income. Due to new regulations, beginning in 2004 the Company reports all revenue immediately. The Company also transfers ownership of the component parts of the devices to the financing company for the period financed.

#### 2g) DEPRECIATION
Depreciation is provided on a straight-line method over the estimated useful lives of the related assets. Leasehold improvements are expensed over the period of the respective leases.

#### 2h) INCOME TAXES
Effective October 1, 1992, the Company adopted Statement of Financial Standards (SFAS) N. 109, Accounting for income Taxes.

#### 2i) FOREIGN CURRENCY TRANSLATION
Foreign currency balance sheet accounts are translated into United States dollars at the exchange rate in effect at year end. Income statement accounts are translated at the average rate of exchange in effect during the year. The resulting translation adjustments are recorded as a separate component of stockholders' equity.

#### 2j) USE OF ESTIMATES
The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assents and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

#### 2k) LONG-LIVED ASSETS
Long-lived assets are reviewed on an ongoing basis for impairment based on comparison of carrying value against undiscounted future cash flows. If an impairment is identified, the asset carrying amount is adjusted to fair value.

# BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2002 AND 2003

## NOTE 3 – PROPERTY AND EQUIPMENT

Property and equipment at cost consist of the following:

|  | 2002 | 2003 |
|---|---|---|
| Furniture and Equipment | $ 156,115 | $ 195,804 |
| Devices | 3,403,922 | -0- |
| Leasehold Improvements | 16,736 | 18,363 |
| Vehicles | 14,673 | 7,198 |
|  | 3,591,446 | 221,365 |
| Less: Accumulated Depreciation | (1,485,444) | (106,954) |
| Total Property and Equipment | $ 2,106,002 | $ 114,411 |

Depreciation expense was $321,338 and $36,040 for the years ended December 31, 2002 and 2003, respectively.

## NOTE 4 – INVESTMENT IN UNCONSOLIDATED SUBSIDIARY

In 1996, the Company acquired a 22% interest in PST Holdings(PST) in exchange for the granting of a distribution Agreement/Franchise Rights for the promotion, use and sale of the device developed by the Company used to treat arthritis and sports type injuries. This franchise right was valued at $3 million by PST Holdings and is amortized over a 20 year period. PST owns approximately 10.8% of the outstanding shares of the Company. Due to the related party nature of this transaction, the share of earnings and losses from date of acquisition adjusted for related amortization taken by PST is recognized by the Company. However, the Company has discontinued using this equity method to account for its investment in PST since the investment was at zero value as of December 31, 2002 and 2003, respectively.

In June 2002, PST investors made loans to PST in order that PST could pay down amounts owed under its franchise agreement to the Company. In return, the Company guaranteed certain PST investors repayment of their loan if PST defaulted. Debt assumed by the Company on behalf of PST was due to the Company in full on October 1, 2003 but was never received. The Company has accrued $497,943 and $521,115 as a liability for these loans as of December 31, 2002 and 2003 respectively.

On March 27, 2003 BMTS and PST entered into an agreement that modified the distribution and licensing agreement by restricting the PST territory to France, Italy, Switzerland, Portugal and Spain. Those territories would be on an exclusive basis to PST; however, all other countries including Germany and Austria were removed from the original agreement. The term was reduced to one year with one-year extensions only if PST achieves certain minimum performance standards. As a result, BMTS GmbH has assumed certain activities of PST relating to the operations in Germany and Austria effective April 1, 2003. This settlement also reflected certain

8

**BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES**
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2002 AND 2003

agreements relating to accounts receivable due from PST to BMTS, the repayment of certain loan and security agreement amounts that were still outstanding. PST has defaulted on their agreement to pay these accounts receivable and has ceased conducting business with BMTS.

NOTE 5 – NOTES PAYABLE

| Notes Payable consists of: | 2002 | 2003 |
|---|---|---|
| Note Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | $ 100,000 | $ 100,000 |
| Note Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | 50,000 | 50,000 |
| Notes Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | 58,320 | -0- |
| Notes payable, due upon demand with all unpaid interest payable at 8%. The Note is Collateralized by all assets of the Company. | 1,535,000 | 1,535,000* |
| Total Notes Payable | 1,743,320 | 1,685,000 |
| Less Current Portion | (1,743,320) | (1,685,000) |
| Total Long-Term Debt | $ -0- | $ -0- |

* In December 2004, the Company made a principle payment of $937,370 to reduce this loan amount.

NOTE 6 – STOCK OPTION PLANS

On September 30, 1994, the company established a non-qualified stock option plan. The plan was amended and restated on January 31, 1996 and again on May 21, 1997 to authorize the

9

issuance of options to purchase up to 3,175,077 shares of common stock, subject to certain anti-dilution requirements. Any option issued entitles the holder to purchase the shares of Class A common stock subject to the option at a purchase price of $1.85 per share. On April 8, 1997, the Company established the 1997 stock option plan. The 1997 stock option plan established the issuance of options to purchase up to 700,000 shares subject to certain dilution requirements. Options have been issued for the purchase of 2,785,635 and 3,285,635 shares as of December 31, 2002 and 2003 respectively. A total of 1,806,135 and 2,196,135 options have expired as of December 31, 2002 and 2003 respectively and 1,191 options have been exercised..

## NOTE 7 – OPERATING LEASE

The Company leases office space, warehouse space, and equipment under operating leases that expire through 2008. Annual rent expense under these operating leases amounted to $160,953 and $163,424 for the years ended December 31, 2002 and 2003, respectively.

At December 31, 2003, the future minimum lease payments approximated the following:

| | |
|---|---|
| 2004 | $ 399,000 |
| 2005 | 397,000 |
| 2006 | 361,000 |
| 2007 | 317,400 |
| 2008 | 235,900 |
| Total future minimum lease payments | $1,710,300 |

## NOTE 8 – DEFERRED COMPENSATION

The Company entered into an employment agreement with its chairman, which requires a minimum annual salary $250,000 for each of the years ended December 31, 2002 and 2003. The salary is payable $150,000 on an annualized bases and $100,000 payable at the discretion of the Company's board of directors. The Company has also deferred salary agreement with another officer in the amount of $20,000 annually. Any salary amounts not paid in the year earned, shall be carried forward to subsequent years and must be paid by the termination date of the agreement. Bonus amounts not paid in the current year are also carried forward. These unpaid obligations are recorded as deferred compensation. As of December 31, 2002 and 2003 deferred compensation was $486,261 and $656,261 respectively.

## NOTE 9 – INCOME TAXES

As of December 31, 2002 and 2003 the Company had net operating loss carryforwards available to offset future taxable income of approximately $8,600,000 and $7,600,000, respectively. These carryforwards begin to expire in 2010. Due to the uncertainty of the future utilization of these net operating losses, a valuation allowance has been recorded against the net operating losses, and no deferred tax assets have been recorded.

10

## NOTE 10 – LITIGATION SETTELEMENTS

In 2001, Eugene Heller, Magnetic Treatment Medical Services, P. C. and Magnetic Treatment Center, P.C. filed a lawsuit against the Company and Dr. Richard Markoll for monetary damages incurred as a result of the investigation by the United States Attorney's office for the District of Connecticut in regards to a possible Medicare/Medicaid violation. The Company has recorded $475,000 as an accrued liability to settle this matter.

In 2002 the Company settled a claim with a former clinic physician and agreed to pay a total of $62,000 in eight monthly payments beginning in October 2003. As of December 31, 2003 a total of $28,000 had been paid and the remaining balance of $34,000 has been recorded as an accrued liability.

## NOTE 11 – RELATED PARTY RECEIVABLES

The Company has receivables due, for overhead charges and funds advanced, from Tinnitus Signal Medizin GmbH, and Institute for Innovative Medizin GmbH (INFINOMED) in the amounts of $328,155 and $890,562 as of December 31, 2002 and 2003 respectively. An allowance for doubtful accounts of $328,155 was recorded as of December 31, 2002 and 2003.

The patents and trademarks developed by Tinnitus Signal Medizin, GmbH were transferred to BMTS, GmbH in 2004. The purchase price was calculated using the outstanding amounts due for overhead charges and funds advanced. Shareholders owning a substantial portion of the outstanding stock of the Company also owned these companies. All the shares of Tinnitus Signal Medizin, GmbH and Institute for Innovative Medizin, GmbH (INFINOMED) are in the process of being transferred to BMTS, GmbH.

## NOTE 12 – SUBSEQUENT EVENTS

In 2004 the Company moved its US corporate office from Boca Raton, Florida to Germany where most of the Companies activity are centralized.

All the shares of Tinnitus Signal Medizin, GmbH and Innovative Medizin, GmbH (INFINOMED) are in the process of being transferred to BMTS, GmbH. This was initiated in 2004 and the final registration is expected in early 2005.

11

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2005**

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
### AND SUBSIDIARIES
### CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2005

| | Page |
|---|---|
| Accountants Compilation Report | 1 |
| Financial Statements | |
|    Consolidated Balance Sheets | 2 |
|    Consolidated Statements of Operations | 3 |
|    Consolidated Statements of Stockholders' Equity | 4 |
|    Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-11 |

## BRUCE J. O'DONNELL, CPA/PFS, PA

*Certified Public Accountant*
*Personal Financial Specialist*

**MEMBER**
Florida Institute of
Certified Public Accountants
American Institute of
Certified Public Accountants

21301 Powerline Road
Suite #102
Boca Raton, Fl 33433-2309
(561) 883-1210
Fax (561) 883-1252
Email bod@cpapfs.net

**LICENSED**
In Florida
and New York

To the Board of Directors and
Stockholders of
Bio-Magnetic Therapy Systems, Inc.
And Subsidiaries

### ACCOUNTANTS REPORT

We have compiled the accompanying consolidated balance sheet of Bio-Magnetic Therapy Systems, Inc and Subsidiaries as of December 31, 2005 and the related consolidated statements of operations, stockholders' equity and cash flows for the year then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting, in the form of financial statements, information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

*Bruce J. O'Donnell, C.P.A., P.A.*

Bruce J. O'Donnell, C.P.A., P.A.
April 25, 2006

Securities offered through Medallion Investment Services, Inc.*
Member NASD/SIPC (410) 544-8400
271 53rd Circle, Vero Beach, Fl 32968
Investment Advice offered through Medallion Advisory Services, LLC*
Registered Investment Advisor
*Wholly owned subsidiary of TMG Holding Company, Inc.
T/A The Medallion Group
1

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
### AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
#### December 31, 2005

### ASSETS

| | |
|---|---:|
| Current Assets | |
| Cash and cash equivalents (Note 2b) | $743,367 |
| Acounts Receivable net of allowance of $0 (Note 3) | 1,000,500 |
| Inventories (Note 2c) | 412,765 |
| Prepaid and other assets | 225,633 |
| Total Current Assets | 2,382,265 |
| Property and Equipment (Note 4) | 116,245 |
| Other Assets | |
| Intangible assets (Note 5) | 2,088,199 |
| Total Other Assets | 2,088,199 |
| TOTAL ASSETS | $4,586,709 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---:|
| Current Liabilities | |
| Accounts payable and accrued expenses (Note 6, 12) | $2,016,326 |
| Deferred Compensation (Note 10) | 970,000  *RM /EM* |
| Deferred revenue - current portion | 76,718 |
| Notes payable - current portion (Note 7) | 195,917 |
| Total Current Liabilities | 3,258,961 |
| Long-Term Liabilities | |
| Accrued Litigation Settlement (Note 12) | 650,000 |
| Stockholders' Equity | |
| Common Stock, par value $.01, 25,000,000 shares authorized, | |
| 14,976,549 shares issued and outstanding.  Preferred Stock, no par value, | 149,765 |
| 5,000,000 shares authorized, none outstanding | |
| Paid in Capital | 8,332,207 |
| Accumulated Deficit | (7,762,316) |
| Foreign currency translation adjustment (Note 2i) | (41,908) |
| Total Stockholders' Equity | 677,748 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $4,586,709 |

See Accompanying Notes and Accountant's Report

2

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
### AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS
#### For theYear Ended December 31, 2005

| | |
|---|---:|
| Revenue | $6,511,284 |
| Cost of Goods Sold | 720,163 |
| Gross Margin | 5,791,121 |
| **Operating Expenses** | |
| Cost of Operations | 3,189,562 |
| Payroll and related items | 2,280,988 |
| Depreciation and Amortization (Notes 4, 5) | 106,432 |
| Total Operating Expenses | 5,576,982 |
| **Other (Expenses)Income** | |
| Interest (Expense) | (148,070) |
| Interest Income | 1,310 |
| Other (Expenses) Income (Notes 6, 12) | (340,773) |
| Total Other (Expenses)Income - Net | (487,533) |
| Net Loss | (273,394) |
| **Other Comprehensive Loss** | |
| Foreign Currency Translation | (278,496) |
| Total Comprehensive Net Loss | ($551,890) |

## BIO-MAGNETIC THERAPY SYSTEMS, INC.
## AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### For the Year Ended December 31, 2005

|  | Common Stock | Accumulated Deficit | Foreign Currency Translation Adjustment | Paid-In Capital | Total Stockholders' Equity(Deficit) |
|---|---|---|---|---|---|
| December 31, 2004 | $92,765 | ($7,733,041) | $236,588 | $6,965,207 | (438,481) |
| Adj for subsidaries acquired | - | 244,119 | - | - | 244,119 |
| Issuance of Stock | 57,000 | - | - | 1,367,000 | 1,424,000 |
| Net Loss | - | (273,394) | - | - | (273,394) |
| Translation Adjustment | - | - | (278,496) | - | (278,496) |
| December 31, 2005 | $149,765 | ($7,762,316) | ($41,908) | $8,332,207 | $677,748 |

**BIO-MAGNETIC THERAPY SYSTEMS, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Year Ended December 31, 2005**

| | |
|---|---:|
| Cash flows from operating activities: | |
| Net Income | ($273,394) |
| | |
| Adjustments to reconcile net income | |
| to cash provided by operating activities: | |
| Depreciation and Amortization | 106,432 |
| Changes in assets and liabilities: | |
| (Increase)Decrease in accounts receivable | (216,924) |
| (Increase)Decrease in inventory | 199,794 |
| (Increase)Decrease in prepaid expenses | (55,087) |
| Increase(Decrease) in accounts payable and accrued expenses | 634,118 |
| Increase(Decrease) in deferred compensation | 143,739 |
| Increase(Decrease) in deferred revenue | 27,361 |
| | |
| Total Adjustments | 839,433 |
| | |
| Net cash provided by operating activities | 566,039 |
| | |
| Cash flows (used for) provided by investing activities: | |
| Equity of subsidiary acquired | 244,119 |
| Capital expenditures | (1,588,952) |
| | |
| Net cash (used for) investing activities | (1,344,833) |
| | |
| Cash flows (used for) provided by financing activities: | |
| Proceeds (payments) of notes payable | (499,953) |
| Issuance of Stock | 1,424,000 |
| | |
| Net cash (used for) provided by investing activities | 924,047 |
| | |
| Effect of exchange rate changes on cash and cash equivalents | (278,496) |
| | |
| Net increase(decrease) in cash and cash equivalents | (133,243) |
| | |
| Cash and cash equivalents at beginning of year | 876,610 |
| | |
| Cash and cash equivalents at end of year | $743,367 |
| | |
| Supplemental disclosure of cash flow information: | |
| Cash paid during the year for interest | $   148,070 |

See Accompanying Notes and Accountant's Report
5

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2005

NOTE 1 – NATURE OF BUSINESS

BIO-MAGNETIC THERAPY SYSTEMS, INC. (the "Company" or "BMTS") is a Virginia corporation engaged in the development and production and commercialization of proprietary technology based on extremely low frequency magnetic field pulses to treat osteoarthritis, sports-type injuries, and other degenerative joint and neurological disorders.

The Company owns a number of United States process patents in addition to other foreign patents that utilize pulse electromagnetic fields ("PEMF") to treat arthritis, sports-type injuries, and other degenerative joint and neurological disorders. #5,131,904 for the "Treatment of Arthritis with Magnetic Field Therapy and Apparatus; #5,387,176 for the "Treatment of acute Diseases as Caused by Sport-type Injuries of the Musculoskeletal System Excluding Fractures with Magnetic Field Therapy"; #5,453,073 for the "Apparatus for Treatment of Diseased Body Organs with Magnetic Field Therapy" ; #5,669,868 for the "Treatment of Wrinkled, Discolored of Aging skin with Magnetic Field Therapy"; #5,665,049 for the "Treatment of Acute Diseases as Caused by Sports-type Injuries of the Musculoskeletal System (excluding fractures) with magnetic Field Therapy" (even broader than #5,387,176); #5,842,966 for the "Treatment of Disease including Degenerative and Inflammatory Conditions of the Musculoskeletal System and…(Enhanced Coverage on Arthritis Treatment)"; #407/809 for "Design patent for treatment bed"; #6,119,631 for "Coil cabinet for treating animals with magnetic field therapy"; #6,048,302 for "New Periodontal device"; #6,524,233 for the "Electromagnetic Stimulation of Cartilage Tissue"; and #111 9393B1(issued by the European Patent Office) for the "Electromagnetic Stimulation of Cartilage Tissue". The Company also holds numerous other foreign patents in this field.

Further, the Company has been granted an exclusive worldwide, royalty-free license by Dr. Richard Markoll, the Company's former chairman and the primary developer of these intended processes, to use, manufacture and lease the proprietary device used to administer PEMF in these processes.

In 2004 the Company moved its US corporate office from Boca Raton, Florida to Germany where most of the Companies activities are centralized.

NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

2a) PRINCIPLES OF CONSOLIDATION
The financial statements include the accounts of Bio-Magnetic Therapy Systems, GmbH a wholly owned German subsidiary and its subsidiaries Signal Medizin Vertriebs, GmbH, PST SMV Italy, GmbH, Tinnitus Signal Medizin, GmbH, and Institute for Innovative Medizin, GmbH. (Infinomed). All significant transactions and balances between the Companies and its subsidiaries have been eliminated in consolidation.

2b) CASH AND CASH EQUIVALENTS
Cash equivalents consist of short-term liquid investments, which are readily convertible into cash, and have maturities of three months or less.

6

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2005

### 2c) INVENTORIES

Inventories consist of treatment devices and accessories assembled for leasing. The inventories are stated at the lower of cost or market. The cost is determined by specific identification method.

### 2d) REVENUES

The Company's revenue is derived from the lease of devices, sale of activation cards used by these devices, and maintenance fees for each device in operation.

### 2e) DEPRECIATION

Depreciation is provided on a straight-line method over the estimated useful lives of the related assets(3-15 years). Leasehold improvements are expensed over the period of the respective leases.

### 2f) AMORTIZATION

The cost of patent rights acquired is being amortized on the straight-line method over a 20-year period. The cost of the non-compete agreement are being amortized over a 5-year period.

### 2g) DEFERRED EARNINGS

Prior to 2003, the Company's deferred earnings represent leases of the treatment devices to operating clinics throughout Germany. Under the terms of the lease arrangements, the Company leases the treatment devices for a period of three to five years. Ownership of the device remains with the Company. Proceeds from the financing of the devices are received in advance from the lessee and income associated with these leases is recognized over the lease term. During 2003 all deferred revenue was recognized and all related devices were written off and is included in other income. Due to new regulations, beginning in 2004 the Company reports all revenue immediately. The Company also transfers ownership of the component parts of the devices to the financing company for the period financed.

### 2h) INCOME TAXES

Effective October 1, 1992, the Company adopted Statement of Financial Standards (SFAS) N. 109, Accounting for income Taxes.

### 2i) FOREIGN CURRENCY TRANSLATION

Foreign currency balance sheet accounts are translated into United States dollars at the exchange rate in effect at year end. Income statement accounts are translated at the average rate of exchange in effect during the year. The resulting translation adjustments are recorded as a separate component of stockholders' equity.

### 2j) USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assents and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2005

### 2k) LONG-LIVED ASSETS

Long-lived assets are reviewed on an ongoing basis for impairment based on comparison of carrying value against undiscounted future cash flows. If an impairment is identified, the asset carrying amount is adjusted to fair value.

### NOTE 3 – ACCOUNTS RECEIVABLE

Management believes that the accounts receivable from normal business operations are collectible, and no allowance for doubtful accounts has been recorded.

### NOTE 4 – PROPERTY AND EQUIPMENT

Property and equipment at cost consist of the following:

| | |
|---|---|
| Furniture and Equipment | $ 337,534 |
| Leasehold Improvements | 18,363 |
| Vehicles | 11,236 |
| | 367,133 |
| Less: Accumulated Depreciation | (250,888) |
| Total Property and Equipment | $ 116,245 |

Depreciation expense was $75,297 for the year ended December 31, 2005.

### NOTE 5 – INTANGIBLES

Intangibles at cost consist of the following:

| | |
|---|---|
| Patent Rights | $ 621,930 |
| Non-compete agreement | 1,500,000 |
| | 2,121,930 |
| Less: Accumulated Amortization | (33,731) |
| Total Patent Rights | $ 2,088,199 |

The Company paid Dr. Richard Markoll $1,500,000 in 2005 as consideration for a non-compete agreement. These costs will be amortized over a five year period beginning in 2006.

Amortization expense was $31,135 for the year ended December 31, 2005.

8

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2005

### NOTE 6 – INVESTMENT IN UNCONSOLIDATED SUBSIDIARY

In 1996, the Company acquired a 22% interest in PST Holdings(PST) in exchange for the granting of a distribution Agreement/Franchise Rights for the promotion, use and sale of the device developed by the Company used to treat arthritis and sports type injuries. PST did not fulfill its agreement and all rights and territories reverted back to the BMTS, GmbH.

In June 2002, PST investors made loans to PST in order that PST could pay down amounts owed under its franchise agreement to the Company. In return, the Company guaranteed certain PST investors repayment of their loan if PST defaulted. Debt assumed by the Company on behalf of PST was due to the Company in full on October 1, 2003 but was never received. The Company has accrued $635,000 as a liability for these loans as of December 31, 2005.

### NOTE 7 – NOTES PAYABLE

| Notes Payable consists of: | 2005 |
|---|---|
| Note Payable, currently due with all unpaid interest payable at 8%. The Note is convertible into shares of the authorized but unissued Class A Common Stock. The Note is collateralized by certain patents and other intellectual property of the Company. | $ 100,000 |
| Notes payable, due upon demand with all unpaid Interest payable at 8% and is Collateralized by all assets of the Company. | 95,917 |
| Total Notes Payable | 195,917 |
| Less Current Portion | (195,917) |
| Total Long-Term Debt | $    -0- |

### NOTE 8 – STOCK OPTION PLANS

On September 30, 1994, the company established a non-qualified stock option plan. The plan was amended and restated on January 31, 1996 and again on May 21, 1997 to authorize the issuance of options to purchase up to 3,175,077 shares of common stock, subject to certain anti-dilution requirements. Any option issued entitles the holder to purchase the shares of Class A common stock subject to the option at a purchase price of $1.85 per share. On April 8, 1997, the Company established the 1997 stock option plan. The 1997 stock option plan established the issuance of options to purchase up to 700,000 shares subject to certain dilution requirements. Options have been issued for the purchase of 3,285,635 shares as of December 31, 2005. A total of 2,757,444 options have expired as of December 31, 2005 and 1,191 options have been exercised.

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2005

NOTE 9 – OPERATING LEASE

The Company leases office space, warehouse space, and equipment under operating leases that expire through 2009. Annual rent expense under these operating leases amounted to $570,395 for the year ended December 31, 2005.

At December 31, 2005, the future minimum lease payments approximated the following:

| | | |
|---|---|---:|
| 2006 | $ | 126,950 |
| 2007 | | 66,228 |
| 2008 | | 31,107 |
| 2009 | | 3,423 |
| Total future minimum lease payments | $ | 227,708 |

NOTE 10 – DEFERRED COMPENSATION

The Company entered into an employment agreement with its chairman, which requires a minimum annual salary $250,000 for the year ended December 31, 2005. The salary is payable $150,000 on an annualized bases and $100,000 payable at the discretion of the Company's board of directors. The Company has also deferred salary agreement with another officer in the amount of $20,000 annually. Any salary amounts not paid in the year earned, shall be carried forward to subsequent years and must be paid by the termination date of the agreement. Bonus amounts not paid in the current year are also carried forward. These unpaid obligations are recorded as deferred compensation. As of December 31, 2005 deferred compensation was $970,000.

NOTE 11 – INCOME TAXES

As of December 31, 2005 the Company had net operating loss carryforwards available to offset future taxable income of approximately $2,900,000. These carryforwards begin to expire in 2011. Due to the uncertainty of the future utilization of these net operating losses, no deferred tax assets have been recorded.

NOTE 12 – LITIGATION SETTELEMENTS

In 2001, Eugene Heller, Magnetic Treatment Medical Services, P. C. and Magnetic Treatment Center, P.C. filed a lawsuit against the Company and Dr. Richard Markoll for monetary damages incurred as a result of the investigation by the United States Attorney's office for the District of Connecticut in regards to a possible Medicare/Medicaid violation. The Company has recorded $650,000 as an accrued liability to settle this matter.

## BIO-MAGENTIC THERAPY SYSTEMS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2005

### NOTE 13 – RELATED PARTY ACTIVITIES

The Company has receivables due, for overhead charges for Innovatis EV in the amounts of $137,383 as of December 31, 2005. This amount has been written off as uncollectible. The patents and trademarks developed by Tinnitus Signal Medizin, GmbH were transferred to BMTS, GmbH in 2004 for a purchase price of $621,930. The purchase price was calculated using the outstanding amounts due for overhead charges and funds advanced. Shareholders owning a substantial portion of the outstanding stock of the Company controlled this company until the end of 2004. All the shares of Tinnitus Signal Medizin, GmbH and Institute for Innovative Medizin, GmbH (INFINOMED) were transferred to BMTS, GmbH in 2005.

### NOTE 15 – SUBSEQUENT EVENTS

In December 2005 Duravest, Inc. acquired 5,700,000 shares of stock from the Company and an additional 2,803,083 shares directly from other shareholders. In January 2006, Duravest, Inc. acquired an additional 8,362,094 shares from the Company at the same price per share. Dr. Richard Markoll stepped down as CEO and now consults the Company and remains a member of the board of directors. Dr. Rolf Käse and Dr. Ogan Gurel became members of the board of directors effective January 1, 2006.

11