UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DURAVEST, INC.,

                                 Plaintiff,        **AFFIDAVIT**

            -against-

VISCARDI, AG; WOLLMUTH MAHER & DEUTSCH, LLP;    Docket No.: 07-Civ-10590(JR)
MASON H. DRAKE, ESQ., BRUCE O'DONNELL, CPA,
BRUCE O'DONNELL CPA/PFS, P.A., BIOMEDICAL
CONSULTANT SL, RICHARD MARKOLL, and
ERNESTINE BINDER MARKOLL,

                                 Defendants.
------------------------------------------------------------------x

SWISS CONFEDERATION    )

CANTON OF ZURICH        )S.S.:

        HENDRIK HAMMJE, being duly sworn, states:

        1.    I am the Chief Executive Officer of Duravest, Inc. ("DURAVEST"), and president of its Board of Directors.

        2.    In my capacity in the above described positions, I have come to know Friedrich W. Goebel, the Chief Executive Officer and senior partner of defendant Viscardi, A.G. ("VISCARDI") I have also come to know some of the history and pedigree of Bio-Magnetic Therapy Systems, Inc. ("BMTS"), whose acquisition is the subject of this lawsuit; the business practices of VISCARDI; and the history of the transaction at issue in this case.

        3.    Duravest's attorneys have informed me that VISCARDI is claiming in this suit that it did not have any business dealings in New York, and that it further claims that as a result, this Court does not have the authority to exercise personal jurisdiction over it. I have also reviewed VISCARDI's submission which makes these claims.

4. VISCARDI's submission does not deny that it advised the sellers in the transaction whereby DURAVEST purchased BMTS (and all of its subsidiaries). The transaction was conducted utilizing the services of defendants WOLLMUTH MAHER & DRAKE, MASON DRAKE, ESQ. (both of whom represented DURAVEST as legal counsel), and based on financial statements provided by Defendants BRUCE O'DONNELL, C.P.A., and BRUCE O'DONNELL CPA/PFS, P.A. ("O'DONNELL Defendants"). Defendants WOLLMUTH, MAHER & DRAKE and MASON DRAKE, ESQ. have offices in New York City, and BRUCE O'DONNELL represents himself to be a Certified Public Accountant licensed in the State of New York.

5. Since DURAVEST's purchase of BMTS, I have become aware that BMTS (a Virginia corporation) has had occasion to conduct significant business in New York, by and through a New York registered subsidiary, Bio-Magnetic Therapy Systems. Inc. ("BMTS New York").

6. Bio-Magnetic Therapy Systems, Inc. was registered in the County of Suffolk, in the State of New York **(Exhibit "A")**. BMTS has conducted significant business in New York through this subsidiary, and then directly, selling Pulsed Signal Technology ("PST") devices for veterinary treatment of animals in the State of New York.

7. BMTS regularly marketed its PST products throughout the United States, including in the State of New York. I am aware that BMTS was able to sell PST machine technology for veterinary use in the State of New York. In my experience, such machines have been sold for approximately twenty seven thousand nine hundred thousand dollars (with unlimited use), or sometimes for



slightly less with the necessity of having the user purchase additional chip card products necessary to keep using the machines. These chip cards could easily add several thousand dollars in sales for a particular machine, provided the machine was used.

8.   At the time of DURAVEST's purchase of BMTS, BMTS also had significant dealings with New York customers for human use of PST technology, who consisted largely of doctors purchasing magnetic therapy machines using PST devices. One such doctor was a Dr. Eugene Heller, who did business in Melville, New York through corporations known as Magnetic Treatment Medical Services, P.C. **(Exhibit "B")**, and under the name Magnetic Treatment Center.

9.   Indeed, Mr. Heller ultimately made a claim in New York against BMTS, resulting in New York litigation, when he claimed he could no longer profit from the PST technology that BMTS sold to him, prior to its purchase by Duravest. I believe that such claim was related to the Markolls' fraud convictions, in that the use of the technology could not be correctly billed to Medicare.

10.   Though at the time of the sale negotiation, Mr. Markoll made a representation that "there were no actions suits, or proceedings pending, or to the knowledge of the company, threatened against the company at law or in equity before or by any court," such statement was, we now know, false. I can safely say that after the purchase we have learned that the Heller claim has been represented to be in an amount in excess of Six Hundred Thousand Dollars ($600,000.00). We now know that all of such business between the Heller companies and BMTS took place prior to Duravest's purchase of BMTS.



11. It is safe to say that if a customer has asserted a claim against BMTS for which the customer demands an amount in excess of Six Hundred Thousand Dollars ($600,000.00), that the amount of business BMTS conducted in New York (even considering only this client) was significant. Accordingly, BMTS, and VISCARDI, the company who marketed BMTS for sale to DURAVEST as a going concern, made a conscious decision to transact business in New York.

12. Prior to the commencement of this lawsuit, I have had occasion to communicate with Mr. Goebel. He has represented himself to me as someone with business interests in the United States, and as one who has had contacts in the State of New York. He has been a Partner at S.G. Cowen, New York, and Managing Director of Hypo Securities, Inc., New York.

13. I am also aware that VISCARDI was founded in 1999, and that during that time period, Mr. Goebel claims to have engaged in many high profile United States – German capital market transactions. In connection with its services for BMTS, VISCARDI authored reports entitled "Executive Summary."

14. As set forth in DURAVEST's Complaint, many of the individual shareholders of BMTS were New York State residents – at least eighteen. This is a significant amount, especially considering that BMTS was a closed corporation. I would expect that any communications, meetings, or contacts between such shareholders would have logically taken place in New York. Their names are set forth in the Complaint, at paragraph five.

15. One such report was authored in June 2005 **(Exhibit "C")**, and describes the BMTS Group as "a leading German-U.S. based medical technology enterprise founded in 1991." I cannot imagine that in light of their own report,

VISCARDI would still deny that it represented a client (i.e. BMTS) that it knew to have significant ties to the State of New York.

16. Based on the foregoing, I respectfully request that VISCARDI's motion to dismiss the claims Duravest makes against it on the basis of a lack of personal jurisdiction, be denied.

Dated:   Zürich Switzerland
         April 25, 2008

*Hendrik Hammje*

Signed and sworn to before me this
25th day of April, 2008

_____
Notary Public

## Official Certification

Seen for authentication of the above signature, affixed in our presence by

Mr. **Hendrik HAMMJE**, born 23. August 1971, Nationality: Germany, according to his information residing at Seehofstrasse 8, 8008 Zürich, Switzerland,
identified by passport,

Zürich, 25. April 2008
BK no. 5209
Fee CHF 20.00

NOTARIAT ENGE-ZÜRICH

Nadia Valler
Notariatsassistentin

# NYS Department of State
## Division of Corporations
## Entity Information

**Selected Entity Name:** BIO-MAGNETIC THERAPY SYSTEMS, INC.

### Selected Entity Status Information

**Current Entity Name:** BIO-MAGNETIC THERAPY SYSTEMS, INC.
**Initial DOS Filing Date:** MAY 01, 1992
**County:** SUFFOLK
**Jurisdiction:** VIRGINIA
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** INACTIVE

### Selected Entity Address Information

**DOS Process** (Address to which DOS will mail process if accepted on behalf of the entity)
BIO-MAGNETIC THERAPY SYSTEMS, INC.
SUITES 13 AND 14
1200 CLINT MOORE ROAD
BOCA RATON, FLORIDA, 33487

**Registered Agent**
NONE

**NOTE:** New York State does not issue organizational identification numbers.

Search Results    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State
## Division of Corporations
## Entity Information

**Selected Entity Name:** MAGNETIC TREATMENT MEDICAL SERVICES, P.C.

### Selected Entity Status Information

**Current Entity Name:** MAGNETIC TREATMENT MEDICAL SERVICES, P.C.
**Initial DOS Filing Date:** JUNE 30, 1992
**County:** SUFFOLK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC PROFESSIONAL CORPORATION
**Current Entity Status:** INACTIVE

### Selected Entity Address Information

**DOS Process** (Address to which DOS will mail process if accepted on behalf of the entity)

HUNTON & WILLIAMS
ATTN: ROBERT ACOSTA-LEWIS
200 PARK AVENUE, 43RD FLOOR
NEW YORK, NEW YORK, 10166-0136

**Registered Agent**

NONE

**NOTE:** New York State does not issue organizational identification numbers.

Search Results     New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

# BMTS GROUP
## Executive Summary





VISCARDI AG
Corporate Finance and Merchant Banking

June 2005

## 1. Business Overview

| | |
|---|---|
| *Unique non-invasive therapy for the treatment of musculoskeletal and degenerative joint disorders such as Osteoarthritis (Arthrosis) and Sports-type injuries* | BMTS Group together with its wholly-owned subsidiaries (collectively, "BMTS" or the "Company") is a leading German-US based medical technology enterprise founded in 1991 and dedicated to the non-invasive treatment of Osteoarthritis (Arthrosis), Sports- and Work-related injuries and Osteoporosis. The Company markets and sells its innovative and patented therapy system (the "PST™ System") that delivers a unique pulsed electronic signal carried on electromagnetic fields that have been proven to stimulate the growth, repair and healing of connective tissue such as cartilage, tendons, ligaments and bones. |
| *Top-tier academic institutions recognize the 20-year research and development work* | Based on the fundamental research of Richard Markoll, MD, PhD, BMTS has successfully pioneered and developed the PST™ System with the initial studies at Yale University and then substantiated by 10 European and Asian universities. In addition the PST™ System has been validated in more than 25 well-controlled clinical studies and more than 60 peer reviewed publications in the US, Europe and Asia. For this significant accomplishment Dr. Markoll was awarded the John Liebeskind Research Award by "The American Academy of Pain Management" in 2000 and published a chapter in the clinicians textbook "American Academy of Pain Management" 6th Edition. |
| *High efficacy and patient satisfaction with no known side effects* | Being a cost competitive, painless, non-invasive and clinically proven therapy without known side effects PST™ offers a breakthrough solution for the treatment of musculoskeletal disorders. To date more than 300,000 patients have been treated with a documented clinical success rate of over 75%. |
| *High profile patients from the sports and entertainment sectors enjoy the PST™ benefits* | BMTS has successfully launched the PST™ System in Germany and currently distributes the PST™ System in 24 countries around the world. The high patient acceptance is reflected by more than 1,500 treatment systems operating in >700 PST™ clinics. A number of high profile patients including members of the German national athletics team, national ski and ski-jump team, professional football teams (including FC Bayern Munich, Borussia Mönchengladbach, 1. FC Kaiserslautern) and various well-known American and German actors have benefited from PST™. |
| *Protected by a broad patent, trademark and IP portfolio* | Currently, 51 international patents cover all essential technical innovations and future treatment options of PST™. Additional patents are in preparation and will be filed within 2005. |

## 2. Mode of Operation

*Patented stimulation of connective tissue growth & repair via a unique pulsed signal*

The heart of PST™ technology is the unique pulsed signal that stimulates connective tissue growth and repair. In healthy individuals, connective tissue cells respond to mechanical stress by making more tissue components. The mechanism by which these cells become aware of mechanical stress and are stimulated to reproduce is thought to be a mechanical-electrical transduction generated by fluid movement in the cartilage, causing charged ions to flow past tissue components that are stationary and carry electric charges. This phenomenon, called streaming potentials, is impaired in cases of osteoarthritis and trauma related joint disorders – the mechanical-electrical transduction does not take place and thus the connective tissue does not receive the appropriate stimuli.

*Signals carried on electromagnetic fields mimic the body's own natural or physiological signals to stimulate cartilage and connective tissue growth and repair*

The Company believes PST™ technology has solved this problem by generating signals that are equivalent in duration, frequency and oscillation to the body's own natural or physiological signals and are thus biologically tuned to start regenerating the damaged connective tissue. In this way, signals induce the missing transmission of information to the damaged cells, thus ensuring the joint's ability to function by producing basic matrix substances. The biophysical mechanism of action of PST™ is described in further detail in the chart below:

**MECHANISM OF ACTION OF PULSED SIGNAL THERAPY**

Charge equilibrium between hydrogen protons and negative charge carriers in the extracellular cartilage matrix (ECM) -no streaming potential-

Fig. 1 — At Rest

Creation of a streaming voltage potential in the ECM during loading caused by the "compression" of fixed negatively charged fluid forced out of cartilage tissue with forced movement of hydrogen protons (joint flexion)

Fig. 2 — Under Load

Generation of "streaming potentials" in the joint caused by the forced movement of hydrogen protons in the ECM through alternating PST™ signals as stimulation of chondrocytes in the connective tissue in matrix

Fig. 3 — At Rest Under PST

The precise algorithms comprising the Company's unique pulsed signals are proprietary trade secrets that have not been duplicated.

VISCARDI AG                                                                                          3

## 3. Product and Treatment Overview

| | |
|---|---|
| *The stationary PST™ System offers an ideal solution for physicians and clinics* | The basic stationary PST™ System consists of a magnetic field generator, an electronic interface, and a segmented single or double toroid coil applied with annular windings. These components produce a pulsed DC elliptical magnetic field that serves as the vehicle to carry the PST™ signals to the affected joint. The signals penetrate the joint by means of the magnetic field and emulate naturally occurring biological processes that stimulate connective tissue growth, repair and healing. |
| | The system is equipped with custom-made furniture that allows the patient to be positioned correctly and comfortably ensuring efficient delivery of the PST™ treatment signal. |
| *The mobile PST™ System offers high patient comfort and flexibility for busy executives* | All PST™ Systems are available as stationary systems for treatment in clinics or in the physician's practice or as mobile systems for treatment in the patients' home or office, thus avoiding the need for the patient to travel back and forth, nine or twelve times, to the PST doctor's office. |
| *CE-Mark and ISO 9000 certified* | After successful completion of regulatory requirements and clinical trials the PST™ System received the CE-Mark and ISO 9000 certification in June 1998 and more recently the MDD 13485/2003. BMTS is therefore in the position to produce and market the PST™ System in all major international markets. The US Food and Drug Administration ("FDA") classified the PST™ System as a non-significant risk device and granted an Investigational Device Exemption (IDE) for the PST™ System in April 1998. |
| *Non-invasive and pain-free treatment without any known side effects* | The typical PST™ treatment comprises 9 or 12 one-hour sessions at a PST™ Center in a physician's practice, clinic or hospital by a licensed medical professional, who has special training and is certified in the use of the PST™ System. During treatment, the patient lies or sits relaxed with the joint or spine to be treated comfortably resting in an air-core coil. Usually patients notice an improvement after several days or weeks. The treatment itself is non-invasive and pain-free since the biological electromagnetic signals fluctuate with low frequency within the physiological energy range of connective tissue. To date, no side effects have been reported. |

## 4. Indication / Application Overview

| | |
|---|---|
| *PST™ addresses significant markets with a high medical treatment need* | Based on scientific evidence and analysis of the clinical studies BMTS has developed a number of PST™ Systems for various medical indications and treatment applications: |
| *\*PST Ortho®* | PST Ortho® was developed for the treatment of connective tissue disorders of the musculoskeletal system, especially Arthritis, Sports-type injuries, articulated joint disorders and lower back pain (Full body & extremity devices). |
| *\*PST Osteo®* | BMTS developed the PST Osteo® device as a multifunctional device for the treatment of Osteoporosis, as well as Arthritis, Fibromyalgia and chronic neck and/or back pain. The system is designed in such a way that the application coil can be lowered to close proximity of the body, ensuring maximum induction and effective treatment. |
| *PST Dental®* | PST Dental® is most commonly used for the treatment of Temporomandibular Joint (TMJ) Disorder. The PST Dental® applicator resembles a headset, positioned to target the affected jaw-joint directly and ensure efficient induction of the unique pulsed signals, through the surrounding tissue. |
| *PST Tinnitus®* | Tinnitus may be caused by constant exposure to noise, tension and stress. However, a large number of sufferers have either a disorder of the cervical spine or misalignment of the jaw, ultimately leading to increased tension in the chewing muscles of the jaw. The Tinnitus device is in the form of a bed, where the patient lies down, and the applicator applied from the back of the head, to cover the TMJ, cervical spine and appropriate anatomical site. In this way, the affected areas are directly targeted, enabling efficient transduction and restoration of physiological signalling. |
| *\*PST Mobil™* | The PST Mobil™ device is essentially an embodiment of the Original PST™ stationary devices, delivering identical pulsed signals with the same unique energy parameters. Its portable miniaturized format has been specially designed for patients to conduct treatment at their own convenience in their own homes and offices twice daily. |
| *PST VET™* | The PST VET™ device is either a stationary unit (used in the Practice) or a mobile device, for the treatment of Osteoarthritis in canines at home or horses in a PST VET™ equipped stable. |
| *Scientific Background* | BMTS' research group will be delighted to make a full presentation and discuss the scientific rational behind these indications/applications in greater detail with interested parties. |

## 5. Business Model and Financials

*Compelling business model based on a diversified revenue base with a high predictability and attractive profit margins*

The Company's business model is based on a diversified revenue base:

- Sale / lease of the PST™ System (the Device) via a financing company to the PST™ clients
- Sale of activation chip-cards to PST™ clients (The chip-cards are required for the operation of the PST™ System)
- Monthly fees for the maintenance of the PST™ Systems.

BMTS generates attractive gross margins from all of these revenue sources, especially from the sale of chip-cards where gross margins exceed 90%. As a consequence the Company pursues the strategy to rapidly install a large base of PST™ Systems and then drive future growth and profitability through the sale of chip-cards.

*Success of the business model demonstrated in Europe*

BMTS has impressively proven the success of this business model in Germany and other European countries where most of the PST™ Systems are installed. In the future the Company plans to introduce this business model globally.

*Sound financial history*

The historical financial performance of BMTS is very promising. Over the last three years BMTS was able grow its revenues at a CAGR of over 40% and (with the exception of 2003 due to the write-off of distributors' accounts receivables) has generated attractive profits, which were posted as $1.5 million in 2004 on an EBITDA basis.

*Consolidated historical financial overview of BMTS Inc*

| (in '000 $) | 2002 BMTS Inc. | 2003 BMTS Inc. | 2004 BMTS Inc. |
|---|---|---|---|
| Revenues | 4,088 | 5,701 | 8,164 |
| Cost of Goods Sold | 60 | 262 | 1,086 |
| **Gross Margin** | 4,028 | 5,439 | 7,078 |
| Cost of Operation | 1,711 | 2,996 | 3,052 |
| Payroll and related items | 1,087 | 1,392 | 2,648 |
| **EBITDA** | 1,230 | 1,051 | 1,378 |
| Depreciation | 321 | 36 | 91 |
| **EBIT** | 909 | 1,015 | 1,287 |
| Other Income | 0 | 0 | 198 |
| Interest Expenses | 138 | 131 | 142 |
| Extraordinary Expenses[1] | 114 | 263 | 0 |
| Foreign Currency Translation | -346 | 68 | 150 |
| Taxes | 0 | 0 | 0 |
| **Net Income (Loss)** | 311 | 689 | 1,493 |

[1] Includes allowances for doubtful accounts of a total of $ 328,155 for 2002 and 2003

*Continuation of the successful financial performance*

BMTS is confident that it will continue its impressive financial performance and expects to grow its revenues at double-digit rates and will further improve the Company's profitability.

## 6. History and Proposed Transaction

*Core competence is research and development of the PST™ System*

In 1991 BMTS was founded by Dr. Markoll and other scientific and medical experts as a pure research company, focused on perfecting and obtaining regulatory approval for PST™ technology.

Due to the emphasis on R&D activities the Company decided to out-source and license the European distribution rights for the device to an unrelated enterprise (the "PST™ Holding Ltd"), which was financed by venture capitalists and well-known individuals from the healthcare industry. BMTS specifically allowed this group to use the Company's trademark PST™ in their corporate name.

Henceforth BMTS was responsible for the scientific domain and successfully conducted numerous *in vitro* and clinical studies at renowned universities and clinics including among others Yale University, Humboldt Charité University/Berlin, Ludwig-Maximilians-University/Munich, Cochin Hospital/Paris and Niguarda Hospital/Milan.

PST™ Holding Ltd was responsible for the commercial domain and successfully launched the PST™ System in Germany. However, when PST™ Holding Ltd tried to expand to other European markets the group developed serious financial and managerial problems and was not able to meet performance standards and to fulfil the financial obligations under the licensing agreement. As a consequence the distribution rights for Germany retroceded to BMTS in April 2003 and for all other European countries in January 2004.

*Successful market launch in Germany created a high level of international interest*

After regaining the distribution rights BMTS started its own marketing activities in Germany in 2003 and in all other European countries in 2004 and impressively demonstrated the high acceptance of the PST™ Therapy and the success of the business model.

The Company's activities created a high level of interest in the PST™ System from all over the world. As a result BMTS receives frequent requests to distribute the PST™ System technology in most international markets.

## 7. Key Investment Highlights

| | |
|---|---|
| *Proprietary groundbreaking Technology* | The Company believes that the PST™ System's proprietary technology is uniquely able to effectively relieve patients of the pain associated with Osteoarthritis, Sports- and Work-related injuries and to heal and repair damaged cartilage and substantially accelerate the healing process. Clinical studies have shown that treatment with the PST™ System is effective over sustained periods in 80% of patients. The PST™ System is a cost efficient therapy alternative to surgical or pharmaceutical treatments. It is envisioned that the PST™ System will become 'the standard of care' in the treatment of Osteoarthritis and Sports- & Work-related injuries in the future. **NOTE: Comprehensive comparison study data available.** |
| *Addressing huge markets with high medical needs* | Osteoarthritis is the most prevalent joint disorder affecting both the young and elderly, occurring in approximately 12% of the population over 45 and 70% of the population over 65. As a result of increasingly active lifestyles and work requirements, Sports-type and work related injuries have rapidly increased in recent years. Currently 2% of the US population suffers from Sports-type or related injuries annually, while 1% of the US population suffers from a work-related injury annually. Osteoarthritis is the most common rheumatic disease and is second only to heart disease as a cause of work disability among persons older than 50 years of age. It is estimated that by the year 2020, the number of US residents affected will increase from 41 million to more than 59 million (or 19 percent of the population). |
| *Proven acceptance by Physicians in the medical community and by patients* | True medical innovation usually needs several years and substantial marketing budgets to be accepted by the medical community and patients. With more than 300,000 patients treated and more than 1,500 PST™ Systems operating in >700 PST™ client's centers, the PST™ therapy has already been widely accepted by the medical fraternity and patients. |
| *Compelling and already proven Business Model* | BMTS has impressively proven the economic success of its business model. Starting its own marketing activities in Germany in 2003 and in other European countries in 2004 the Company was able to generate total revenues in excess of $8 million and profits on an EBITDA basis in the amount of $1.5 million in 2004. |

| | |
|---|---|
| *Strong Intellectual Property Position* | More than 50 patents and numerous Trade and Service Marks have been issued in 20 countries (the major markets) to BMTS. Several utility patents have been issued for the medical processes involved, including the stimulation of cartilage (connective) tissue. BMTS expects to submit several new patent applications in 2005. |
| *Recognized reputation for high quality and innovative medical products* | BMTS has achieved the highest quality manufacturing certification in the medical device industry. The Company is recognized for its excellence in innovative product development and manufacturing quality. Continuous product development, including improvements and the development and roll out of new products, greatly enhance the Company's product offerings. BMTS received the ISO 9000 certification (now MDD 13485/2003) and the CE-Mark and has completed another successful TÜV audit in February 2005. |
| *Vision* | With BMTS and its PST™ technology, a large corporation in the medical technology field would have access to a unique treatment application covering a broad range of Arthritis and musculoskeletal disorders. Based on a decade of experience of treating patients in Canada and Europe and opening centers in 24 countries around the world the Company is prepared for a rapid global expansion by a strong international device company. |

## Pictures of Treatment Devices

PST Ortho®                                    PST Mobil™




More Detailed Information about BMTS can be found on the Company's web pages:

**www.sigmed.de**

**www.pstvet.com**

VISCARDI AG
Corporate Finance and Merchant Banking                                          9

# DISCLAIMER

THIS DOCUMENT IS STRICTLY CONFIDENTIAL

IT IS BEING FURNISHED TO YOU SOLELY FOR YOUR INFORMATION AND MAY NOT BE REPRODUCED, REDISTRIBUTED OR PUBLISHED IN WHOLE OR IN PART, TO ANY OTHER PERSON.

THE DISTRIBUTION OF THIS DOCUMENT IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW AND PERSONS INTO WHOSE POSSESSION THIS DOCUMENT COMES SHOULD INFORM THEMSELVES ABOUT, AND OBSERVE SUCH RESTRICTIONS.

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES ABSENT REGISTRATION OR AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE SECURITIES ACT. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION WITH RESPECT TO THE PURCHASE OR SALE OF ANY SECURITY WITHIN THE MEANING OF SECTION 5 OF THE UNTIED STATES SECURITIES ACT OF 1933 AND NEITHER THIS DOCUMENT NOR ANYTHING CONTAINED HEREIN SHALL FORM THE BASIS OF, OR BE RELIED UPON IN CONNECTION WITH ANY CONTRACT OR COMMITMENT WHATSOEVER.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR AN INVITATION TO SUBSCRIBE FOR OR A SOLICITATION OF AN OFFER TO PURCHASE ANY SECURITIES AND NEITHER THIS DOCUMENT NOR ANYTHING CONTAINED HEREIN SHALL FORM THE BASIS OF OR BE RELIED UPON IN CONNECTION WITH ANY CONTRACT OR COMMITMENT WHATSOEVER.

THIS DOCUMENT HAS BEEN PRODUCED WITH THE PURPOSE TO PROVIDE BACKGROUND INFORMATION ABOUT THE COMPANY. THE AUTHOR DOES NOT MAKE OR PROVIDE ANY REPRESENTATIONS OR WARRANTIES, REGARDING THE COMPLETENESS OR ACCURACY OF THE INFORMATION, OPINIONS OR ESTIMATES CONTAINED IN THIS DOCUMENT. FURTHER NO LIABILITY CAN BE ASSUMED FOR LOSSES INCURRED AS A RESULT OF THE DISTRIBUTING AND/OR USING THIS DOCUMENTATION OR FOR ANY LOSSES WHICH ARE IN ANY WAY ASSOCIATED WITH THE DISTRIBUTION AND/OR USAGE OF THIS DOCUMENT. THIS DOCUMENT IS NOT INTENDED AS A SUBSTITUTE FOR INDIVIDUAL INVESTMENT CONSULTATION.

THE RECOMMENDATIONS AND OPINIONS CONTAINED IN THIS DOCUMENT CONSTITUTE THE BEST JUDGMENT OF THE AUTHOR AT THIS DATE AND TIME AND ARE SUBJECT TO CHANGE WITHOUT NOTICE AS A RESULT OF FUTURE EVENTS OR RESULTS. NO GUARANTEE CAN BE GIVEN THAT THIS DOCUMENT WILL BE UPDATED TO REFELECT THE EFFECT OF SUCH FUTURE EVENTS OR RESULTS.

BY ACCEPTING THIS DOCUMENT, YOU AGREE TO BE BOUND BY THE FOREGOING LIMITATIONS.

STATE OF NEW YORK       )
COUNTY OF WESTCHESTER)

  JANICE MULLEN, being duly sworn, deposes and says that deponent is not a party to the action, is over eighteen years of age and resides in Westchester County. On April 28, 2008, deponent served Plaintiff's Declaration of counsel in Opposition, Affidavit of Hendrik Hammje, and Memorandum of Law in Opposition upon all parties who have appeared in this action, via ECF, directed to them at the addresses shown below:

    Abrams Gorelick, Friedman & Jacobson, P.C.
    Attorneys for Defendants Wollmuth and Drake
    One Battery Park Plaza, 4th floor
    New York, N.Y.
    Att: Barry Jacobs, Esq.

    Landman Corsi Ballaine & Ford, PC
    Attoneys for Defendants Bruce O'Donnell, C.P.A
    And Bruce O'Donnell, C.P.A./P.F.S.
    120 Broadway, 27th floor
    New York, N.Y. 10271
    Att: Stephen Jacobs, Esq.

    Kasowitz Benson Torres & Friedman, LLP
    Attorneys for Defendant VISCARDI
    1633 Broadway
    New York, N.Y. 10019
    Att: Mark W. Lerner, Esq.

            JANICE L. MULLEN

SWORN to before me, this
28th day of April, 2008

_____
Notary Public

LUIS F. RAS
NOTARY PUBLIC, STATE OF NEW YORK
REG. NO. 02RA6096763
QUALIFIED IN NASSAU COUNTY
MY COMMISSION EXPIRES 8/4/11