UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DURAVEST, INC., | Civil Action No. 07 Civ. 10590 (JSR) |
| Plaintiff, | **DECLARATION OF PETER J. PIZZI** |
| v. | |
| VISCARDI, A.G., WOLLMUTH MAHER & DEUTSCH, LLP, MASON H. DRAKE, ESQ., BRUCE O'DONNELL, CPA, BRUCE O'DONNELL CPA/PFS, P.A., BIOMEDICAL CONSULTANTS SL, RICHARD MARKOLL, and ERNESTINE BINDER MARKOLL, | |
| Defendants. | |

PETER J. PIZZI makes this declaration under penalty of perjury and, unless otherwise stated, based upon personal knowledge:

1.       I am an attorney at law of the State of New York and a member of the firm of Connell Foley LLP, attorneys for defendants Richard Markoll, Ernestine Binder Markoll, and Biomedical Consultants SL.

2.       Attached as exhibits to this Declaration are true and correct copies of the following documents referenced in Memorandum Of Law In Support Of Motion To Dismiss filed by defendants Richard Markoll, Ernestine Binder Markoll, and Biomedical Consultants SL:

| Exhibit | Description |
|---|---|
| A. | Excerpts from the December 1, 2005 Form 8-K report filed by DuraVest, Inc. |
| | NOTE: In the interest of conserving paper and data storage, Exhibits 12(a) [Ogan Gurel employment agreement], 12(f) [DuraVest, Inc. promissory note] and 12(g) [stock Ogan Gurel option agreement] the December 1, 2005 Form 8-K report are not included in this exhibit, but may be found at the following location: |
| | http://www.sec.gov/Archives/edgar/data/1066281/000101490905000157/0001014 909-05-000157-index.htm |

| **Exhibit** | **Description** |
|---|---|
| B. | January 23, 2006 Form 8-K report filed by DuraVest, Inc. |
| C. | February 27, 2006 Form 8-K report filed by DuraVest, Inc. |
|  | NOTE:  Unrelated exhibits to this filing are not included. |

Further this declarant sayeth not.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: August 25, 2008                                    /s/ Peter J. Pizzi
                                                                        Peter J. Pizzi

EXHIBIT A

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>f8k_30nov2005duravest.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON D.C. 20549


FORM 8-K

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934


DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) November 25, 2005


DURAVEST, INC.
-----------------------------------------------------
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


    FLORIDA                  0-27489              59-2624575
-------------------------------------------------------------------------------
(STATE OR OTHER JURISDICTION      (COMMISSION              (IRS EMPLOYER
    OF INCORPORATION)          FILE NUMBER)        IDENTIFICATION NUMBER)


    11 South LaSalle Street, 5th Floor, Chicago, Illinois 60603-1238
    ---------------------------------------------------------------
                (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES,
                        INCLUDING ZIP CODE)


    REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE (312) 423-2763
                                                       --------------

                            (NOT APPLICABLE)
    ---------------------------------------------------------------
            (FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

Check the appropriate box below If the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2 below):

[ ] Written communications pursuant to Rule 425 under the Securities Act
    (17 CFR 230.425)

[ ] Soliciting materials pursuant to Rule 14a-12 under the Exchange Act
    (17 CFR 240.14a-12)

[ ] Pro-commencement communications pursuant to Rule 14d-2(b) under the Exchange
    Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
    Act (17 CFR 240.13e-4(c))


```
<PAGE>
```

Section 1. - Registrant's Business and Operations
----------    ------------------------------------

Item 1.01    Entry into a material Definitive Agreement
---------    ------------------------------------------

     A. On November 25, 2005, DuraVest, Inc. (the "Company") entered into an
Amended and Restated Employment Agreement (the "Employment Agreement") with Dr.
Ogan Gurel whose employment as the President and Chief Executive of the Company
was continued on a full-time basis following the Company's determination that
Dr. Gurel had successfully completed the initial trial period of his employment
by executing all operations of the Company faithfully and promptly since
September 1, 2005 and advancing the Company's business purposes. The full-time
employment of Dr. Gurel under the Employment Agreement will be for a term of two
years on a full-time basis from December 1, 2005 with increased salary,
additional bonuses and an additional option grant. The Employment Agreement
amends and restates the terms of the Employment Agreement dated as of
September 1, 2005 (the "Original Employment Agreement") between the Company and
Dr. Gurel with respect to the terms of his full-time employment following the
initial trial period. Information as to the Employment Agreement and its amended
terms and conditions is set forth on in Item 5.02 of Section 5 below. A copy of
the Employment Agreement is filed with this Form 8-K Report as Exhibit 12(a).

     B. On November 25, 2005, the Company entered into a Subscription Agreement
with Bio-Magnetic Therapy Systems, Inc., a privately-held Virginia corporation
with principal offices at Kapellenweg 6, 81371 Munich, Germany ("BMTS") engaged
in the development of a process for the treatment of arthritic disease with
pulsed electromagnetic fields (referred to as the PST technology), to purchase
the following shares of common stock on the following terms and conditions:

          (1)  5,700,000 shares of common stock in BMTS, par value $0.01 per
               share, for a purchase price of US$ 0.32 per share for a total
               consideration of $1,824,000; and

          (2)  an additional subscription for 8,362,500 shares for a purchase
               price of $0.32 per share for a total consideration of $2,676,000
               immediately upon amendment of the BMTS charter to increase the
               number of authorized shares to a sufficient number to allow the
               issuance thereof. For this purpose BMTS has given notice to its
               shareholders that a Special Meeting of Shareholders will be held
               on December 28, 2005, at Brienner Strasse 1, D-80333 Munich,
               Germany, beginning at 15:00h local time (CET).

A copy of the Subscription Agreement is filed with this Form 8-K Report as
Exhibit 12(b). A copy of the BMTS representation letter delivered to the Company
is filed with this Form 8-K Report as Exhibit 12(c).

     In addition to the foregoing investment in BMTS, the Company has offered to
purchase from the shareholders of BMTS all of their outstanding shares of common
stock at a purchase price of $0.32 per share pursuant to a tender offer document
transmitted to the BMTS shareholders on November 29, 2005 (the "Shareholder
Offer"). The Shareholder Offer is subject to several conditions, including
without limitation a minimum of 4,636,775 shares of BMTS common stock being

                                    2
<PAGE>


validly tendered, no material adverse change to the business or financial
condition of BMTS, and the Company raising sufficient financing of up to at
least $7,700,000 in order to complete the direct investments in BMTS described
above as well as the Shareholder Offer. The Shareholder Offer will terminate on

December 28, 2005 unless extended by the Company. A copy of the document related to the Shareholder Offer is filed with this Form 8-K Report as Exhibit 12(d).

In connection with the Shareholder Offer, Dr. Richard Markoll and Ernestine Binder-Markoll agreed, in order to induce the Company to acquire when and if offered, not less than 50% of the currently outstanding shares of BMTS (or 4,636,774 shares) or all shares that are tendered as part of the Shareholder Offer, whichever is greater, to tender as part of the Shareholder Offer, in total, not less than either (i) the amount necessary to achieve a tender of 4,636,775 shares of BMTS when combined with all other shares being tendered, or (ii) 4,279,000; whichever is less. To guaranty compliance with this paragraph, Dr. Markoll and Ms. Markoll agreed to deliver certificates for shares of BMTS issued in their names to an escrow agent mutual agreeable to all parties with instructions to comply with the conditions of this paragraph. Dr. Richard Markoll currently is the owner of 4,079,000 Shares and Ms. Ernestine Binder-Markoll currently is the owner of 200,000 shares.

As further consideration for Dr. and Ms. Markoll agreeing as above and for other agreements and undertakings that are intended to be part of the transactions involving the Company and BMTS, and/or the Markolls, the Company acknowledged and agreed that if the Company, acting alone, together, or with or through BMTS and others, proposes to sell or otherwise transfer, directly or indirectly, more than 50% of the then outstanding shares of BMTS in a public offering, a private placement, or any transaction that would change control of BMTS, or otherwise be considered an exit from BMTS, or BMTS and/or the Company, acting alone or together, proposes to sell or transfer, substantially all the assets of BMTS, to any person or group of persons, then the Markolls shall be entitled to participate, from time to time, in any such transactions to the extent of 17.74% (on a fully diluted basis), notwithstanding the Markolls' current ownership of shares. A copy of the foregoing letter agreement is filed with this Form 8-K Report as Exhibit 12(e).

C. On November 28, 2005, the Company issued three Convertible Promissory Notes (each a "Note" and collectively the "Notes"), one of which was issued to European Catalyst Fund Limited in the total principal amount of $3,000,000, the second of which was issued to Absolute Octane Fund Limited in the total principal amount of $1,000,000, and the third of which was issued to Absolute Return Europe Fund Limited in the total principal amount of $1,000,000, for an aggregate principal amount of all Notes of $4,500,000. The principal of the Notes is due November 28, 2006 (the "Maturity Date"). Interest on the Notes is payable on the Maturity Date at the rate of 20% per annum solely in a number of shares of common stock of the Company determined by dividing the unpaid interest on the Note by the 20-day trailing market price of the shares of the Company's common stock measured at the Maturity Date. In the event the Company is unable to pay the principal amount of any Note on the Maturity Date, the holder of such Note may convert any or all of the unpaid principal into shares of the Company's common stock at any time following the Maturity Date at a conversion price equal to 80% of the 20-trading day trailing market price of the shares of the Company's Common Stock measured at the time of payment. The Notes were issued in order to finance the Company's investment in Bio-Magnetic Therapy Systems, Inc.

3

<PAGE>

more fully described below. Additional information relative to the Note and/or its issuance is set out in Item 3.02 of Section 3 below. A copy of the Notes are filed with this Form 8-K Report as Exhibit 12(f).

D. On November 30, 2005 and effective as of November 25, 2005, the Company granted and issued to Dr. Ogan Gurel, the Company's President and Chief Executive officer, an option to purchase up to 750,000 shares of the Company's Common Stock at an exercise price $1.26 per share pursuant to a Stock Option

Agreement. This option grant represents an increase from the originally
contemplated grant of 500,000 shares of the Company's Common Stock contemplated
under the Original Employment Agreement. Information with respect to this Stock
Option Agreement and its issuance is set out in Item 3.02 of Section 3 and Item
5.02 of Section 5 below. A copy of this Stock Option Agreement is filed with
this Form 8-K Report as Exhibit 12(g).

Section 2. - Registrant's Business and Operations
----------   ------------------------------------

Item 2.01    Completion of Acquisition or Disposition of Assets
---------    ---------------------------------------------------

      On November 30, 2005, the Company funded the purchase of the first tranche
of shares of common stock of Bio-Magnetic Therapy Systems, Inc., a
privately-held Virginia corporation with principal offices at Kapellenweg 6,
81371 Munich, Germany ("BMTS") engaged in the development of a process for the
treatment of arthritic disease with pulsed electromagnetic fields (referred to
as the "PST technology"), pursuant to the Subscription Agreement described above
in Item 1.01B. The Company purchased 5,700,000 shares of common stock in BMTS,
par value $0.01 per share, for a purchase price of US$ 0.32 per share for a
total consideration of $1,824,000. BMTS has informed the Company that,
immediately prior to the purchase of the foregoing shares, BMTS had 9,276,549
shares of common stock outstanding.

      BMTS was incorporated in October 1991. It originally operated from offices
and clinical study/research facilities in Waterbury, Connecticut and Long
Island, New York. BMTS operated clinical study activities and engaged in product
research from 1991 to 1995 and developed a process for the treatment of
arthritic disease with pulsed electromagnetic fields (referred to as the PST
technology). BMTS licensed its PST technology and product distribution rights to
various entrepreneurs in the Bahamas, Mexico and Canada.

      In August 1996, BMTS entered into a technology license and distribution
agreement with PST International for distribution and commercialization of
BMTS's products in various countries throughout Europe and elsewhere.

      From 1996 to April, respective December, 2003 PST International constituted
the majority source of revenue and operating income of BMTS. In 1998, BMTS began
commercializing the PST Veterinary applications of its technology in North
America.

      Since 1996 BMTS has continued to pursue research and development activities
to expand the applications of its expertise and technology. As a result of PST
International having failed to meet its obligations in April 2003 all marketing
and other distribution rights regarding the PST German operations granted to PST
International reverted back to BMTS and on January 1st, 2004 all other rights in

                                       4
<PAGE>


all other countries reverted back to BMTS. BMTS has subsequently given the
marketing and other distribution rights to Signal Medizin Vertriebs GmbH ("SMV")
a 100% wholly owned subsidiary of BMTS.


Section 3. - Securities and Trading Markets
----------   ------------------------------

Item 3.02    Unregistered Sales of Equity Securities
---------    ---------------------------------------

A.    (1) On November 28, 2005, the Company issued the one-year convertible promissory notes (the "Notes") described above, one of which was issued to European Catalyst Fund Limited in the total principal amount of $3,000,000, the second of which was issued to Absolute Octane Fund Limited in the total principal amount of $1,000,000, and the third of which was issued to Absolute Return Europe Fund Limited in the total principal amount of $1,000,000, for an aggregate principal amount of all Notes of $4,500,000. The principal of the Notes is due November 28, 2006 (the "Maturity Date"). Interest on the Notes is payable on the Maturity Date at the rate of 20% per annum solely in a number of shares of common stock of the Company determined by dividing the unpaid interest on the Note by the 20-day trailing market price of the shares of the Company's common stock measured at the Maturity Date. In the event the Company is unable to pay the principal amount of any Note on the Maturity Date, the holder of such Note may convert any or all of the unpaid principal into shares of the Company's common stock at any time following the Maturity Date at a conversion price equal to 80% of the 20-trading day trailing market price of the shares of the Company's Common Stock measured at the time of payment.

(2) The Notes were issued in order to finance the Company's investment in Bio-Magnetic Therapy Systems, Inc. more fully described above.

(3) Each of the Notes was issued to an institutional investor which is an "accredited investor" as defined under the Securities Act of 1933, as amended ("Securities Act"). Each Note was, and any shares of the Common Stock of the Company issued upon conversion of such Note must be, taken by the noteholder for investment and not for distribution and as "restricted securities" under the Securities Act. The Company made available to the noteholder the material information about the Company and its securities, including the information contained in its reports filed under the Securities Exchange Act of 1934 ("Exchange Act"). In issuing the Notes, the Company relied upon the e4xemption from the registration requirements of Section 5 of the Securities Act provided in Section 4(2) thereof, as a transaction by an Issuer not involving a public offering.

(4) Interest on the Notes is payable on the Maturity Date at the rate of 20% per annum solely in a number of shares of common stock of the Company determined by dividing the unpaid interest on the Note by the 20-day trailing market price of the shares of the Company's common stock measured at the Maturity Date. In the event the Company is unable to pay the principal amount of any Note on the Maturity Date, the holder of such Note may convert any or all of the unpaid principal into shares of the Company's common stock at any time following the Maturity Date at a conversion price equal to 80% of the 20-trading day trailing market price of the shares of the Company's Common Stock measured at the time of payment. Any shares acquired upon conversion of the Note must be taken as "restricted Securities" under the Securities Act unless a

5

<PAGE>

registration statement in then in effect with respect to the shares. The holder of the Note has the qualified right to have the underlying shares included in any future registration statement filed under the Securities Act by the Company. A copy of each Note is filed with this Form 8-K Report as Exhibit 12(f).

B.    (1) On November 25, 2005, the Company granted and issued an option to Dr. Ogan Gurel to purchase up to 750,000 shares of its Common Stock at $1.26 per share.

(2) The option was issued as an incentive for Dr. Gurel to act as a director and/or President and Chief Executive Officer of the Company on a full-time basis under the Employment Agreement.

(3) The Option was issued to a director of the Company, thus to an "accredited investor" as defined under the Securities Act of 1933, as amended ("Securities Act"). The Option was, and any shares of the Common Stock of the Company issued upon exercise of the Option must be, taken by the Optionholder for investment and not for distribution and as "restricted securities" under the Securities Act. The Company made available to the Optionholder the material information about the Company and its securities, including the information contained in its reports filed under the Securities Exchange Act of 1934 ("Exchange Act"). In issuing the Option, the Company relied upon the exemption from the registration requirements of Section 5 of the Securities Act provided in Section 4(2) thereof, as a transaction by an Issuer not involving a public offering.

(4) The holder of the Option has the right to exercise it and purchase shares of the Company's Common Stock at $1.26 per share at any time on or after December 1, 2007 through November 30, 2007 if he serves as a director of the Company through November 30, 2007. If he ceases to be a director prior to November 30, 2007 for a termination for cause or a resignation without Good Reason (as defined in the Employment Agreement) the Option shall be cancelable as to 250,000 of the 750,000 shares underlying the Option. Certain acceleration events with respect to the exercisability and vesting of the Option apply if Dr. Gurel is terminated without cause or resigns for Good Reason. Any shares acquired upon exercise of the Option must be taken as "restricted Securities" under the Securities Act unless a registration statement in then in effect with respect to the shares. The holder of the Option has the qualified right to have the underlying shares included in any future registration statement filed under the Securities Act by the Company. A copy of the Option is filed with this Form 8-K Report as Exhibit 12(g) and additional information with respect thereto is set out in Item 5.02 of Section 5 below.


Section 5. - Corporate Governance and Management
----------   ----------------------------------

Item 5.02     Departure of Directors or Principal Officers;  Election of
---------     -----------------------------------------------------------
              Directors;  Appointment of Principal Officers
              ---------------------------------------------

    On November 25, 2005, the Company entered into an Amended and Restated Employment Agreement (the "Employment Agreement") with Dr. Ogan Gurel. A copy of this Employment Agreement is filed with this Form 8-K report as Exhibit 12(a). A summary of the material terms of the Employment Agreement are:


                                6

<PAGE>


    -    Dr. Gurel will be employed as the President and Chief Executive
         officer of the Company on a full time basis through November 30, 2007.

    -    During the employment period Dr. Gurel will devote at least 40 hours
         per week to his duties to the Company and will receive a salary of
         $21,667.67 per month.

    -    During the employment period, he will be responsible to manage the
         operations of the Company, subject to the restrictions that certain
         actions must have the prior approval of the Board of Directors.

    -    In recognition of the successful completion of the initial trial
         period and consonant with verbal discussions between the Executive and
         the controlling shareholder, the Company shall pay the Executive a

one-time bonus of $20,000 payable on December 1st, 2005.

- In order to additional align incentives with the Company's strategic plan, the Executive will earn additional bonuses if the following conditions are met:

    i.   a one-time bonus of $10,000 payable upon successful completion of the Estracure reverse takeover - namely achievement of 100% control of the Company's Estracure subsidiary.

    ii.  a one-time bonus of $20,000 (in addition to the bonus outlined in (i) above payable if and only if the terms of the Estracure reverse takeover as negotiated by the Executive result in a less than 15% aggregate ownership stake on the part of the minority Estracure shareholders in total outstanding Duravest shares.

    iii. a one-time bonus of $30,000 (in addition to the bonus terms outlined in (i) and (ii) above) payable if the terms of the Estracure reverse takeover result in a less than 10% aggregate ownership stake on the part of the minority Estracure shareholders in total outstanding Duravest shares.

    iv.  a one-time bonus of $10,000 payable upon successful completion of the Company's tender offer for shares of BMTS.

    v.   A one-time bonus of $20,000 payable upon enrollment of the first patient in the Company's Phase II/Phase III European trial utilizing the Estracure 17-beta-estradiol stent.

The bonus terms outlined above do not exclude any other future bonus terms that may be negotiable as circumstances warrant.

7

<PAGE>

- Upon execution of the Employment Agreement, Dr. Gurel received a Stock Option to purchase up to 750,000 shares of the Company's common stock at an exercise price of $1.26 per share. The Stock Option: (i) is for a term ending November 30, 2015; (ii) is exercisable at any time during its term after November 30, 2007; (iii) is exercisable on a cashless basis; and (iv) provides that shares purchased upon exercise may be included in future registration statements filed by the Company under the Securities Act of 1933.

- On December 1, 2007, the option will vest for the full 750,000 shares, if Dr. Gurel serves as a director for one full year whether or not he continues as President of the Company. If he ceases to serve as a director prior to November 30, 2007 by reason of a termination for cause or a voluntary resignation without Good Reason (as defined in the Employment Agreement), the Option is cancelable as to 250,000 of the 750,000 shares underlying the Option.

- The Employment Agreement will be for a term of two years from December 1, 2005, and will renew automatically for an additional one year term, unless terminated by either party upon 90 days notice prior to the end of the then-current term.

Dr. Gurel does not hold any directorship in any other entity filing reports with the U.S. Securities and Exchange Commission under the Securities Exchange Act of 1934. There is no family relationship between or among the Company's directors and/or officers. There is no arrangement or understanding between Dr. Gurel and any other person pursuant to which Dr. Gurel was selected as a

director, except for the Employment Agreement between the Company and Dr. Ogan
Gurel described below.


Section 9. - Financial Statements and Exhibits
----------  --------------------------------

Item 9.01    Financial Statements and Exhibits
---------   --------------------------------

        (a) The appropriate financial statements for Bio-Magnetic Therapy Systems,
Inc., the company in which the Company has made an investment (see Item 2.01)
and for the Company will be filed with an Amendment to this Form 8-K

        (d) Exhibits

               Exhibit
                 No.        Description of Exhibits

               12(a)       Amended and Restated Employment Agreement between the
                           Company and Dr. Ogan Gurel dated November 25, 2005

               12(b)       Subscription Agreement between the Company and BMTS dated
                           November 25, 2005

               12(c)       BMTS Representation Letter in Connection with the
                           Subscription Agreement


                                        8
<PAGE>


               12(d)       Shareholder Offer Document from the Company to shareholders
                           of BMTS dated November 29, 2005

               12(e)       Shareholder Offer Guaranty Letter from Dr. and Ms. Markoll
                           dated November 23, 2005 and executed by the Company on
                           November 25, 2005

               12(f)       Convertible Promissory Notes dated November 28, 2005 issued
                           by the Company to European Catalyst Fund Limited, Absolute
                           Octane Fund Limited, and Absolute Return Europe Fund Limited

               12(g)       Stock Option Agreement between the Company and Dr. Ogan
                           Gurel dated November 30, 2005 and effective as of November
                           25, 2005



                                   SIGNATURES

        In accordance with Section 13 or 15(d) of the Exchange Act, the registrant
caused this report to be signed on its behalf by the undersigned, therein to
duly authorized.

                                   DURAVEST, INC.

Dated:   November 30, 2005            By: /s/ Dr. Ogan Gurel
                                      --------------------------------
                                      Dr. Ogan Gurel, President and Chief
                                      Executive, Officer and a Director

9

```
</TEXT>
</DOCUMENT>
```

```
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>3
<FILENAME>exh12_b.txt
<TEXT>
```

Exhibit 12(b)
-------------

SUBSCRIPTION AGREEMENT
----------------------

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT
OF 1933, AS AMENDED ("ACT"), NOR UNDER THE SECURITIES LAWS OF ANY STATE OR THE
DISTRICT OF COLUMBIA. THESE SECURITIES ARE BEING OFFERED IN RELIANCE ON
EXEMPTIONS FROM FEDERAL REGISTRATION REQUIREMENTS PROVIDED BY THE ACT, AND ON
EXEMPTIONS FROM STATE REGISTRATION AND QUALIFICATION REQUIREMENTS AVAILABLE
UNDER STATE LAWS AND REGULATIONS. THESE SECURITIES MAY NOT BE SOLD, ASSIGNED,
TRANSFERRED OR OTHERWISE DISPOSED OF BY THE SUBSCRIBER IN THE ABSENCE OF
REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES ACTS OR AN EXEMPTION
FROM SUCH REGISTRATION REQUIREMENTS.

    TO:    Bio-Magnetic Therapy Systems, Inc. ("BMTS")
           a Virginia corporation

1. Subscription. The undersigned hereby irrevocably subscribes to purchase from
BMTS 5,700,000 shares of the common stock of BMTS, par value $0.01 per share
("Shares") for a purchase price of US$ 0.32 per share for a total consideration
of US$ 1,824,000 immediately upon the execution of this Agreement. In addition,
the undersigned hereby irrevocably subscribes to purchase from BMTS 8,362,500
Shares for a purchase price of US$ 0.32 per share for a total consideration of
US$ 2,676,000, immediately upon amendment of the BMTS Charter to increase the
number of authorized shares to a sufficient number to allow the issuance
thereof.

2. Shares Subscribed For; Method of Payment. The undersigned, by subscribing for
the number of Shares indicated above agrees to pay for such Shares by wire
transfer to BMTS, into an account specified by BMTS

3.    General Information.

      a.    Basic Subscriber Information:
            Name:                             DuraVest Inc.
            Social Security or Tax ID No.:     59-2624574
            Date of Birth or Creation of Entity:  August 5, 1980

      b.    Registered Name(s) as it (they) should appear on legal documents:
            DuraVest Inc.

```
<PAGE>
```

      c.    Principal Office Address (other than Post Office Box):

            11 South LaSalle Street, 5th Floor
            City   Chicago State    Illinois  Zip 60603-1238
            Telephone No.:(312) 423-2763

      d.    Mailing Address (if different from above address:)

            ------------------------------------------------------------

http://www.sec.gov/Archives/edgar/data/1066281/000101490905000157...

City _____ State _____ Zip _____
Telephone No.:(_____)_____

4.    Representations.

In connection with the Subscriber's subscription for Shares and becoming a
holder of Shares, the Subscriber hereby represents, warrants, acknowledges,
covenants and agrees as follows:

a. Analysis of Investment. The undersigned has (i) analyzed and reviewed
the investment, and (ii) had an opportunity to ask questions of and receive
answers from BMTS officers and directors concerning subscription, and to obtain
any additional information which BMTS possesses or can acquire that is necessary
to verify the accuracy of the information furnished. In particular, the
Subscriber acknowledges and agrees that the Subscriber has been given access to,
or has been furnished with, all material books and records of BMTS and all
material contracts and documents. All questions have been answered, and all
additional information has been provided, all to the full satisfaction of the
undersigned.

b. Accredited Investor. The Subscriber is an Accredited Investor as defined
under Rule 501 of Regulation D of the Act

c. Subscriber Knowledge. The undersigned has sufficient knowledge and
experience in business and financial matters to evaluate the merits and risks of
this investment.

d. Suitability. The Subscriber represents and warrants that (1)
Subscriber's overall commitment to investments which are not readily marketable,
including this investment in the Shares, is reasonable in relation to the
Subscriber's net worth, (2) the Subscriber does not anticipate that this
investment will be a principal source of income, (3) the Subscriber is able to
bear the substantial economic and tax risks of an investment in the Shares, and
(4) the Subscriber can afford a complete loss of the Subscriber's investment in
Shares.

e. No Other Representations. No representations or warranties, oral or
otherwise, have been made to the undersigned by BMTS, or any officer, director,
representative, agent, employee or affiliate of BMTS, or any other person.

2

<PAGE>

f. Restrictions on Transfer. The undersigned understands that the
undersigned must bear the economic risk of this investment for an indefinite
period of time because the Shares are not registered under the Act or any state
securities laws, and there is no market for the Shares.

g. Entity Representations. The Subscriber hereby represents and warrants
that (1) the Subscriber is duly organized and validly existing, and has the
power, authority and capacity to enter into this Subscription Agreement and to
consummate the transactions contemplated hereby, (2) all necessary actions have
been taken, and all necessary approvals and consents have been given, to
authorize the execution, delivery and performance of this Subscription Agreement
by the Subscriber, (3) this Subscription Agreement has been duly executed and
delivered by the Subscriber and constitutes the valid and legally binding
obligation of the Subscriber, fully enforceable against the Subscriber in
accordance with its terms, and (4) the execution and delivery of this
Subscription Agreement by the Subscriber, and the Subscriber's performance of
its obligations hereunder, will not conflict with the charter, bylaws, trust

agreement or other organizational document(s) of the Subscriber, will not violate or result in default under any contract or other agreement to which the Subscriber is a party or is otherwise bound, and will not conflict with or result in a breach of any judgment, order or other decree of any court or of any governmental authority binding on the Subscriber.

h. Acquisition for Investment. The undersigned is acquiring the Shares for which the undersigned has subscribed for the undersigned's own account for investment purposes only, and not with a view to or for the sale or other distribution thereof, in whole or in part.

i. Risk of Loss. The Subscriber recognizes that an investment in the Shares is highly speculative and involves a substantial risk of loss of the entire investment, and involves significant and material risks.

j. Accuracy of Representations. All of the representations, warranties, covenants, agreements, acknowledgements and information provided by the undersigned in this Subscription Agreement and any additional information and documents which the undersigned has furnished, or hereafter furnishes, with respect to the undersigned's financial position and financial, business and investment experience, qualification and authority, are true, accurate and complete in all respects as of the date hereof and as of the date of the closing at which this Subscription Agreement is accepted, and shall survive closing.

5. Further Consideration. As further consideration for this Subscription, BMTS and the undersigned acknowledge and agree that if the undersigned, acting alone, together, or with or through BMTS and others, propose to sell or otherwise transfer, directly or indirectly, more than 50% of the then outstanding Shares in a public offering, a private placement, or any transaction that would change control of BMTS, or otherwise be considered an exit from BMTS, or BMTS and/or the undersigned, acting alone or together, propose to sell or transfer, substantially all the assets of BMTS, to any person or group of persons, then Dr. Richard Markoll and Ms. Ernestine Binder-Markoll shall be entitled to participate, from time to time, in any such transactions to the extent of 17.74% (on a fully diluted basis), notwithstanding their or the undersigned's current ownership of Shares. The undersigned and BMTS shall notify Dr. Richard Markoll

3

<PAGE>

and Ms. Ernestine Binder-Markoll of any such proposed transaction and the terms thereof sufficiently in advance and with adequate detail to allow Dr. Richard Markoll and Ms. Ernestine Binder-Markoll to have sufficient time and information to make an informed decision. As used in this Section, fully diluted assumes any subsequent issuance of any BMTS securities, and the issuance and/or exercise of all options, warrants and rights to purchase BMTS securities and the conversion of all outstanding securities convertible into shares.

6. Legal Representation. The undersigned acknowledges that Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Law Firm") represents BMTS and Dr. Richard Markoll and Ms. Ernestine Binder-Markoll, as well as certain affiliates of BMTS (the "Clients"). The undersigned further acknowledges that such representation may give rise to potential conflicts of interest. Upon consideration of the disclosures set forth in this Section 7, the undersigned hereby consents to the representation by the Law Firm of the Clients.

7. Miscellaneous.

a. This Subscription Agreement shall be governed by and enforced, determined and construed in accordance with the laws of the Commonwealth of Virginia applicable to contracts entered into and to be performed therein, without giving effect to the principles of choice of law.

b. This Subscription Agreement contains the entire agreement between the parties with respect to the subscription for Shares. The provisions of this Subscription Agreement may not be amended, modified or waived except by an instrument in writing signed by the party against which enforcement of the amendment, modification or waiver is sought.

c. The headings of this Subscription Agreement are for convenient reference only, and they shall not limit or otherwise affect the interpretation of any term or provisions hereof. All terms and words in this Subscription Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Subscription Agreement or any paragraph or clause herein may require, as if such words had been fully and properly written in the appropriate number and gender.

d. This Subscription Agreement shall bind and inure to the benefit of the heirs, executors, administrators, legal and personal representatives, successors and assigns of the parties hereto.

e. The Subscriber may not transfer this Subscription Agreement, or any of the Subscriber's rights or obligations under this Subscription Agreement, without the written consent of BMTS.

f. This Subscription Agreement shall survive the bankruptcy, insolvency, dissolution or cessation of business of the undersigned.

<PAGE>

IN WITNESS WHEREOF, the undersigned, whose address is set forth above, hereby executes this Subscription Agreement as of 25th day of November, 2005.

DuraVest Inc.

By: /s/ Ogan Durel
    --------------------------------------------
        Ogan Gurel, MD

SUBSCRIPTION ACCEPTED:
Bio-Magnetic Therapy Systems, Inc.

By: /s/ Richard Markoll
    --------------------------------------------
    Richard Markoll, MD

Date:

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>4
<FILENAME>exh12_c.txt
<TEXT>
```

Exhibit 12(c)
-------------

November 28, 2005


To DuraVest, Inc.
11 S. LaSalle Street, 5th floor
Chicago, IL 60603

Ladies and Gentlemen:

        Reference is made to the Subscription Agreement (the "Subscription
Agreement") between Bio-Magnetic Therapy Systems, Inc., a Virginia corporation
(the "Company") and DuraVest, Inc. (the "Subscriber"), pursuant to which the
Subscriber have subscribed to purchase shares of common stock ("Shares") of the
Company. As a material inducement of the Subscriber to enter into the
Subscription Agreement and subscribe for the Shares, the Company represents and
warrants to, and agrees with, the Subscriber as of the date hereof and as of the
closing under the Subscription Agreement as follows:

        a. Incorporation and Standing. The Company is a corporation duly
        incorporated, validly existing and in good standing under the laws of the
        State of Virginia, has full power to carry on its business as and where
        such business is now being conducted and to own, lease and operate the
        properties and assets now owned or operated by it and is duly qualified to
        do business and is in good standing in each jurisdiction where the conduct
        of its business or the ownership of its properties requires such
        qualification.

        b. Authority. The execution, delivery and performance of the
        Subscription Agreement by the Company and the consummation by the Company
        of the transactions contemplated thereby have been duly authorized by all
        necessary corporate action.

        c. No Conflict. The execution, delivery and performance of the
        Subscription Agreement by the Company and the consummation by the Company
        of the transactions contemplated thereby do not (i) violate or conflict
        with the certificate of incorporation or bylaws or any shareholder
        agreement of the Company, (ii) conflict with or result (with the lapse of
        time or giving of notice or both) in a breach or default under any material
        agreement or instrument to which the Company is a party or by which the
        Company is otherwise bound, (iii) violate any material order, judgment,
        law, statute, rule or regulation applicable to the Company. The
        Subscription Agreement, when executed and delivered by the Company, will be
        a legal, valid and binding obligation of the Company, enforceable against
        the Company in accordance with its terms (except as may be limited by
        bankruptcy, insolvency, reorganization, moratorium and similar laws and
        equitable principles relating to or limiting creditors' rights generally).


```
<PAGE>
```


        d. Capitalization. All of the presently issued and outstanding shares
        of capital stock in the Company have been duly authorized and validly
        issued. The capitalization of the Company (including any and all

outstanding options, warrants, convertible securities or other rights to acquire securities of the Company) is as set forth on Exhibit A hereto. When issued and delivered as contemplated by the Subscription Agreement (including, without limitation, the payment of the subscription price provided for therein), the Shares shall be validly issued, fully paid and non-assessable.

e. Litigation and Other Proceedings. There are no actions, suits, proceedings or investigations pending or, to the knowledge of the Company, threatened against the Company at law or in equity before or by any court or Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would, if adversely decided, materially adversely affect the Company. The Company is not subject to any continuing order, writ, injunction or decree of any court or agency which would have a material adverse effect on the Company.

f. Use of Proceeds. The Company shall use the proceeds received from the sale of the Shares for general working capital purposes and other general company purposes and not for the repayment of debt or the repurchase of any debt or equity securities of the Company, except the payment of loans, advances, compensation (including, without limitation, deferred compensation) and/or bonuses to Dr. Richard Markel and/or Ernestine Binder-Markoll. A bonus of $50,000 for Dr. Markoll is noted for payment for 2005 bonuses as per his employment agreement.

g. Consents/Approvals. No consents, filings (other than Federal and state securities filings relating to the issuance of the Shares pursuant to applicable exemptions from registration, which the Company hereby undertakes to make in a timely fashion), authorizations or other actions of any governmental authority are required to be obtained or made by the Company for the Company's execution, delivery and performance of the Subscription Agreement which have not already been obtained or made or will be made in a timely manner following the Closing. Assuming the truth of the representations and warranties of the Subscriber in the Subscription Agreement, the offer, sale and issuance of the Shares as contemplated hereby are exempt from the registrations requirements of the Securities Act of 1933, as amended.

h. No Commissions. The Company has not incurred and will not have incurred any obligation for any finder's, broker's or agent's fees or commissions in connection with the transaction contemplated hereby, other than that which may be payable to Viscardi AG and/or its affiliates, subsidiaries, agents, representatives, or employees.

j. Financial Statements. The compiled consolidated balance sheet and income statement of the Company and its subsidiaries for the year ended December 31, 2004 and the unaudited interim balance sheet and income

2

<PAGE>

statement for the interim period ended August 31, 2005 previously delivered to the Subscriber (the "Financial Statements") fairly present, in all material respects, the financial position of the Company as of the dates thereof and for the periods then ended and have been prepared in accordance with generally accepted accounting principles, subject to year end adjustments and the absence of footnote disclosures. Since August 31, 2005, there has been no material adverse change in the assets, liabilities or financial condition of the Company, other than decreases in working capital.

k. Intellectual Property. The Company owns or possesses adequate licenses or other rights to use all patents, patent applications,

trademarks, trademark applications, service marks, service mark applications, trade names, copyrights, manufacturing processes, formulae, trade secrets, customer lists and know how (collectively, "Intellectual Property") necessary or desirable to the conduct of its business as conducted and as proposed to be conducted, with such exceptions as would not have, individually or in the aggregate, a material adverse effect on the Company. No claim is pending or, to the Company's knowledge, threatened to the effect that the operations of the Company infringe upon or conflict with the asserted rights of any other person under any Intellectual Property. No claim is pending or, to the Company's knowledge, threatened to the effect that any such Intellectual Property owned or licensed by the Company, or which the Company otherwise has the right to use, is invalid or unenforceable by the Company.

     l. Taxes. All of the tax returns and reports of the Company required by law to be filed have been filed on a timely basis (or extensions therefor have been obtained on a timely basis). All filed tax returns were accurate in all material respects when filed, and all taxes shown due thereon have been paid. There are in effect no waivers of the applicable statute of limitations for any domestic or foreign taxes for any period. No deficiency assessment or proposed adjustment of the Company's domestic or foreign taxes is pending.

     m. Indebtedness. Except as set forth on the Financial Statements, the Company has no material indebtedness for borrowed money.

     n. Related Party Transactions. Except as set forth in the Financial Statements and the capitalization table of the Company, since the date of the most recent Financial Statement there has not been any transaction between the Company and its affiliates, officers or directors except in the ordinary course of business (it being understood that employment relationships are in the ordinary course of business).

     The Company hereby agrees to indemnify and hold harmless the Subscriber and its affiliates and each of their owners, officers, directors and agents against loss or damage arising out of any breach of the foregoing representations and warranties.

     The foregoing representations and warranties are given on the date hereof and on the closing of the purchase of shares of capital stock pursuant to the Subscription Agreement. For the avoidance of doubt, all documents executed by

3

<PAGE>

any officer or director of the Subscriber or the Company with respect to the transactions contemplated by or associated with the Subscription Agreement are on behalf of the Subscriber or the Company, as applicable, and without personal liability to such officer or director.

                         BIO-MAGNETIC THERAPY SYSTEMS, INC.


                         By: /s/ Richard Markoll
                            --------------------------------------
                         Name:   Richard Markoll
                         Title:  President

4

<PAGE>


EXHIBIT A - Capitalization


Common Stock, par value US$ 0.01 per share, 15,000,000 shares authorized as of
the date of this letter, and 9,276,549 shares issued and outstanding prior to
the issuance of the Shares to be issued pursuant to the Subscription Agreement.
The Company intends to amend its Charter in December 2005 or January 2006 to
increase the Common Stock, par value US$ 0.01 per share, from 15,000,000 shares
authorized to 25,000,000 shares authorized.


Preferred Stock , without par value, 5,000,000 shares authorized as of the date
of this letter, and no shares issued and outstanding.


</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>5
<FILENAME>exh12_d.txt
<TEXT>
```

                                                    Exhibit 12(d)
                                                    -------------

                            Name of Shareholder:_____

                                    Number:_____


                          Offer to Purchase for Cash

                    All Outstanding Shares of Common Stock

                                      of

                      BIO-MAGNETIC THERAPY SYSTEMS, INC.

                                      at

                             A Purchase Price of

                              $0.32 Per Share

                                      by

                               DuraVest Inc.

      a Company incorporated under the laws of the State of Florida with principal
                            executive offices in

            11 South LaSalle Street, 5th Floor, Chicago Illinois 60603 - 1238

        THE OFFER WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON DECEMBER 28,
2005, UNLESS THE OFFER IS EXTENDED. WITHDRAWAL RIGHTS WILL ONLY EXPIRE UPON
ACCEPTANCE FOR PAYMENT OF TENDERED SHARES.

                              IMPORTANT NOTICE

        THE ATTACHED OFFER TO PURCHASE CONTAINS NON-PUBLIC INFORMATION REGARDING
BIO-MAGNETIC THERAPY SYSTEMS, INC. (THE "COMPANY") WHICH HAS BEEN FURNISHED TO
DURAVEST INC. (THE "PURCHASER") BY THE COMPANY FOR INCLUSION HEREIN. IT IS BEING
SUPPLIED TO YOU FOR THE SOLE PURPOSE OF PROVIDING YOU WITH INFORMATION THAT MAY
BE HELPFUL IN DETERMINING WHETHER OR NOT TO ACCEPT PURCHASER'S OFFER TO PURCHASE
ANY OR ALL OF THE SHARES OF COMMON STOCK OWNED BY YOU, SUBJECT TO THE TERMS AND
CONDITIONS SET FORTH IN THE OFFER TO PURCHASE AND THE RELATED LETTER OF
TRANSMITTAL. EACH OFFER TO PURCHASE IS NUMBERED AND ISSUED ONLY TO THE
SHAREHOLDER NAMED THEREON. UPON RECEIPT OF THE OFFER TO PURCHASE, YOU WILL BE
DEEMED TO HAVE AGREED TO KEEP SUCH INFORMATION CONFIDENTIAL AND NOT, WITHOUT THE
PRIOR WRITTEN CONSENT OF PURCHASER AND THE COMPANY, TO DISCLOSE SUCH INFORMATION


                                      i
```
<PAGE>
```

TO ANY THIRD PARTY, EXCEPT TO YOUR LEGAL, ACCOUNTING OR TAX ADVISORS, SOLELY FOR
THE PURPOSE OF ADVISING YOU WHETHER OR NOT TO ACCEPT PURCHASER'S OFFER TO
PURCHASE YOUR SHARES AND SUBJECT TO SUCH ADVISORS' AGREEMENT TO KEEP SUCH

INFORMATION CONFIDENTIAL. THE OFFER TO PURCHASE MAY NOT BE PHOTOCOPIED OR REPRODUCED IN ANY FASHION, EXCEPT TO YOUR ADVISORS AS PROVIDED ABOVE.

THE BOARD OF DIRECTORS OF THE COMPANY HAS DETERMINED THAT THE OFFER IS FAIR TO THE SHAREHOLDERS OF THE COMPANY, AND RECOMMENDS ACCEPTANCE OF THE OFFER BY THE SHAREHOLDERS OF THE COMPANY. EACH SHAREHOLDER IS URGED TO CONSULT HIS OR HER TAX ADVISOR WITH RESPECT TO THE TAX EFFECTS OF TENDERING SHARES.

THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (i) VALID TENDER OF NOT LESS THAN 4,636,775 SHARES OF COMMON STOCK PURSUANT TO THE OFFER; AND (ii) THE SATISFACTION OR WAIVER OF CERTAIN CONDITIONS TO CLOSING (INCLUDING, WITHOUT LIMITATION, PURCHASER RAISING SUFFICIENT FINANCING TO ENABLE IT TO CONSUMMATE THE OFFER, AND PAY ALL RELATED COSTS AND EXPENSES AND PURCHASER'S COMPLETION OF DUE DILIGENCE WITH RESPECT TO THE COMPANY WITH RESULTS SATISFACTORY TO PURCHASER IN ITS SOLE DISCRETION.

-----------------------

Any shareholder desiring to tender all or any portion of his Shares should complete and sign the Letter of Transmittal or a facsimile copy thereof in accordance with the instructions in the Letter of Transmittal, and mail or deliver it to Purchaser with the certificates for such Shares and any other documents required by the Letter of Transmittal.

Questions and requests for assistance may be directed to Purchaser at the following address and telephone numbers:

DuraVest Inc.

Ogan Gurel, MD MPhil

Chief Executive Officer

11 South LaSalle Street, 5th Floor

Chicago, Illinois 60603 - 1238

USA

Tel: 001 - (312) 423-2763

Additional copies of this Offer to Purchase, the Letter of Transmittal or any other tender offer materials may be obtained from Purchaser at the same address and telephone number.

November 29, 2005

                                        ii
<PAGE>

SUMMARY TERM SHEET

Purchaser is offering to purchase all of the outstanding shares of common stock of Bio-Magnetic Therapy Systems, Inc for US$0.32 per share in cash. The following are some of the questions you, as a stockholder, may have and answers to those questions. We urge you to read carefully the remainder of this Offer to Purchase and the Letter of Transmittal because the information in this summary is not complete. Additional important information is contained in the remainder of this Offer to Purchase and the Letter of Transmittal.

Who is offering to buy my shares?

    Our name is DuraVest Inc. We are incorporated under the laws of the State
of Florida with a principal place of business at 11 South LaSalle Street, 5th
Floor, Chicago, Illinois 60603-1238. (For further information, see "Certain
Information Concerning Purchaser.")

What shares are being sought in the Offer?

    We are seeking to purchase all shares of common stock of Bio-Magnetic
Therapy Systems, Inc. This offer is being made to all persons who are
stockholders of Bio-Magnetic Therapy Systems, Inc on November 29, 2005. In the
event that less than all shares are tendered pursuant to this offer then we
shall purchase shares from each shareholder in the amount offered. (For further
information, see "The Offer.")

How much are you offering to pay? What is the form of payment? Will I have to
pay any fees or commissions?

    We are offering to pay US$0.32 per share, net to you, in cash, less any
required withholding of taxes and without payment of interest. If you are the
record owner of your shares and you tender your shares to us in the offer, you
will not have to pay brokerage fees or similar expenses. (For further
information, see "The Offer.")

Do you have the financial resources to make payment?

    The offer is conditioned on our obtaining sufficient financing on terms and
conditions reasonably satisfactory to us. To finance the offer, we anticipate
obtaining a bridge financing of up to US$ 7.7MM. We cannot assure you, however,
that sufficient funds will be available on terms and conditions reasonably
satisfactory to us. If not, we shall not purchase your shares (for further
information, see "Background and Purpose of the Offer")




                                        1
<PAGE>


How long do I have to decide whether to tender in the Offer?

    You will have at least until 5:00 p.m., New York City time, on December 28,
2005, to tender your shares in the offer. (For further information, see "The
Offer.")

Can the Offer be extended and under what circumstances?

    We may extend the offer without the Company's prior written consent for one
or more periods of time we reasonably believe necessary to cause the conditions
to our offer to be satisfied, if on a scheduled expiration date any of the
conditions to our offer are not satisfied; however, we may not extend the offer
beyond January 31st, 2006 (for further information, see "The Offer").

How will I be notified if the Offer is extended?

    If we extend the offer, we will make a public announcement of the
extension, not later than 9:00 a.m., New York City time, on the next business

day after the day on which the offer was scheduled to expire and will send you
written notice of such extension. (For further information, see "The Offer.")

What are the most significant conditions to the Offer?

    We are not obligated to purchase any shares if:

o    We fail to obtain sufficient financing on terms reasonably
    satisfactory to us to enable us to consummate the offer and to pay our
    expected transaction costs;

o    There is a material adverse effect on Bio-Magnetic Therapy Systems,
    Inc or its business;

o    Less than 4,636,775 shares are validly tendered

o    The results of our due diligence review are not satisfactory to
    ourselves or any of the persons who we approach to provide financing
    to fund the transaction; and/or

o    Any one of several other conditions precedent to our obligations are
    not met or waived by us. (For further information, see "The Offer.")

Until what time can I withdraw previously tendered shares?

    You can withdraw shares at any time until the offer has expired and you may
withdraw them at any time after the expiration of the offer until we accept
shares for payment. (For further information, see "The Offer".)

2

<PAGE>

How do I withdraw previously tendered shares?

    To withdraw shares, you must deliver a written notice of withdrawal, or a
facsimile of one, with the required information to us while you still have the
right to withdraw the shares. (For further information, see "The Offer.")

What does the Bio-Magnetic Therapy Systems, Inc. Board of Directors think of the
Offer?

    The Bio-Magnetic Therapy Systems, Inc board of directors has determined
that the consideration to be paid for each share in the offer is fair to all
holders of such shares and recommends that the holders of such shares accept the
offer.

How will I be taxed for U.S. Federal income tax purposes?

    Receipt of cash for your shares in the offer will be a taxable transaction
for U.S. federal income tax purposes. You will generally recognize a gain or
loss in an amount equal to the difference between (1) the cash you receive in
the Offer, and (2) your adjusted tax basis in your shares surrendered in the
Offer. That gain or loss will be a capital gain or loss if the shares are a
capital asset in your hands, and will be long term capital gain or loss if you
have held the shares for more than one year at the time the Offer completed, as
the case may be. You are urged to consult your own tax adviser as to the
particular tax consequences to you of the Offer.

How do I tender my shares?

    To tender shares you must deliver the certificates representing your shares, together with a completed letter of transmittal and any other documents required, to us no later than the time the tender offer expires. (For further information, see "The Offer.")

If I decide not to tender, how will the Offer affect my shares?

    To the extent you decide not to tender your shares you shall continue to hold stock in Bio-Magnetic Therapy Systems, Inc. Pursuant to the terms of an agreement entered into by the Company's controlling shareholder, Dr. Richard Markoll and us, Dr. Markoll has agreed to sell an amount of shares at least equal to the shortfall between the number of shares tendered pursuant to the offer and 50% of the outstanding shares. As a result your decision not to tender will not in any way prevent us from closing the offer and acquiring shares.

What is the market value of my shares as of a recent date?

    The shares do not trade on a public trading market so it is not possible to gauge their market value beyond any offers received by you to purchase your shares, including this offer.

Are dissenters' rights available in the Offer?

    No. There are no dissenter rights available in the Offer or any related transaction.


                                    3
<PAGE>


To whom may I speak if I have questions about the Offer?

                You may call


                DuraVest Inc.

                Ogan Gurel, MD MPhil

                Chief Executive Officer

                11 South LaSalle Street, 5th Floor

                Chicago, Illinois 60603 - 1238

                USA

                Tel: 001 - (312) 423-2763


                See page ii of this Offer to Purchase.

```
                                    4
<PAGE>
```

                              INTRODUCTION

                          -------------------


NOVEMBER 29, 2005

To:  Holders of Common Stock of Bio-Magnetic
     Therapy Systems, Inc. (the "Shareholders")

     DuraVest Inc. ("Purchaser"), hereby offers to purchase all outstanding
shares ("Shares") of Common Stock, $.01 par value ("Common Stock"), of
Bio-Magnetic Therapy Systems, Inc., a Virginia corporation (the "Company"), at a
purchase price of $0.32 per Share, net to the seller in cash and without
interest, upon the terms and subject to the conditions set forth in this Offer
to Purchase and in the related Letter of Transmittal. (The Offer to Purchase and
such Letter of Transmittal are hereinafter collectively referred to as the
"Offer.")

     On the date of consummation of the purchase of the Shares as contemplated
by the Offer (the "Closing Date"), Purchaser will pay US$0.32 per tendered Share
purchased by check to the tendering shareholders.

     All Shares validly tendered prior to the expiration of the Offer and not
properly withdrawn in accordance with Section 5 of "The Offer," will be accepted
for payment from each tendering Shareholder of record on December 28, 2005 (the
"Record Date").

     The Company has informed Purchaser that as of November 29, 2005, there were
9,273,549 Shares of Common Stock issued and outstanding. (See "Background and
Purpose of the Offer")

     PRIOR TO DECIDING WHETHER TO TENDER SHARES TO PURCHASER, SHAREHOLDERS ARE
URGED TO CAREFULLY REVIEW THIS OFFER TO PURCHASE AND THE LETTER OF TRANSMITTAL
AND TO CONSIDER THE EFFECT THAT THE OTHER TRANSACTIONS REFERRED TO HEREIN MAY
HAVE ON THE COMPANY AND THE SHARES.

     Under the terms and subject to the conditions of the Offer, Shareholders
may (i) elect to tender all or any portion of their Shares, or (ii) elect not to
accept the Offer and retain all the Shares they own. (See "The Offer.")

     Only those Shareholders wishing to tender Shares pursuant to the Offer are
required to submit (i) a properly completed and duly executed Letter of
Transmittal (including, in certain cases described herein, a properly executed
stock power) and (ii) certificates for the Shares to be tendered for receipt by
Purchaser on or prior to the Expiration Date as described in The Offer. Such
Shareholders must accept each of the terms and comply with each of the
conditions of the Offer.

Shareholders are urged to consider the following factors:

5

<PAGE>

    o    Shareholders who tender their Shares will give up the opportunity to participate in any future benefits from the ownership of Shares, including potential future distributions by the Company, past and future profits of the Company, and any future appreciation of the value of the Shares.

    o    Purchaser is making the Offer for investment purposes and with the intention of making a profit from the ownership of the Shares. In establishing the purchase price of $0.32 per Share, Purchaser is motivated to establish the lowest price which might be acceptable to Shareholders consistent with Purchaser's objectives.

    o    As a result of consummation of the Offer, Purchaser may be in a position to significantly influence all the Company decisions on which Shareholders may vote. Purchaser will vote the Shares acquired in the Offer in its own interest, which may be different from or in conflict with the interests of the remaining Shareholders.

    o    There are conditions to the consummation of the Offer by Purchaser pursuant to which Purchaser is not obligated to consummate the Offer if:

        o    Purchaser fails to raise sufficient financing to enable Purchaser to consummate the Offer, and to pay its related costs;

        o    there is a material adverse effect on the Company;

        o    the results of Purchaser's due diligence review are not satisfactory to any of the persons who Purchaser approaches to provide financing to fund the transaction;

    Those conditions and various additional conditions set out in the Offer (see "the Offer") are for the sole benefit of Purchaser and can only be waived by Purchaser.

    No dissenters' rights are available in connection with the Offer.

    Questions and requests for assistance or additional copies of the Offer to Purchase and the Letter of Transmittal should be directed in writing to

    DuraVest Inc.

    Ogan Gurel, MD MPhil

    Chief Executive Officer

    11 South LaSalle Street, 5th Floor

    Chicago, Illinois 60603 - 1238

    USA

    Tel: 001 - (312) 423-2763

6

<PAGE>

NO AGENT OR OFFICER OF PURCHASER OR THE COMPANY OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS OFFER TO PURCHASE AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY PURCHASER OR THE COMPANY.

7

<PAGE>

BACKGROUND AND PURPOSE OF THE OFFER

Purpose of the Offer

The purpose of the Offer is for Purchaser to acquire a controlling interest in the Company.

Control of the Company

Assuming that the transactions contemplated by the Offer and the transactions described below (the "Transactions") are consummated, Purchaser will hold, in the aggregate, between approximately 70% and approximately 80% of the then outstanding Shares. Accordingly, Purchaser would be able to determine

the outcome of any corporate action requiring shareholder approval and would be able to control the election of the Board of Directors of the Company and the determination of the Company's policies, at least for the foreseeable future.

Except for the Transactions and as otherwise described in this Offer to Purchase, neither Purchaser nor the Company has any current plans or proposals that would result in any extraordinary corporate transaction, such as a merger, reorganization, liquidation, relocation of operations or sale or transfer of a material amount of assets, involving the Company or any of its subsidiaries, or any material changes in the Company's capital structure or business. However, neither Purchaser nor the Company can predict whether such an extraordinary transaction might be considered or approved or the effect that the consummation of such a transaction might have on the condition of the Company (financial or other) or the value of the Shares.

Source and Amount of Funds

The offer is conditioned on our obtaining sufficient financing on terms and conditions satisfactory to us. To finance the Offer, Purchaser shall require up to US$ 7.7 MM which it anticipates obtaining through a bridge financing. These funds will be used to finance the Offer as well as the following Transactions:

- finance the subscription of 5,700,000 shares of common stock in BMTS, par value $ 0.01 per share, for a purchase price of US$ 0.32 per share for a total consideration of US$ 1,824,000

- finance the additional subscription of 8,362,500 shares for a purchase price of US$ 0.32 per share for a total consideration of US$ 2,676,000 immediately upon amendment of the BMTS Charter to increase the number of authorized shares to a sufficient number to allow the issuance thereof. For this purpose the Company has given Notice to its shareholders that a Special Meeting of Shareholders will be held on December 28, 2005, at Brienner Strasse 1, D-80333 Munich, Germany, beginning at 15:00h local time (CET).

8

<PAGE>

We cannot assure you that we will receive financing on terms and conditions that are reasonably satisfactory to us and, if we cannot, then the Transactions, including the purchase of the Shares pursuant to the Offer, will not be consummated.

9

<PAGE>


THE OFFER

1.    Terms of the Offer; Expiration Date.

     Upon the terms and subject to the conditions of the Offer (including, if
the Offer is extended or amended, the terms and conditions of any extension or
amendment), Purchaser will accept for payment (and thereby purchase) all Shares
that are validly tendered on or prior to the Expiration Date and not properly
withdrawn in accordance with Section 5. The term "Expiration Date" shall mean
5:00 p.m., New York City time, on December 28, 2005, unless and until Purchaser
shall have extended the period of time for which the Offer is open, in which
event the term Expiration Date shall mean the latest time and date at which the
Offer, as so extended by Purchaser, shall expire. In no event shall any
extension of the Offer extend beyond January 31st, 2006.

     The Offer is conditioned upon, among other things, the valid tender of not
less than an aggregate of 4,636,775 Shares pursuant to the Offer, no material
adverse change to the Company's business or financial condition and the
satisfaction or waiver of certain additional conditions to closing (including,
without limitation, Purchaser raising sufficient financing to enable it to
consummate the offer, and pay all related costs and expenses). Subject to
applicable law, Purchaser reserves the right (but shall not be obligated) to
waive any conditions to the Offer in whole or in part, at any time and from time
to time in its sole discretion. If by the Expiration Date any or all such
conditions have not been satisfied, Purchaser reserves the right to (a) decline
to accept for payment or pay for any of the Shares tendered, terminate the Offer
and return all tendered shares to tendering Shareholders, (b) extend the Offer
and, subject to the withdrawal rights set forth in Section 5, retain the Shares
that have been tendered until the expiration of the Offer as extended or (c) to
the extent permitted by applicable law, waive such unsatisfied condition or
conditions and, in accordance with applicable law, accept for payment and pay
for all Shares validly tendered.

     The Company has furnished Purchaser with the Company's Shareholder list for
the purpose of disseminating the Offer to holders of Shares and the Company
informs Purchaser that the list is true and correct as of the most recent
practicable date. The Offer to Purchase and the related Letter of Transmittal
will be mailed by the Company on behalf of the Purchaser to record holders of
Shares whose names, or the names of whose nominees, appear on the Company's
Shareholder list at the date of this Offer to Purchase and to any person who the
Company informs us has become a Shareholder on or prior to the Record Date.

2.    Extension of Offer Period; Termination; Amendment.

     Purchaser expressly reserves the right (but will not be obligated), in its
sole discretion and without the Company's consent, to extend the period of time
during which the Offer is open by giving written notice of such extension to the
Shareholders of the Company to whom this Offer is sent if (i) at the Expiration
Date any of the conditions set forth in the Transactions have not been satisfied

                                    10
<PAGE>

or waived, until such time as such conditions are satisfied or waived (ii) on
the Expiration Date less than 4,636,775 of the outstanding Shares (as adjusted
in the event of any stock split, stock dividend, combination or
reclassification) have been validly tendered and not properly withdrawn pursuant
to the Offer, and (iii) required by any rule, regulation, interpretation or
position of the United States Securities and Exchange Commission (the "SEC") or
the staff thereof applicable to the Offer. During any extension of the Offer by
Purchaser, all Shares previously tendered and not withdrawn will remain subject
to the Offer and may be accepted for payment by Purchaser at the conclusion of
the Offer, except to the extent such Shares may be withdrawn as set forth in
Section 5. There can be no assurance that Purchaser will exercise its right to
extend the Offer.

     Purchaser also expressly reserves the right (i) to terminate the Offer and
not accept for payment or pay for any Shares not theretofore accepted for
payment or paid for or to delay the acceptance for payment of, or payment for,
any Shares validly tendered and not properly withdrawn, upon the occurrence of
any of the conditions specified in Section 8(b), by giving written notice of
such termination or delay to the shareholders of the Company to whom this Offer
was sent and (ii) subject to the limitations set forth in Section 8(b) and upon
the occurrence of any of the conditions specified in Section 8(b), at any time,
or from time to time, to amend the Offer in any respect. Except that, without
the consent of the Company, Purchaser shall not (i) reduce the number of Shares
subject to the Offer, (ii) reduce the price per Share to be paid pursuant to the
Offer, (iii) modify or add to any of the conditions to the Offer set forth in
Section 8 in any manner adverse to the Shareholders, (iv) except as set out
above, extend the offer, or (v) change the form of consideration payable in the
Offer.

     If Purchaser extends the Offer or (whether before or after their acceptance
for payment of Shares) is delayed in making payment for Shares or is unable to
pay for Shares pursuant to the Offer for any reason, then, without prejudice to
Purchaser's rights pursuant to the Offer (including, without limitation, as set
forth in Sections 2 and 8 of "The Offer"), Purchaser may retain tendered Shares,
subject to withdrawal rights as described in Section 5. The ability of Purchaser
to delay payment for Shares that it has accepted for payment is limited by Rule
14e-1(c) under the Securities Exchange Act of 1934, as amended (the "Exchange
Act"), which requires any person making a tender offer to pay the consideration
offered or return the tendered securities promptly after the termination or
withdrawal of the tender offer.

3.    Procedure for Accepting the Offer and Tendering Shares.

     Valid Tender. For a Shareholder validly to tender Shares pursuant to the
Offer, Purchaser must receive on or prior to the Expiration Date, at the address
set forth on page twenty-three of this Offer to Purchase, a properly completed
and duly executed Letter of Transmittal or manually signed facsimile thereof
with any required signature guarantees, together with certificates representing
such Shares and any other documents required by the Letter of Transmittal.

     Full and Partial Tenders. Shareholders who wish to tender may elect to

tender (i) all their Shares, or (ii) any specified number of their Shares.


                                    11
<PAGE>


     Signature Guarantees. No signature guarantee is required on the Letter of
Transmittal if it is signed by the registered holder of the Shares tendered
therewith (unless such holder has completed either the box captioned "Special
Delivery Instructions" or the box captioned "Special Payment Instructions" on
the Letter of Transmittal). In all other cases, signatures on the Letter of
Transmittal must be guaranteed, and the tendered certificates must be endorsed
or accompanied by appropriate stock powers. See Instruction 4 to the Letter of
Transmittal.

     In all cases, payment for Shares tendered and accepted for payment pursuant
to the Offer will be made only after timely receipt by Purchaser of certificates
for such Shares, a properly completed and duly executed Letter of Transmittal or
manually signed facsimile thereof, and any other documents required by the
Letter of Transmittal.

     The method of delivery of certificates for Shares and all other required
documents is at the option and risk of the tendering Shareholder. If delivery is
by mail, registered mail with return receipt requested and properly insured is
recommended. In all cases, sufficient time should be allowed to assure timely
delivery.

     Proxy. By executing a Letter of Transmittal, a tendering Shareholder
irrevocably appoints designees of Purchaser as such Shareholder's
attorneys-in-fact and proxies, each with full power of substitution, in the
manner set forth in the Letter of Transmittal, to vote and exercise all of such
Shareholder's rights with respect to the Shares tendered and any and all
dividends, distributions, rights, other Shares or other securities issued or
insurable in respect of such Shares. All such proxies shall be considered
coupled with an interest in the tendered Shares. Such appointment will be
effective if, when, and only to the extent that, Purchaser accepts such Shares
for payment. Upon such acceptance for payment, all prior proxies given by such
Shareholder with respect to the Shares or other securities or rights will be
revoked without further action, and no subsequent proxies may be given (and, if
given, will not be deemed effective).

     The appointed proxies will, with respect to such Shares or other securities
or rights purchased, be empowered, among other things, to exercise all voting
and other rights of such Shareholder as such proxies, in their sole discretion,
may deem proper at any annual, special or adjourned meeting of the Shareholders,
by consent in lieu of any such meeting or otherwise. In order for Shares to be
deemed validly tendered, Purchaser must be able to exercise full voting and
other rights with respect to such Shares immediately after acceptance for
payment.

     Backup Withholding. To prevent backup federal income tax withholding on
payments made with respect to Shares purchased pursuant to the Offer, tendering
Shareholders must provide Purchaser with their correct taxpayer's identification
number by completing the substituted Form W-9 included in the Letter of
Transmittal. See Instruction 7 and the information under the caption "Important
Tax Information" in the Letter of Transmittal.

     Other Requirements. It is a violation of Section 14 (e) of the Exchange Act
and Rule 14e-4 promulgated thereunder for a person to tender Shares for his

<PAGE>

account unless the person so tendering (i) owns such Shares or (ii) owns other securities convertible into or exchangeable for such Shares or owns an option, warrant or right to purchase such Shares and intends to acquire such Shares for tender by conversion, exchange or exercise of such option, warrant or right. Section 14(e) and Rule 14e-4 provide a similar restriction applicable to the tender or guarantee of a tender on behalf of another person. By signing and delivering the Letter of Transmittal, the tendering Shareholder will represent and warrant to Purchaser that (a) such Shareholder owns the Shares being tendered within the meaning of Rule 14e-4 promulgated under the Exchange Act and (b) the tender of such Shares complied with said Rule 14e-4.

    Determination of Validity; Rejection of Shares; Waiver of Defects; No Obligation to Give Notice. A valid tender of Shares pursuant to any of the procedures described above will constitute the tendering Shareholder's acceptance of the terms and conditions of the Offer, as well as the tendering Shareholder's representation and warranty that such Shareholder owns the Shares being tendered within the meaning of Rule 14e-4 under the Exchange Act. Purchaser's acceptance for payment of Shares pursuant to the Offer will constitute a binding agreement between the tendering Shareholder and Purchaser upon the terms and subject to the conditions of the Offer.

    All questions as to the form of documents and the validity, eligibility (including time of receipt) and acceptance for payment of any tendered Shares will be determined by Purchaser, in its discretion, which determination will be final and binding. Purchaser reserves the absolute right to reject any or all tenders of any particular Shares determined by Purchaser not to be in proper form or if the acceptance of, or payment for, such Shares may, in the opinion of Purchaser's counsel, be unlawful. Purchaser also reserves the absolute right to waive any of the conditions of the Offer or any defect or irregularity in any tender with respect to any particular Shares. Purchaser's interpretation of the terms and conditions of the Offer (including the Letter of Transmittal and the instructions thereto) will be final and binding. No tender of Shares will be deemed to have been validly made until all defects and irregularities have been cured or waived to the satisfaction of Purchaser. Neither Purchaser nor any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such notification.

4.  Acceptance for Payment and Payment of Consideration.

    Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of any such extension or amendment), Purchaser will accept for payment, and will pay the Consideration for, all Shares validly tendered on or prior to the Expiration Date and not properly withdrawn which it intends to purchase, as promptly as practicable after the latest to occur of (a) 5:00 p.m., New York City time, on the Expiration Date, and (b) the satisfaction or waiver of the conditions set forth in Section 8. Purchaser expressly reserves the right to delay acceptance for payment of or payment for Shares in order to comply, in whole or in part, with any applicable law. See Section 7.

    For purposes of the Offer, Purchaser shall be deemed to have accepted for payment (and thereby purchased) Shares validly tendered and not properly withdrawn if, as and when Purchaser gives written notice to the Company's

<PAGE>

controlling shareholder, Dr. Richard Markoll, on behalf of the Shareholders, of Purchaser's acceptance of such Shares for payment pursuant to the Offer. Payment for Shares accepted for payment pursuant to the Offer will be made by check to the tendering Shareholder (or his designee as specified in the Letter of Transmittal) at the address specified by such Shareholder in the Letter of Transmittal. Under no circumstances will interest be paid on the Consideration to be paid by Purchaser, regardless of any delay in making such payment.

In all cases, payment for Shares tendered and accepted for payment pursuant to the Offer will be made only after timely receipt by Purchaser of (i) certificates for such Shares, (ii) a properly completed and duly executed Letter of Transmittal or a manually signed facsimile thereof and (iii) any other documents required by the Letter of Transmittal.

If any tendered Shares are not purchased pursuant to the Offer, or if certificates are submitted for more Shares than are tendered, certificates for such unpurchased or untendered Shares will be returned, without expense to the tendering Shareholder as promptly as practicable after the expiration, termination or withdrawal of the Offer.

Purchaser reserves the right to assign its rights and/or delegate its respective obligations to any one or more of its affiliates, but no such assignment or delegation will relieve Purchaser of any of its obligations under the Offer and will in no way prejudice the rights of tendering Shareholders to receive payment for Shares validly tendered and accepted for payment pursuant to the Offer.

5.    Withdrawal Rights.

Except as otherwise provided in this Section 5, tenders of Shares made pursuant to the Offer are irrevocable. Shares tendered pursuant to the Offer may be withdrawn pursuant to the procedures set forth below at any time prior to the Expiration Date and, unless theretofore accepted for payment as provided herein, may also be withdrawn at any time after the Expiration Date (as extended from time to time).

For a withdrawal of Shares to be effective, a written, telegraphic or facsimile transmission notice of withdrawal must be timely received by Purchaser at the address specified on page twenty-three of the Offer to Purchase. Any such notice of withdrawal must specify the name of the person who tendered the Shares to be withdrawn, the number of Shares to be withdrawn and the name in which the certificates representing such Shares to be withdrawn are registered, if different from that of the person tendering such Shares. If certificates for Shares to be withdrawn have been delivered to Purchaser, then, prior to the physical release of such certificates, the serial numbers shown on the particular certificates evidencing such Shares to be withdrawn and a signed notice of withdrawal (with signatures guaranteed by a bank or other institution participating in a recognized signature guarantee program, if the signature on the Letter of Transmittal was required to be guaranteed), must be furnished to Purchaser as described above.

If Purchaser extends the Offer, is delayed in its acceptance of Shares or payment for Shares or is unable to purchase Shares pursuant to the Offer for any

14

<PAGE>

reason, then, without prejudice to Purchaser's rights under the Offer, Purchaser may, subject to applicable law, retain tendered Shares and such Shares may not be withdrawn except to the extent tendering Shareholders are entitled to withdrawal rights as described in this Section 5.

All questions as to the form and validity (including time of receipt) of notices of withdrawal will be determined by Purchaser, in its sole discretion, which determination shall be final and binding. Neither Purchaser nor any other person will be under any duty to give notification of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give any such notification.

Withdrawals of tenders of Shares may not be rescinded, and any Shares properly withdrawn will be deemed not validly tendered for purposes of the Offer; however, withdrawn Shares may be retendered by following any of the procedures described in Section 3 of "The Offer" at any subsequent time prior to the Expiration Date.

6.    Certain Federal Income Tax Consequences.

The receipt of cash for Shares pursuant to the Offer will be a taxable transaction for federal income tax purposes under the Internal Revenue Code of 1986, as amended (the "Code"), and also may be a taxable transaction under applicable state, local, foreign or other tax laws. In general, a Shareholder will recognize gain or loss equal to the difference between the Shareholder's tax basis in the Shares sold and the amount of any cash received in exchange therefor. Such gain or loss will be capital gain or loss if the Shares sold were held as a capital asset, and will be long-term capital gain or loss if the Shares were held for more than one year.

IN VIEW OF THE INDIVIDUAL NATURE OF TAX CONSEQUENCES, EACH SHAREHOLDER IS URGED TO CONSULT HIS OR HER OWN TAX ADVISOR TO DETERMINE THE PARTICULAR TAX CONSEQUENCES TO HIM OR HER OF THE OFFER. THE FOREGOING DISCUSSION MAY NOT BE APPLICABLE WITH RESPECT TO SHARES RECEIVED PURSUANT TO THE EXERCISE OF EMPLOYEE STOCK OPTIONS OR OTHERWISE AS COMPENSATION OR WITH RESPECT TO SHAREHOLDERS WHO ARE SUBJECT TO SPECIAL TAX TREATMENT UNDER THE CODE, AND MAY NOT APPLY TO A PARTICULAR SHAREHOLDER IN LIGHT OF HIS OR HER INDIVIDUAL CIRCUMSTANCES.

7.    Certain Legal Matters and Regulatory Approvals.

The acquisition of the Shares pursuant to the Offer may be subject to certain regulatory requirements described below.

State Takeover Laws. A number of states have adopted takeover laws which by their terms are applicable to attempts to acquire securities of corporations which are incorporated in such states, or have substantial assets, security holders, principal executive offices or principal places of business therein. To the extent that certain provisions of these state takeover statutes may purport to apply to the Offer, Purchaser believes that such laws conflict with federal

15

<PAGE>

law and constitute an unconstitutional burden on interstate commerce. Should any governmental agency or official or any other person seek to apply any state takeover law to the Offer, Purchaser will take such action as it then believes desirable, which may involve contesting the validity of such statutes and the application of such statutes to the Offer in appropriate judicial or administrative proceedings or filing certain information with, or obtaining approvals from the relevant state authorities, in which event Purchaser might be unable to accept for payment or pay for Shares tendered pursuant to the Offer, or might be delayed in consummation the Offer. In such case, Purchaser might not be obligated to accept for payment or pay for any Shares tendered. See Section 8.

8.    Certain Conditions to the Offer.

(a) Notwithstanding any other terms of the Offer, Purchaser shall not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act (relating to Purchaser's obligation to pay for or return tendered Shares after the termination or withdrawal of the Offer), to pay for any Shares tendered pursuant to the Offer unless:

(i) there shall have been validly tendered and not withdrawn prior to the expiration of the Offer, not less than 4,636,775 of the outstanding Shares or Dr. Markoll shall have tendered to Purchaser an amount of Shares (if any) equal in number to the shortfall between the number of Shares tendered pursuant to the Offer and 4,636,775 of the outstanding Shares;

(ii) sufficient financing shall have been obtained by Purchaser, on terms reasonably satisfactory to it, to enable Purchaser to consummate the Offer, and to pay all related costs and expenses;

(iii) any waiting period (and any extension thereof) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), applicable to the purchase of Shares pursuant to the Offer shall have expired or been terminated;

(iv) Shareholders tendering Shares pursuant to the Offer have given warranties in favor of Purchaser and its affiliates stating that they have full power and authority to tender, sell, assign and transfer the Shares they are tendering, that such Shares are fully paid and that when the same are accepted for purchase by Purchaser or its designated affiliate, Purchaser or its designated affiliate will acquire good, valid and unencumbered title thereto, free and clear of all liens, restrictions, charges and encumbrances and the same will not be subject to any adverse claim;

(v) Purchaser shall have completed its due diligence of the Company with results satisfactory to Purchaser in its sole discretion and no material adverse effect shall have occurred with respect to the Company's business or financial condition;

16

<PAGE>

(vi) Purchaser shall have received a completed and executed IRS Form W-8 or IRS Form W-9, as applicable, from each Shareholder participating in the Offer; and

(vii) all of the Transaction agreements have been executed and delivered by each party thereto and said agreements shall be in full force and effect and all conditions with respect to consummation of such agreements shall have been satisfied or waived.

(b) Furthermore, notwithstanding any other term of the Offer, Purchaser (a) shall not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act (relating to Purchaser's obligation to pay for or return tendered Shares promptly after the termination or withdrawal of the offer) to pay for any Shares tendered pursuant to the Offer; (b) may terminate or, with the consent of the Company, amend the Offer, if, at any time on or after the date of this Agreement and before the expiration of the Offer, any of the following circumstances exists:

(i) there shall be threatened or pending or decided any suit, action

or proceeding by any government agency or any other person, in each case that has a reasonable likelihood of success, (1) challenging the acquisition by Purchaser of the Shares, seeking to restrain or prohibit the making or consummation of the Offer, or seeking to obtain from the Company or Purchaser any damages that are material in relation to the Company and its subsidiaries taken as whole, (2) seeking to prohibit or limit the ownership or operation by Company or Purchaser or any of their respective subsidiaries of any material portion of the Business or the Assets, or to compel the Company or Purchaser or any of their respective subsidiaries to dispose of or hold separate any material portion of the Business or the Assets as a result of the Offer, (3) seeking to impose limitations on the ability of Purchaser to acquire or hold, or exercise full rights of ownership of, any Shares, including the right to vote the Shares purchased by it on all matters properly presented to the Shareholders, or (4) seeking to prohibit Purchaser or any of its subsidiaries from acquiring or holding or effectively controlling in any material respect the Business or the Assets, or (5) which otherwise is reasonably likely to have a material adverse effect on either of the Company and its subsidiaries taken as a whole, on the Business, on the Assets, on Dr. Markoll or on Purchaser and its subsidiaries taken as a whole;

(ii) any statute, rule, regulation, legislation, interpretation, judgment, order or injunction shall be threatened, proposed, sought, enacted, entered, enforced, promulgated, amended or issued with respect to, or deemed applicable to, or any consent or approval withheld with respect to, (1) Purchaser, the Company, or any of their respective subsidiaries or Dr. Markoll or (2) the Offer, or any other transaction contemplated by the transaction documents, by any governmental agency that is reasonably likely to result, directly or indirectly, in any of the consequences referred to in clause (b)(i) above;

                                    17
<PAGE>

(iii) the Company or Dr. Markoll shall have failed to perform in any material respect any obligation or to comply in any material respect with any agreement or covenant to be performed or complied with by them under the Offer.

    The foregoing conditions are for the sole benefit of Purchaser and may be asserted by Purchaser regardless of the circumstances giving rise to any such conditions (including any action or inaction by Purchaser) or may be waived by Purchaser in whole or in part, subject to applicable law, at any time and from time to time in its sole discretion. The failure by Purchaser at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right and may be asserted at any time and from time to time.

    Any determination by Purchaser with respect to the foregoing conditions shall be final and binding.

    THE OFFER IS CONDITIONED UPON THE SATISFACTION, OR WAIVER BY PURCHASER IN ITS SOLE DISCRETION, SUBJECT TO APPLICABLE LAW, OF ALL THE CONDITIONS DESCRIBED ABOVE.

9.    No Offer in Certain Jurisdictions.

    The Offer is not being made to, nor will tenders be accepted from or on behalf of holders of Shares in any jurisdiction in which the making of the offer

or the acceptance thereof would not be in compliance with the securities, blue
sky or other laws of such jurisdiction.

                                        18
<PAGE>


                    CERTAIN INFORMATION CONCERNING THE COMPANY

THE INFORMATION REGARDING THE COMPANY CONTAINED IN THIS OFFER TO PURCHASE HAS
BEEN SUPPLIED BY THE COMPANY TO PURCHASER FOR INCLUSION HEREIN. PURCHASER
ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION
OR FOR ANY FAILURE BY THE COMPANY TO DISCLOSE EVENTS OR CIRCUMSTANCES THAT MAY
HAVE OCCURRED OR THAT MAY AFFECT THE SIGNIFICANCE OR ACCURACY OF SUCH
INFORMATION BUT ARE UNKNOWN TO PURCHASER.


General

     The Company, a Virginia corporation, has its principal executive offices at
Kapellenweg 6, 81371 Munich, Germany (telephone: (049) (089) 7473050, facsimile:
(049) (089) 74730525.

     The Company was incorporated in October 1991. It originally operated from
offices and clinical study/research facilities in Waterbury, Connecticut and
Long Island, New York. The Company operated clinical study activities and
engaged in product research from 1991 to 1995 and developed a process for the
treatment of arthritic disease with pulsed electromagnetic fields (referred to
as the PST technology). The Company licensed its PST technology and product
distribution rights to various entrepreneurs in the Bahamas, Mexico and Canada.

     In August 1996, the Company entered into a technology license and
distribution agreement with PST International for distribution and
commercialization of the Company's products in various countries throughout
Europe and elsewhere.

     From 1996 to April, respective December, 2003 PST International constituted
the majority source of revenue and operating income of the Company. In 1998, the
Company began commercializing the PST Veterinary applications of its technology
in North America.

     Since 1996 the Company has continued to pursue research and development

activities to expand the applications of its expertise and technology. As a
result of PST International having failed to meet its obligations in April 2003
all marketing and other distribution rights regarding the PST German operations
granted to PST International reverted back to BMTS and on January 1st, 2004 all
other rights in all other countries reverted back to BMTS. The Company has
subsequently given the marketing and other distribution rights to Signal Medizin
Vertriebs GmbH ("SMV") a 100% wholly owned subsidiary of BMTS.

                                        19
<PAGE>


Price Range of Shares; Dividends

        There is no established market for the Shares.

        During the past fourteen years there have been no dividends declared or
paid in respect of the Shares.

        Set forth below is certain selected financial information with respect to
the Company and its subsidiaries. The audited Consolidated Financial Statements
for 2003 and 2004 (including P&L statement) for the BMTS Group, and for the
period ending August 2005 were distributed to all shareholders after the Annual
Shareholder Meeting, held on November 2, 2005.


Results of Operations

        The Company's result of operations for the three years ended December 31,
2004 are summarized below (in thousands of US dollars except per share amounts):

|                                | 2004      | RESTATED<br>2003 | 2002      |
| ------------------------------ | --------- | --------- | --------- |
| Revenues                       | 8,164,343 | 5,700,560 | 4,087,644 |
| Cost of Goods Sold             | 1,085,521 | 261,938   | 57,949    |
| Costs of Operation             | 3,051,641 | 2,996,423 | 1,710,538 |
| Payroll and Related Item       | 2,648,157 | 1,391,532 | 1,087,379 |
| Depreciation and Amortization  | 90,927    | 36,040    | 321,338   |
| Financial Expense              | (142,405) | (131,355) | (138,179) |
| Other (expenses) Income - Net  | 197,692   | (263,418) | (114,362) |
| Net Income                     | 1,343,384 | 619,854   | 657,899   |
| Foreign Currency Translation   | 150,286   | 67,867    | (346,254) |
| Total Comprehensive Net Income | 1,493,670 | 687,721   | 311,645   |

20

<PAGE>

BMTS Litigation

Please review the BIO-MAGNETIC THERAPY SYSTEM, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS DECEMBER 31, 2003 AND 2004, Note 12

Liquidity and Capital Resources

From 1991 to 1996, the Company was primarily operating as a development
stage enterprise. As such, it sources of capital (needed to fund its development
activities) came almost exclusively from its efforts to raise capital through
the sale of equity.

The Company raised over $6,000,000 through a series of private placement
offerings which sold approximately 3,200,000 Shares at prices up to $1.85 each.

From 1996 to 2005, the Company has been able to maintain adequate levels of
working capital to fund its commercial and development activities through the
revenues and gross incomes realized from operations.

Should the Offer not be consummated, the Company will attempt to resolve
its liquidity difficulties by seeking to borrow from alternative sources and/or
seeking additional infusions of capital through equity investment. However,
there can be no assurance that any such sources of capital will be available, or
that capital can be obtained on terms satisfactory to the Company.

Should the Offer be consummated, the Company expects that the Company will have
enough resources to satisfy its anticipated demands and commitments for cash for
the next 36 months.

21

<PAGE>

CERTAIN INFORMATION CONCERNING PURCHASER

Information Concerning Purchaser

Purchaser: DuraVest Inc.

The principal activity of Purchaser is the initiation of
strategic investments in leading edge medical technology.

The purpose of the Offer is:

To acquire a majority stake in the Company in combination with
to capital increases to fund (among other) the US approval of
the PST Therapy and to finance further clinical trials.

Source and Amount of Funds

The offer is conditioned on the Purchaser obtaining sufficient financing on
terms and conditions satisfactory to Purchaser. To finance the Offer, Purchaser
shall require up to US$ 7.7 MM which it anticipates obtaining through a bridge
financing. These funds will be used to finance the Offer as well as the
following Transactions:

- finance the subscription of 5,700,000 shares of common stock in BMTS,
  par value $ 0.01 per share, for a purchase price of US$ 0.32 per share
  for a total consideration of US$ 1,824,000

- finance the additional subscription of 8,362,500 shares for a purchase
  price of US$ 0.32 per share for a total consideration of US$ 2,676,000
  immediately upon amendment of the BMTS Charter to increase the number
  of authorized shares to a sufficient number to allow the issuance
  thereof. For this purpose the Company has given NOTICE to its
  shareholders that a Special Meeting of Shareholders will be held on
  December 28, 2005, at Brienner Strasse 1, D-80333 Munich, Germany,
  beginning at 15:00h local time (CET).

                                        22
<PAGE>


        Manually signed facsimile copies of the Letter of Transmittal will be
accepted, however, Purchaser must receive the original stock certificate to
which such Letters of Transmittal relate. The Letter of Transmittal,
certificates for Shares and any other acquired documents should be sent or
delivered by each Shareholder to Purchaser at the following address:


        DuraVest Inc.

        Ogan Gurel, MD MPhil

        Chief Executive Officer

        11 South LaSalle Street, 5th Floor

        Chicago, Illinois 60603 - 1238

        USA

        Tel: 001 - (312) 423-2763


                                        23


</TEXT>

</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>6
<FILENAME>exh12_e.txt
<TEXT>
```

                                                        Exhibit 12(e)
                                                        -------------

                              Richard Markoll, MD
                           Ernestine Binder-Markoll
                                Kapellenweg 6
                                81371 Munich
                                   Germany

                             November 23, 2005


Duravest Inc.
Dr. Ogan Gurel
11 South LaSalle Street,5th Floor
Chicago, Illinois 60603-1238


        Re:  Bio-Magnetic Therapy Systems, Inc. ("BMTS")

Gentlemen:


        This ltter is to conirm certain transactions that will take place in the
near future involving the shares of Common Stock of BMTS ("Shares"), including
the tender offer to be made by Duravest Inc., Dr. Gurel, and/or its, his, or
their affiliates ("Offeror"), and the additional investment of capital by the
Offeror into BMTS of not less than US$ 4,500,000 for the issuance of additional
Shares.

        As a condition to closing the tender offer, Offeror must be offered, and
the Offeror agrees to acquire when offered, not less than 50% of the currently
outstanding Shares (or 4,636,774 Shares) or all Shares that are tendered as part
of the tender offer, whichever is greater. Dr. Richard Markoll currently is the
owner of 4,079,000 Shares and Ms. Ernestine Binder-Markoll currently is the
owner of 200,000 shares. As assurance that the 50% condition of the tender offer
will be met, we will tender as part of the tender offer, in total, not less than
either (i) the amount necessary to achieve a tender of 4,636,775 Shares when
combined with all other Shares being tendered, or (ii) 4,279,000; whichever is
less. To guaranty compliance with this paragraph, we will deliver our
certificates for the Shares issued in our names to an escrow agent mutual
agreeable to all parties with instructions to comply with the c9onditions of
this paragraph.

        As further consideration for us agreeing as above and for other agreements
and undertakings that are intended to be part of the transactions involving the
Offeror, BMTS, and/or us, you acknowledge and agree that if you, acting alone,
together, or with or through BMTS and others, propose to sell or otherwise
transfer, directly or indirectly, more than 50% of the then outstanding Shares
in a public offering, a private placement, or any transaction that would change
control of BMTS, or otherwise be considered an exit from BMTS, or9 BMTS and/or
the Offeror, acting alone or together, propose to sell or transfer,
substantially all the assets of BMTS, to any person or group of persons, then we
shall be entitled to participate, from time to time, in any such transactions to
the extent of 17.74% (on a fully diluted basis), notwithstanding our current
ownership of Shares.


```
<PAGE>
```

Duravest Inc.
Dr. Ogan Gurel
Novembe 23, 2005
Page2


BMTS shall notify us of any such proposed transaction and the terms thereof
sufficiently in advance and with adequate detail to allow us to have sufficient
time and information to make an informed decision. As used in this paragraph,
fully diluted assumes any subsequent issuance of any BMTS securities, and the
issuance and/or exercise of all options, warrants and rights to purchase BMTS
securities and the conversion of all outstanding securities convertible into
shares-.

        If the terms and conditions set forth above are acceptable to you, please
sign and return a copy of the letter.

        Thank you for your cooperation.

                                        Sincerely.


                                        /s/ Richard Markoll
                                        Richard Markoll, M.D.


                                        /s/ Ernestine Binder-Markoll
                                        Ernestine Binder-Markoll


The undersigned acknowledge and accept the terms and conditions set forth in the
above letter.


/s/ Ogan Gurel
--------------------------------------
Dr. Ogan Gurel and Duravest Inc.




</TEXT>
</DOCUMENT>

EXHIBIT B

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 AZz1jrMn2T8EjcCmBnma3LmC1/RItxhpUjTG2PsjzDwpGKij5OBlHHaWW9nDbLGs
 rn/mMjzaDoDiPseWLjr2tw==

<SEC-DOCUMENT>0001014909-06-000005.txt : 20060126
<SEC-HEADER>0001014909-06-000005.hdr.sgml : 20060126
<ACCEPTANCE-DATETIME>20060126134440
ACCESSION NUMBER:		0001014909-06-000005
CONFORMED SUBMISSION TYPE:	8-K
PUBLIC DOCUMENT COUNT:		2
CONFORMED PERIOD OF REPORT:	20060123
ITEM INFORMATION:		Completion of Acquisition or Disposition of Assets
ITEM INFORMATION:		Financial Statements and Exhibits
FILED AS OF DATE:		20060126
DATE AS OF CHANGE:		20060126

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			DURAVEST INC
		CENTRAL INDEX KEY:			0001066281
		STANDARD INDUSTRIAL CLASSIFICATION:	BLANK CHECKS [6770]
		IRS NUMBER:				592624574
		STATE OF INCORPORATION:			FL
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		8-K
		SEC ACT:		1934 Act
		SEC FILE NUMBER:	000-27489
		FILM NUMBER:		06552937

	BUSINESS ADDRESS:
		STREET 1:		1543 BAYVIEW AVENUE
		STREET 2:		SUITE 409
		CITY:			TORONTO ONTARIO
		STATE:			FL
		ZIP:			33486
		BUSINESS PHONE:		4162715285

	MAIL ADDRESS:
		STREET 1:		1543 BAYVIEW AVENUE SUITE 409
		STREET 2:		TORONTO ONTARIO
		CITY:			CANADA M4G 3B5

	FORMER COMPANY:
		FORMER CONFORMED NAME:	GREAT WALL FOOD & BEVERAGE CORP
		DATE OF NAME CHANGE:	19990929
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>f8k_23jan2006duravest.txt
<TEXT>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON D.C. 20549


FORM 8-K


CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934


DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) January 23, 2006


DURAVEST, INC.
------------------------------------------------------
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


|          FLORIDA          |        0-27489        |       59-2624575        |
| ------------------------- | --------------------- | ----------------------- |
| (STATE OR OTHER JURISDICTION | (COMMISSION        | (IRS EMPLOYER           |
|     OF INCORPORATION)     |      FILE NUMBER)     |   IDENTIFICATION NUMBER) |


101 N. Wacker Dr., Suite 2006, Chicago, IL 60606
----------------------------------------------
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES,
INCLUDING ZIP CODE)


REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE (312) 525-8285
--------------

11 South LaSalle Street, 5th Floor, Chicago, Illinois 60603-1238
-----------------------------------------------------------
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

Check the appropriate box below If the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2 below):

[ ] Written communications pursuant to Rule 425 under the Securities Act
    (17 CFR 230.425)

[ ] Soliciting materials pursuant to Rule 14a-12 under the Exchange Act
    (17 CFR 240.14a-12)

[ ] Pro-commencement communications pursuant to Rule 14d-2(b) under the Exchange
    Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
    Act (17 CFR 240.13e-4(c))

<PAGE>

Section 2. - Financial Information
- --------- ---------------------

Item 2.01    Completion of Acquisition or Disposition of Assets
- --------- ---------------------------------------------------


    On January 23, 2006, the Company announced the completion of its
acquisition of common stock of Bio-Magnetic Therapy Systems, Inc., a
privately-held Virginia corporation with principal offices at Kapellenweg 6,
81371 Munich, Germany ("BMTS") engaged in the development of a process for the
treatment of arthritic disease with pulsed electromagnetic fields (referred to
as the "PST technology"). Following completion of a tender to all BMTS
shareholders and two capital increases by BMTS, the Company announced that it
had acquired at approximately 17,026,456 shares or approximately 70.59% of the
outstanding shares at a total cost of $5,448,466, subject to minor adjustment
for late or defective tenders and assuming exercise by the holder of a call
option granted by the Company for 250,000 shares at $0.32 per share.

    In order to facilitate its acquisition of BMTS, the Company arranged for
convertible financing in November 2005. The Company is presently in negotiations
with the purchasers of the Convertible Promissory Notes issued in November 2005

to amend and restate the terms of the Convertible Promissory Notes to provide
greater flexibility for the Company and to arrange additional convertible
financing.

   Additional information relating to the BMTS acquisition and the issuance of
the Convertible Promissory Notes can be found in the Company's Form 8-K Report
filed on December 1, 2005. A copy of the press release issued by the Company on
January 23, 2006 relating to the completion of the BMTS acquisition is filed
with this Form 8-K Report as Exhibit 12(a).


Section 9. - Financial Statements and Exhibits
- --------   --------------------------------


Item 9.01   Financial Statements and Exhibits
- --------   --------------------------------


   (d) Exhibits


   Exhibit No.              Description of Exhibits
   -----------              -----------------------

   12(a)                    Press Release dated January 23, 2006.


                              SIGNATURES

   Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

                                   DURAVEST, INC.

Dated:   January 26, 2006         By: /s/ Dr. Ogan Gurel
                                      --------------------------------
                                      Dr. Ogan Gurel, President and
                                      Chief Executive, Officer and a
                                      Director



                                   2

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-12
<SEQUENCE>2
<FILENAME>exh12_apressrel.txt
<TEXT>
                                             Exhibit 12(a)
                                             -------------


DURAVEST, INC. COMPLETES ACQUISITION OF BIO-MAGNETIC THERAPY SYSTEMS, INC.
(BMTS) - AN EMERGING MEDICAL TECHNOLOGY COMPANY WITH STRONG EARNINGS GROWTH; DR.
ROLF KAESE CONFIRMED AS NEW CEO OF BMTS.

Chicago - Jan 23, 2006 - Duravest, Inc. (OTC BB:DUVT, XETRA:DUV) has completed
the acquisition of Bio-Magnetic Therapy Systems, Inc. (BMTS) through two capital
increases in combination with a tender offer to all BMTS shareholders. Duravest
has acquired a minimum stake of 70.59% - at a total cost of US$ 5,448,466 -
which represents a controlling position in the company. In order to facilitate
this highly accretive transaction, Duravest obtained convertible financing. BMTS
is a leading German-US medical technology firm dedicated to the safe,
non-invasive treatment of osteoarthritis, osteoporosis and orthopedic injuries
and its associated pain management. The company produces an innovative and
patented "Pulsed Signal Therapy" (PST(TM)) system which delivers a unique pulsed

electromagnetic signal that has been clinically shown to stimulate the healing of connective tissue (cartilage, tendons, ligaments and bone) injuries. The PST(TM) system has been extensively validated by more than 25 clinical studies and 60 peer reviewed publications worldwide; in addition, 51 international patents cover all the essential technical innovations as well as current and future treatment indications. More than 300,000 patients have been treated with a documented clinical success rate over 75%.

BMTS previously reported audited 2004 revenues of $7.5M with an associated net income of $0.87M. Over the past three years profit growth has exceeded a 35% average annual growth rate and preliminary returns from 2005 look to be the best year ever with profits exceeding $1M. The Duravest acquisition and accompanying investment will help accelerate BMTS' historical earnings growth by internationalizing its distribution network. BMTS is presently well established in Germany and sales will be expanded throughout Europe in 2006 and Asia in 2007/2008. Investigational Device Exemption (IDE) status has already been granted by the U.S. FDA to BMTS and the company will work to achieve FDA approval in 2008. Dr. Ogan Gurel, CEO of Duravest, Inc., commented that "This acquisition significantly advances Duravest's mission and business strategy. This enhancement of the Duravest portfolio to include BMTS - a company with outstanding earnings growth potential, an impeccable balance sheet, no bank debt and both historical and projected positive cash flow - will substantially bolster Duravest's financial strength and its ability to deliver new treatments for patients and increased value to shareholders." Dr. Peter Bonis (a member of the Duravest medical advisory board, Director of Research at Up-To-Date and Assistant Director of the Tufts New England Medical Center Evidence Based Practice Center) remarked: "BMTS fits in perfectly with the company's mission of developing technologies that have a strong basis in safety as well as in cross-disciplinary areas that fall in between traditional medical technology sectors."

As part of the transaction, several management and Board of Directors changes have been instituted. As anticipated, Dr. Rolf Kaese has been confirmed as Chief Executive Officer of BMTS, replacing its scientific founder Dr. Richard Markoll. Dr. Kaese was previously CEO of Impella CardioSystems AG, at which he

<PAGE>

successfully restructured the company leading to its sale to Abiomed for $65 M in April, 2005. In addition, both Drs. Gurel and Kaese have been appointed to the Board of Directors of BMTS. Dr. Kaese remarked: "The BMTS technology will be a critical part of the armamentarium of safe, efficient pain management and treatment for a number of orthopedic conditions. It's exciting to be associated with the innovative team at Duravest and to work together to grow the business."

Background on Duravest, Inc.

Duravest, Inc. (OTC BB:DUVT, XETRA:DUV) seeks innovative and safe medical technologies in their preclinical and breakthrough stages and helps move them toward successful commercialization. In addition to the BMTS acquisition, Duravest - through its other subsidiary Estracure - is currently developing a next-generation coronary stent based on proprietary estrogen-based technologies that minimize restenosis and potentially prevent progression of coronary lesions. The BMTS acquisition represents a complementary and synergistic addition to Duravest's core mission of bringing safe and effective next-generation medical technologies for the benefit of patients worldwide.

Safe Harbor Forward Looking Statements

This release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21B of the Securities Exchange Act of 1934. Any statements that express or involve discussions with respect to predictions, expectations, beliefs, plans, projections, objectives, goals or assumptions of future events are not statements of historical fact and may be considered forward looking statements. They involve a number of risks and

uncertainties, which could cause actual results or events to differ materially
from those presently anticipated.

Spokespersons For Duravest, Inc.

Ogan Gurel, MD MPhil
Chief Executive Officer
gurel@duravestinc.com

Dick Gersh
Richard Gersh Associates
dickgersh@rgapr.com


</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# EXHIBIT C

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 CFHweJU976PuUHKrq5+ohDb860lKUuBVUCZb753xGjK9Gmy59mQn5YAz36Q5YDdU
 H4sVIhszR7I44raSot/Ivw==

<SEC-DOCUMENT>0001014909-06-000019.txt : 20060227
<SEC-HEADER>0001014909-06-000019.hdr.sgml : 20060227
<ACCEPTANCE-DATETIME>20060227085516
ACCESSION NUMBER:		0001014909-06-000019
CONFORMED SUBMISSION TYPE:	8-K
PUBLIC DOCUMENT COUNT:		3
CONFORMED PERIOD OF REPORT:	20060227
ITEM INFORMATION:		Entry into a Material Definitive Agreement
ITEM INFORMATION:		Unregistered Sales of Equity Securities
ITEM INFORMATION:		Financial Statements and Exhibits
FILED AS OF DATE:		20060227
DATE AS OF CHANGE:		20060227

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			DURAVEST INC
		CENTRAL INDEX KEY:			0001066281
		STANDARD INDUSTRIAL CLASSIFICATION:	BLANK CHECKS [6770]
		IRS NUMBER:				650924320
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		8-K
		SEC ACT:		1934 Act
		SEC FILE NUMBER:	000-27489
		FILM NUMBER:		06645011

	BUSINESS ADDRESS:
		STREET 1:		101 N. WACKER DR., SUITE 2006
		CITY:			CHICAGO
		STATE:			IL
		ZIP:			60606
		BUSINESS PHONE:		(312) 525-8285

	MAIL ADDRESS:
		STREET 1:		101 N. WACKER DR., SUITE 2006
		CITY:			CHICAGO
		STATE:			IL
		ZIP:			60606

	FORMER COMPANY:
		FORMER CONFORMED NAME:	GREAT WALL FOOD & BEVERAGE CORP
		DATE OF NAME CHANGE:	19990929
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>f8k_27feb2006.txt
<TEXT>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON D.C. 20549


FORM 8-K


CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED) February 27, 2006

DURAVEST, INC
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


        FLORIDA                    0-27489                65-0924320
- --------------------------------------------------------------------------------
(STATE OR OTHER JURISDICTION      (COMMISSION           (IRS EMPLOYER
    OF INCORPORATION)             FILE NUMBER)        IDENTIFICATION NUMBER)


        101 N. Wacker Dr., Suite 2006, Chicago, IL 60606
        ----------------------------------------------------------
        (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES, INCLUDING ZIP CODE)

    REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE (312) 525-8285
                                                       --------------

        11 South LaSalle Street, 5th Floor, Chicago, IL 60603
        ----------------------------------------------------------
        (FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2 below):

[ ] Written communications pursuant to Rule 425 under the Securities Act
    (17 CFR 230.425)

[ ] Soliciting materials pursuant to Rule 14a-12 under the Exchange Act
    (17 CFR 240.14a-12)

[ ] Pro-commencement communications pursuant to Rule 14d-2(b) under the Exchange
    Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
    Act (17 CFR 240.13e-4(c))



<PAGE>


Section 1. - Registrant's Business and Operations
- ---------   ---------------------------------------

Item 1.01    Entry into a Material Definitive Agreement
- ---------   -------------------------------------------

    A. On November 28, 2005, the Company issued three Convertible Promissory
Notes (each a "November 2006 Note" and collectively the "November 2006 Notes"),
one of which was issued to European Catalyst Fund Limited in the total principal
amount of $3,000,000, the second of which was issued to Absolute Octane Fund
Limited in the total principal amount of $1,000,000, and the third of which was
issued to Absolute Return Europe Fund Limited in the total principal amount of
$1,000,000, for an aggregate principal amount of all November 2006 Notes of
$5,000,000. The principal of the November 2006 Notes is due November 28, 2006
(the "November 2006 Notes Maturity Date"). On February 22, 2006, the Company and
the purchasers of the November 2006 Notes amended and restated certain of the
terms of the November 2006 Notes to provide the Company with greater flexibility
in interest repayment options and to make the terms more consistent with the
terms of the January 2007 Notes described below.

    As amended and restated, interest on the November 2006 Notes is payable as
soon as practicable following the November 2006 Notes Maturity Date at the
option of the Company either (i) at the rate of 15% per annum solely in a number
of shares of common stock of the Company determined by dividing the unpaid

interest on such November 2006 Note by the lesser of (A) the average market
price of the shares of the Company's common stock for the 20 trading days
immediately preceding the November 2006 Notes Maturity Date and (B) $1.11 per
share (subject to certain antidilution adjustments) or (ii) at the rate of 10%
per annum at the option of the Company in (A) cash or (B) an additional
promissory note having a one year term and otherwise terms substantially
identical to the November 2006 Notes. In the event the Company is unable to pay
the principal amount of any November 2006 Note on the November 2006 Notes
Maturity Date, the holder of such Note may convert any or all of the unpaid
principal into shares of the Company's common stock at any time following the
November 2006 Notes Maturity Date at a conversion price equal to 80% of the
lesser of (A) the average market price of the shares of the Company's common
stock for the 20 trading days preceding the repayment date and (B) $1.11 per
share (subject to certain antidilution adjustments). The November 2006 Notes
were issued in order to finance the Company's purchase of 14,062,500 shares of
Bio-Magnetic Therapy Systems, Inc. ("BMTS") in two stages in November and
December 2005. The November 2006 Notes are secured by a pledge of a number of
shares of common stock of BMTS held by the Company and purchased with the
proceeds of the November 2006 Notes (subject to certain exceptions) equal to the
principal amount of the November 2006 Notes divided by $0.32. In the event of a
sale by the Company of any pledged BMTS shares, the net proceeds of such sale
will be applied first to the ratable repayment of the November 2006 Notes and
the January 2007 Notes described below.

    The BMTS acquisition is more fully described in the Company's Form 8-K
Reports filed on December 1, 2005 and January 26, 2006. Additional information
relating to the November 2006 Notes and/or their issuance is set out in Item
3.02 of Section 3 below. Copies of the amended and restated November 2006 Notes
are filed with this Form 8-K Report as Exhibit 10(a).


                                       2
<PAGE>


    B. On February 22, 2006, the Company concluded negotiations with two of the
purchasers of its November 2006 Notes with respect to financing for the BMTS
shares acquired in the tender offer to BMTS shareholders which closed in January
and issued two Convertible Secured Promissory Notes (each a "January 2007 Note"
and collectively the "January 2007 Notes"), one of which was issued to Absolute
Octane Fund Limited in the total principal amount of $714,233, and the second of
which was issued to Absolute Return Europe Fund Limited in the total principal
amount of $714,233, for an aggregate principal amount of all January 2007 Notes
of $1,428,466. Although the loans represented by the January 2007 Notes was
advanced to the Company on January 17, 2006, the collateral package and interest
payment provisions were not finalized until February 22, 2006.

    The principal of the January 2007 Notes is due January 17, 2007 (the
"January 2007 Notes Maturity Date") and the January 2007 Notes bear interest
from January 17, 2006. Interest on the January 2007 Notes is payable as soon as
practicable following the January 2007 Notes Maturity Date at the option of the
Company either (i) at the rate of 15% per annum solely in a number of shares of
common stock of the Company determined by dividing the unpaid interest on such
January 2007 Note by the lesser of (A) the average market price of the shares of
the Company's common stock for the 20 trading days immediately preceding the
January 2007 Notes Maturity Date and (B) $1.11 per share (subject to certain
antidilution adjustments) or (ii) at the rate of 10% per annum at the option of
the Company in (A) cash or (B) an additional promissory note having a one year
term and otherwise terms substantially identical to the January 2007 Notes. In
the event the Company is unable to pay the principal amount of any January 2007
Note on the January 2007 Notes Maturity Date, the holder of such Note may
convert any or all of the unpaid principal into shares of the Company's common
stock at any time following the January 2007 Notes Maturity Date at a conversion
price equal to 80% of the lesser of (A) the average market price of the shares
of the Company's common stock for the 20 trading days preceding the repayment
date and (B) $1.11 per share (subject to certain antidilution adjustments). The
January 2007 Notes are secured by a pledge of a number of shares of common stock

of BMTS held by the Company and purchased with the proceeds of the January 2007
Notes (subject to certain exceptions) equal to the principal amount of the
January 2007 Notes divided by $0.32. In the event of a sale by the Company of
any pledged BMTS shares, the net proceeds of such sale will be applied to the
ratable repayment of the November 2006 Notes and the January 2007 Notes. The
Company believes that by securing the November 2006 Notes and the January 2007
Notes with the BMTS stock rather than with a lien on its assets generally, the
Company will have greater flexibility to undertake other acquisitions in the
future.

    Additional information relating to the January 2007 Notes and/or their
issuance is set out in Item 3.02 of Section 3 below. Copies of the January 2007
Notes are filed with this Form 8-K Report as Exhibit 10(b).

Section 3 - Securities and Trading Markets
- ---------   ------------------------------

Item 3.02   Unregistered Sales of Equity Securities
- ---------   ---------------------------------------

    Each of the November 2006 Notes and January 2007 Notes described in Item
1.01 above was issued to an institutional investor which is an "accredited
investor" as defined under the Securities Act of 1933, as amended ("Securities

                                    4
<PAGE>

Act"). Each such Note was, and any shares of the Common Stock of the Company
issued upon conversion of such Note must be, taken by the noteholder for
investment and not for distribution and as "restricted securities" under the
Securities Act unless a registration statement in then in effect with respect to
the shares. The holder of each Note has the qualified right to have the
underlying shares included in any future registration statement filed under the
Securities Act by the Company. In issuing the Notes, the Company relied upon the
exemption from the registration requirements of Section 5 of the Securities Act
provided in Section 4(2) thereof, as a transaction by an issuer not involving a
public offering.

Section 9. - Financial Statements and Exhibits
- ---------   ------------------------------

Item 9.01   Financial Statements and Exhibits
- ---------   ------------------------------

        (d)  Exhibits

            Exhibit No.        Description of Exhibits

            10(a)              Amended and Restated Convertible Promissory Notes
                               dated November 28, 2005 issued by the Company to
                               European Catalyst Fund Limited, Absolute Octane Fund
                               Limited, and Absolute Return Europe Fund Limited.

            10(b)              Convertible Secured Promissory Notes dated
                               January 17, 2006 issued by the Company to Absolute
                               Octane Fund Limited and Absolute Return Europe Fund
                               Limited.

4
```
<PAGE>
```

SIGNATURES

     Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

                              DURAVEST, INC.

Dated:    February 27, 2006           By: /s/ Dr. Ogan Gurel
                                          -------------------------------------
                                          Dr. Ogan Gurel, President and Chief
                                          Executive, Officer and a Director

5
```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10
<SEQUENCE>2
<FILENAME>exh10_a.txt
<TEXT>
```
                                                             EXHIBIT 10(a)