UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

DURAVEST, INC.,                          :

        Plaintiff,                     :       07 Civ. 10590 (JSR)

        -v-                            :       OPINION AND ORDER

VISCARDI, A.G., WOLLMUTH MAHER &          :
DEUTSCH, LLP, MASON H. DRAKE, ESQ.,       :
BRUCE O'DONNELL, CPA, BRUCE O'DONNELL     :
CPA/PFS, P.A., BIOMEDICAL CONSULTANTS     :
SL, RICHARD MARKOLL, and ERNESTINE        :
BINDER MARKOLL,                           :

        Defendants.                    :

------------------------------------ x

JED S. RAKOFF, U.S.D.J.

Plaintiff Duravest, Inc. has sued a number of individuals and
entities for damages associated with Duravest's 2005 purchase of
Bio-Magnetic Therapy Systems, Inc. ("BMTS"), alleging, among other
things, that these individuals and entities knew BMTS was nearly
worthless but engaged in fraud and misconduct to lure Duravest into
purchasing it.  Duravest has named the following defendants:  Richard
Markoll ("Markoll"), who was the Chief Executive Officer of BMTS at
the time of purchase; Ernestine Binder Markoll ("Ernestine"), his
wife and a shareholder in BMTS; and Biomedical Consultant SL
("BCSL"), the Markolls' consulting company (collectively, the
"Markoll defendants"); Viscardi, AG ("Viscardi"), the German
brokerage involved in the sale; Wollmuth Maher & Deutsch, LLP and
Mason H. Drake, Esq. (together, the "lawyer defendants"), who
provided legal services to plaintiff in connection with the sale; and
Bruce O'Donnell, CPA, and Bruce O'Donnell CPA/PFS, P.A. (together,

the "O'Donnell defendants"), who provided accounting services to BMTS. Duravest has asserted the following federal and New York law claims against various combinations of the defendants: (1) common law fraud; (2) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; (3) conversion; (4) breach of contract; (5) professional malpractice; (6) securities fraud under 15 U.S.C. § 78j; (7) securities fraud under 15 U.S.C. § 77l; and (8) common law negligence.

By Memorandum Order dated April 11, 2008 ("April 11 Order"), the Court granted in part the motion to dismiss of the O'Donnell defendants, dismissing with prejudice the RICO count, which was the sole federal claim against the O'Donnell defendants, and the breach of contract count. The Court denied the motion with respect to the common law fraud and negligence claims against these defendants, but deferred ruling on whether to exercise supplemental jurisdiction over these claims until the Court had determined whether any federal claims would proceed against the other defendants.[1]

Viscardi subsequently moved to dismiss the claims against it (common law fraud, securities fraud under § 77l and § 78j, and negligence) for want of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P., or, in the alternative, for failure to state a claim

---

[1] This Court has only federal question jurisdiction over this case, and not diversity jurisdiction, because both the plaintiff and defendant Bruce O'Donnell, CPA/PFS, P.A., are organized under the laws of Florida. See Complaint ("Compl.") ¶¶ 11, 31.

under Rule 12(b)(6).  At the same time, the lawyer defendants moved to dismiss the professional malpractice claim, the only claim against them, on the ground that the Court lacked supplemental jurisdiction to consider it.

Duravest's and Viscardi's submissions on the question of personal jurisdiction revealed a disputed issue of fact with possible relevance to the outcome of the motion.  Specifically, the parties introduced conflicting evidence as to whether Friedrich Wilhelm Göbel, the Chief Executive Officer ("CEO") of Viscardi, had a business relationship with a New York management consulting company called The Schubert Group ("TSG"), and if so, whether that relationship involved Viscardi.  At oral argument on the motion, the Court expressed doubts that Duravest could make an evidentiary showing of contacts sufficient to establish personal jurisdiction, but nonetheless agreed to hold a hearing at which plaintiff's counsel could question Walter Schubert, the principal of TSG.  The Court deferred, for the time being, any ruling on the lawyer defendants' motion.

The Court held the personal jurisdiction evidentiary hearing on July 1, 2008.  Schubert's testimony, however, brought to light a number of troubling misrepresentations with possible relevance to Viscardi's presence (or lack thereof) in New York.  Accordingly, the Court adjourned the hearing so that Göbel, who resided in Germany, could testify as well.[2]  The Court conducted the second part of the

---

[2]  The Court also took testimony from Steven Solano, of L&S Consulting, who performed regulatory compliance work for Schubert

hearing on September 22, 2008.

Meanwhile, the Markoll defendants, whom plaintiff had been able to serve only much later than the other defendants, appeared and moved to dismiss, also on the ground of lack of personal jurisdiction and, in the alternative, for failure to state a claim. On September 22, in addition to the continued evidentiary hearing, the Court held oral argument on that motion.

Based on the evidence adduced at the two evidentiary hearings and on the submissions of the parties with respect to both the Markoll defendants' and Viscardi's motions, the Court, for the reasons to be discussed, grants those motions and dismisses both the Markoll defendants and Viscardi for lack of personal jurisdiction and, concomitantly, declines to exercise supplemental jurisdiction against the other remaining (exclusively state law) claims against the other remaining defendants.

Although the Court provided a brief overview of the events underlying this case in its April 11 Order, a further summary of the facts as they pertain to the Markoll defendants and Viscardi is warranted here. Richard Markoll founded BMTS, a closely held Virginia company,[3] in 1991, to develop and sell biomedical products

_____

and Göbel.

[3] The Complaint alleges that BMTS is a Florida company, <u>see</u> Complaint ("Compl.") ¶ 51; however, Richard Markoll's Declaration (as well as numerous other documents presented to the Court) confirms that it is indeed organized under the laws of Virginia. Declaration of Richard Markoll ("RM Decl.") ¶ 22. Plaintiff never challenged this assertion in its submissions or at oral argument.

that used a technique called "Pulsed Signal Technology" ("PST"). Complaint ("Compl.") ¶¶ 52, 74; Declaration of Richard Markoll ("RM Decl.") ¶ 22. At the time of the events underlying this action, BMTS had its principal place of business in Germany, where both Markolls have resided for many years. RM Decl. ¶ 3-8, 24. Richard Markoll was the CEO and majority shareholder of BMTS, and Ernestine Markoll was a shareholder and employee who participated in the company's management. Compl. ¶¶ 59-60.

Viscardi, an independent investment bank incorporated under the laws of Germany and having an office in Munich, is in the business of providing small- and medium-capitalized European companies with advisory services for financing transactions and mergers and acquisitions. Compl. ¶ 12-16; Affidavit of Barbara Thätig, General Counsel and Chief Operating Officer of Viscardi ("Thätig Aff.") ¶¶ 4-5. On February 1, 2005, in Munich, Richard Markoll engaged Viscardi to seek the sale of BMTS. Agreement, Ex. A to Thätig Aff. Viscardi's CEO, Friedrich Wilhelm Göbel, unsuccessfully approached a number of companies, none of which was in New York, about purchasing BMTS, but eventually placed the company with Duravest, a Florida company based in Illinois. Thätig Aff. ¶¶ 8, 11-12.

On November 25, 2005, Duravest entered into an agreement to acquire the outstanding shares of BMTS. See 12/1/2005 Form 8-K submitted by Duravest, Inc. to the Securities and Exchange Commission ("12/1/05 8-K") at 1.01(B), Ex. A to Declaration of Peter Pizzi

("Pizzi Decl.").[4]  The acquisition took place in two stages: first,

on November 25, Duravest purchased 5.7 million shares of BMTS common

stock; second, Duravest made a tender offer to BMTS's shareholders

which expired on December 28, 2005.  12/1/05 8-K at 1.01(B); Ex.

12(d) to 12/1/05 8-K; 2/27/06 Form 8-K submitted by Duravest, Inc. to

the Securities and Exchange Commission ("2/27/06 8-K") at 1.01, Ex. C

to Pizzi Decl.  The tender offer was successful, and Duravest became

the majority shareholder of BTMS.

        Duravest's Complaint, filed on November 26, 2007, alleges

that up to, during, and after this sale, the Markoll defendants and

Viscardi, among others, perpetrated various frauds on Duravest.

These allegedly included concealing the Markolls' prior criminal

convictions for Medicare fraud, Compl. ¶¶ 69-73; concealing competing

claims to PST intellectual property rights, id. ¶¶ 74-79;

misrepresenting the existence of prior clinical trials demonstrating

the effectiveness of PST, id. ¶¶ 80-81; issuing accounting statements

that misrepresented BMTS's income and expenses, id. ¶¶ 82-85; and

falsely claiming, after purchase, that BMTS owed loan payments to the

Markolls, id. 86-88, 152-55.  Duravest also claimed that the

defendants committed other types of misconduct.  See, e.g., id. ¶¶

96-105.

        Duravest claims that it has established both "general" and

_____

        [4]  While the Complaint alleges that Duravest's acquisition
took place over a period of six months "between November 2005 and
April 2006," Compl. ¶¶ 2, 3, 7, 9, 55, Duravest's SEC filings are
more precise.  Duravest has not disputed their accuracy in its
submissions or at oral argument.

"specific" personal jurisdiction over the Markoll defendants under the New York Civil Practice Law and Rules ("CPLR"). Under CPLR section 301, a court may assert general personal jurisdiction over a foreign corporation "if it has engaged in such a continuous and systematic course of doing business here that a finding of its presence in this jurisdiction is warranted." Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y.2d 28, 33 (1990) (internal quotation marks omitted). "The test for 'doing business' is a simple and pragmatic one . . . . The court must be able to say from the facts that the corporation is present in the State not occasionally or casually, but with a fair measure of permanence and continuity." Id. at 33-34 (citations and internal quotation marks omitted); see also Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) ("The New York courts, in applying the pragmatic test for section 301 jurisdiction, have focused upon factors including: the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state.").

Under CPLR section 302(a)(1), New York's long-arm jurisdiction statute, a court may assert specific personal jurisdiction over a foreign corporation if the defendant "transacts . . . business" within the state and the claim against the defendant "aris[es] from" activity within New York. "A non-domiciliary transacts business in New York by purposefully availing him or herself of the privilege of conducting activities within the State,

7

thus invoking the benefits and protections of its laws." <u>Ehrenfeld</u>
<u>v. Mahfouz</u>, 489 F.3d 542, 548 (2d Cir. 2007) (internal quotation
marks and alterations omitted). The exercise of long-arm
jurisdiction must also satisfy constitutional due process standards,
which it does where it is based on defendants' "'minimum contacts'
with the state" and where it "'comport[s] with traditional notions of
fair play and substantial justice.'" <u>Agency Rent A Car Sys. v. Grand</u>
<u>Rent A Car Corp.</u>, 98 F.3d 25, 32 (2d Cir. 1996) (citing <u>Int'l Shoe</u>
<u>Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).

Richard Markoll was born in New York, but since 1976 he has
not resided, owned or leased property, maintained an office, mailing
address, telephone listing, or bank account, or had any employees or
agents, in New York. RM Decl. ¶¶ 11-19. Ernestine Markoll has never
had any of those types of contact with New York. Ernestine Markoll
Declaration ("EM Decl.") ¶¶ 11-17. And BCSL, the Markolls'
consulting company, was formed under the laws of Spain and has never
had any contacts with New York. RM Decl. ¶ 31-32. Nonetheless,
Duravest argues that the following alleged contacts between the
Markolls and New York support a finding of either general or specific
jurisdiction over the Markolls: (1) the New York residence of twenty-
three shareholders of BMTS, of which the Markolls were officers and
shareholders; (2) Richard Markoll's solicitation in New York of
investors in BMTS; (3) the Markolls' promotion and operation of three
BMTS "patient centers" in New York; (4) the registration of BMTS as a
foreign corporation with the New York Department of State ("NYDOD");
and (5) the Markolls' solicitation of share sales in November and

December 2005 from New York resident shareholders of BMTS in the context of Duravest's tender offer. But the argument is both factually and legally deficient.

To begin with, it is important to remember that BMTS is not a party to this lawsuit. Duravest's premise that any contacts of BMTS, the corporation, may automatically be imputed to the Markolls, its shareholders and officers, is in error. See Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs., 2005 U.S. Dist. LEXIS 4746 (S.D.N.Y. Mar. 23, 2005) ("[I]t does not follow automatically that New York may exercise personal jurisdiction over all of a corporation's officers as a consequence of having jurisdiction over the corporation." (citing Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470 (1988)).[5] Rather, an individual defendant may be subject to specific personal jurisdiction (but not general jurisdiction) based on his actions in his corporate capacity only where the plaintiff can show that the corporation was acting as the agent of the officer (rather than vice versa, as would usually be the case). See Beatie & Osborn LLP v. Patriot Sci. Corp., 431 F. Supp. 2d 367, 389 (S.D.N.Y. 2006). "[F]or a corporation to be considered an agent of an officer for personal jurisdiction purposes, a plaintiff must allege: (1) that the

_____

[5] However, the Markolls' contrary argument that under no circumstances can the actions of a corporation be imputed to an officer is likewise incorrect, at least with respect to specific jurisdiction. See Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460 (1988); see also Big Apple Pyrotechnics & Multimedia, Inc. v. Sparktacular, Inc., 2007 U.S. Dist. LEXIS 17163 (S.D.N.Y. Mar. 6, 2007) (confirming that "a corporate officer cannot be subject to general jurisdiction under CPLR § 301 for his New York activities on behalf of a corporation" but that he can be subject to specific jurisdiction under § 302).

corporation engaged in purposeful activities in New York in relation to the transaction; (2) that the corporation's activities were performed for the benefit of the individual defendant; (3) that the corporation's activities were performed with the knowledge and consent of the individual defendant; and (4) that the individual defendant exercised some control over the corporation." Id. (citing Kreutter, 71 N.Y.2d at 467).

In light of the foregoing, the only relevant contacts with New York are those that could establish specific jurisdiction over BMTS.[6] The sole contact that Duravest has alleged in this category

_____

[6] Even if conduct establishing general jurisdiction could be imputed to corporate officers, no contacts that Duravest has alleged (with the possible exception of BMTS's prior registration as a foreign business corporation in New York) are sufficient to establish general jurisdiction over BMTS. First, as to BMTS's twenty-three New York shareholders, plaintiff's counsel has not pointed to any case holding that shareholders' residence within a forum is sufficient to establish personal jurisdiction over the corporation, and admitted at oral argument that he knew of no such case. Indeed, other authority suggests the contrary. See, e.g., Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 218 (5th Cir. 2000) ("[A] foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." (internal quotation marks omitted)); Stutzman v. Rainbow Yacht Adventures Ltd., 2007 U.S. Dist. LEXIS 8697 (N.D. Tex. Feb. 7, 2007) ("Neither the residency nor the citizenship of a controlling shareholder will establish personal jurisdiction over the company."). Second, as to the treatment centers, Duravest has not even shown that they were operated by BMTS - indeed, the Markolls' counsel represented otherwise at oral argument, and Duravest provided no basis on which to challenge that representation – but even if they were, and even if their operation rose to the level of doing business, those contacts, which occurred in the 1990s, occurred so far before the complaint was filed in this action as to be completely irrelevant. And third, the basis for the allegation of any original "solicitation of investment dollars" by Richard Markoll in New York proved, at

is the November 25, 2005 Notice Letter, signed by Richard Markoll in his capacity as the Chairman of the Board of Directors of BMTS and sent to BMTS's shareholders, which conveyed to the shareholders the Board of Directors' recommendation that they tender their shares to Duravest.[7]  Yet the mailing of this single letter to shareholders residing in New York is far from sufficient to establish that either Markoll or BMTS was "transact[ing] . . . business" within the meaning of CPLR section 301(a)(2).  See Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 112 (S.D.N.Y. 1993) ("Generally, telephone and mail contacts do not provide a basis for jurisdiction under CPLR § 302(a)(1) unless the defendant 'projected' himself by those means into New York in such a manner that he 'purposefully availed himself . . . of the benefits and protections of its laws.'" (citing Parke-Bernet Galleries, 26 N.Y.2d 13, 19 (1970)); Etra v. Matta, 61 N.Y.2d 455, 458-59 (1984) (finding telephone and mail contacts "too insubstantial" to amount to transacting business); Sunward Elecs. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2002) (directing courts, when assessing whether contacts are sufficient to establish that a defendant has "transact[ed] . . . business within the state," to consider, e.g., whether the defendant has an ongoing contractual relationship with New York or has visited New York).

_____

oral argument, to be entirely speculative.  See Tr. 9/23/08.

[7]  Although Duravest refers repeatedly to an alleged "solicitation" of share sales directed by the Markolls to BMTS's shareholders, the only "solicitation" sent out in the context of the tender offer was Duravest's own offer.  See Ex. 12(b) to 12/1/2005 8-K.

In any event, the Court finds that to subject Richard Markoll, in his individual capacity, to personal jurisdiction in New York based upon a single letter he signed in his official capacity and sent out generally to all of BMTS's shareholders, some of whom happened to live in New York, when Markoll has had no other personal contacts with New York in decades, would not "comport with traditional notions of fair play and substantial justice," and therefore fails to satisfy the Due Process Clause.  Int'l Shoe, 326 U.S. at 316.  And the contacts between Ernestine Binder Markoll and New York, and between BSCL and New York, are even more tenuous – if they can be said to exist at all - than those of Richard Markoll. Accordingly, the Court finds that Duravest has not made even a prima facie showing of personal jurisdiction over all three Markoll defendants.[8]

Turning to Viscardi's motion, the Court, based on the Court's evaluation of the testimony and documentary evidence presented during the two-part evidentiary hearing (including the Court's evaluation of the demeanor and credibility of the various witnesses), finds the following facts:

Walter Schubert founded SGI, LLC ("SGI"), a New York based broker-dealer, in 1992, and operated it until October 2006, when it ceased business activities.  See Transcript of hearing held 7/1/08

---

[8]  "If the court chooses to rely on pleadings and affidavits [rather than hold an evidentiary hearing], the plaintiff need only make a prima facie showing of personal jurisdiction over defendant."  Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986).  The Court's evidentiary hearing addressed only Viscardi, not the Markoll defendants.

("July Tr."). According to Schubert and Friedrich Wilhelm Göbel, Viscardi's CEO, SGI did no work for or with Viscardi during this time, and Göbel himself neither was employed by the firm nor was affiliated with it in any other way. See July Tr.; Transcript of hearing held 9/23/08 ("Sept. Tr."). Nonetheless, in around 2000, Schubert and Göbel began making misrepresentations to the National Association of Securities Dealers ("NASD") about the relationship between Göbel and SGI. Göbel explained that in the late 1990s, he had worked for a New York investment bank and had been registered with the NASD as a broker-dealer; but when he took on a management role in Viscardi, a German company, in 1999, he knew that his U.S. registration would lapse. He therefore contacted Schubert, a personal friend, to inquire whether he could "keep alive" his U.S. broker-dealer registrations by "housing" them at SGI. July Tr.; Sept. Tr. When Schubert agreed, they began representing to the NASD on Form U-4 and U-4 Amendment applications that Göbel was an employee of SGI and maintained a business address at SGI's offices in New York. See, e.g., Form U-4 Uniform Application for Securities Industry Registration or Transfer of Friedrich Wilhelm Göbel, dated Oct. 25, 2000. As both Schubert and Göbel candidly admitted during the hearing, these representations were "lie[s]," and the Court -- while appalled at the facile way in which both Schubert and Göbel made false representations to NASD and its successor, the Financial Industry Regulatory Authority ("FINRA") both at this time and subsequently -- credits these admissions as making perfect sense.

Meanwhile, in around 2006, Schubert founded The Schubert

Group ("TSG"), a management consulting company. When Schubert created TSG's website, he posted a biography of Göbel, including his affiliation with Viscardi, and stated that he was a "Team Leader" in investment banking at TSG. See July Tr.; Affidavit of Walter Schubert ("Schubert Aff.") ¶¶ 3-6. Schubert admitted that this representation was false, that neither Göbel nor Viscardi was affiliated in any way with TSG, and that Schubert had posted Göbel's information without obtaining his permission. See July Tr. Schubert, the Court infers, felt free to do this because of his close personal relationship with Göbel and his prior knowledge of Göbel's own willingness to make false representations with Schubert's connivance. Nevertheless, when Göbel learned, apparently in the context of this litigation, that the information appeared on TSG's website, he directed Schubert to remove it, and Schubert did so. Schubert Aff. ¶ 5; Affidavit of Friedrich W. Göbel ¶ 6.

In October 2006, Göbel became involved with Schubert's other company, SGI. Around that time, Schubert testified, he was considering closing SGI, but Göbel believed he might one day wish to operate a U.S. broker-dealer. Schubert therefore granted Göbel a controlling interest in SGI, receiving as consideration forgiveness of a $50,000 personal loan Göbel had given him in 2005. See Membership Interest Purchase Agreement between Göbel and Schubert, dated Oct. 1, 2006; Promissory Note from Schubert to Göbel, dated July 14, 2005. SGI then applied to FINRA for approval of the change of controlling ownership, which FINRA granted in April 2007. Slightly before this time, Göbel and Schubert introduced another

misrepresentation into Göbel's FINRA Form U-4 Amendment application: that Göbel resided in New Jersey, at Schubert's address. See Form U4 Uniform Application for Securities Industry Registration or Transfer for Friedrich Wilhelm Göbel, dated Apr. 20, 2007. Göbel and Schubert explained, however, that this also was a lie, whose object was to speed approval of SGI's application for change of ownership.[9]

Throughout this time period and to the present day (with an exception noted below), SGI has remained inactive, conducting no business. In order to maintain SGI in capital compliance during that time, however, Göbel made a series of loans to the company (via Schubert) beginning in March 2007. See, e.g., Loan Agreement between Göbel and Schubert, dated March 30, 2007; Promissory Note from Göbel to Schubert, dated April 27, 2007; Promissory Note from Göbel to Schubert, dated November 1, 2007. The source of these funds, however, was Viscardi; for each loan from Göbel to SGI the documents reflect a corresponding loan in the same amount from Viscardi to Göbel. See, e.g., Loan Agreement between Viscardi and Göbel, dated March 30, 2007; Promissory Note from Göbel to Viscardi, dated April 27, 2007; Promissory Note from Viscardi to Göbel, dated November 1, 2007. According to Göbel, Viscardi provided the funds to SGI because Viscardi was contemplating a possible expansion into the United States. See Sept. Tr. To that end, in April 2008, Göbel, Viscardi, and Schubert entered into an agreement whereby Viscardi purchased 100

---

[9] The Court finds that Solano, who prepared this form, also knew that the representation concerning Göbel's New Jersey address was a lie.

percent of SGI.[10]  See, e.g., Assignment of Membership Interests from Göbel to Schubert, dated April 15, 2008; Membership Interest Purchase Agreement between Viscardi and Schubert, dated April 15, 2008. Following the sale, SGI applied to FINRA for approval of the ownership transfer; the application is still pending.  See Sept. Tr.

Up until the present, Viscardi has undertaken a single project in conjunction with SGI: in June of this year, Viscardi engaged SGI to assist it in a private placement in the United States. See Sept. Tr.; Engagement Agreement between SGI and Viscardi, dated June 26, 2008.

As this lengthy recitation demonstrates, the facts as found by the Court demonstrate, at most, the following contacts between Viscardi and New York: (1) Göbel, Viscardi's CEO, represented to FINRA that he was an employee of SGI, a New York broker-dealer, from around 2000 to 2007, but this was a lie and Göbel was not in fact an employee of SGI during this period; (2) between October 2006 and April 2007, Göbel acquired a beneficial ownership in SGI and became an officer in that firm; (3) starting in March 2007, Viscardi indirectly loaned money to SGI, which was at that time inactive, in contemplation of a possible future expansion into New York; (4) in April 2008, Viscardi initiated the process of purchasing SGI, which remained inactive; and (5) in June 2008, Viscardi engaged SGI to

_____

[10]  For various reasons explained at the evidentiary hearing, this transaction took a complex form: Göbel first sold his interest in SGI back to Schubert; Schubert then sold a 100 percent in the company to Viscardi.  See, e.g., Email from Michael Martin to Walter Schubert, dated Jan. 7, 2008 (explaining two-part transaction).

assist it in one project.[11]  However, none of these contacts, either alone or in combination, is sufficient to establish personal jurisdiction over Viscardi.

In assessing whether a defendants' contacts with New York are sufficient to establish general jurisdiction,[12] the relevant question is whether the defendant was present in New York at the time the complaint was filed.  Darby v. Compagnie Nationale Air France, 735 F. Supp. 555, 560 (S.D.N.Y. 1990).  To the extent that events occurring prior to that time are relevant, it is "only to establish the pattern

---

[11]  Various other contacts to which the witnesses adverted during the hearing are almost too minor to mention, including: (1) Göbel's investment, prior to his affiliation with Viscardi, in a different New York company, the Gay Financial Network ("GFN"), his subsequent transfer of the Gay Financial shares to Viscardi, and Viscardi's eventual "writ[ing] off" of those shares once GFN went out of business, see, e.g., Sept. Tr.; Letter from Frank Heinemann to Stephen Rossi, dated Nov. 20, 2000; Agreement between GFN and Viscardi, dated May 3, 2002; (2) the April 2008 misrepresentation on the Form U-4 application of another Viscardi employee, Robert Willis, that Willis was an employee of SGI, made with the same purpose of keeping Willis's registrations active, see Form U4, Uniform Application for Securities Industry Registration of Transfer, of Robert Arthur Willis, dated Mar. 4, 2008, at 1, 6; (3) Göbel's granting a New York law firm power of attorney over SGI in April 2008, see Power of Attorney dated Apr. 4, 2008; and (4) the relocation in May 2008 of SGI's offices from 111 Broadway to the offices of Levin & Srinivasan LLP, which has served as counsel to Viscardi in various transactions, see Letter from Levin & Srinivasan to SGI, dated May 1, 2008.

[12]  As far as the Court is aware, the plaintiff has not advanced any non-frivolous argument for the exercise of specific jurisdiction on the basis of these contacts.  As described above, Viscardi's role in the sale of BMTS occurred exclusively in Europe; no evidence brought forth at the evidentiary hearing even bore on this issue.  To the extent Duravest has, in earlier submissions, argued otherwise – for example, by arguing that because of Viscardi's involvement with BMTS, all of BMTS's contacts with New York may be imputed to Viscardi – such argument is on its face both legally and factually meritless.

of contacts that existed at the moment the complaint was filed." Schenker v. Assicurazioni Generali S.P.A., Consol., 2002 U.S. Dist. LEXIS 12845 (S.D.N.Y. July 11, 2002). Accordingly, the Court focuses exclusively on events occurring in the year leading up to Duravest's filing of the complaint in this action on November 26, 2007. See id. (observing that courts have considered contacts "at least as far as a year before the filing of the complaint").

The fact that Göbel in his individual capacity purchased a controlling stake in SGI in October 2006 (later approved by FINRA in April 2007) and served as an officer of SGI in several capacities is, standing alone, irrelevant to whether this Court has jurisdiction over Viscardi. Even if owning an inactive broker-dealer in New York were sufficient to establish that Göbel himself was "doing business in New York," on which the Court expresses no opinion, the fact that a corporation's officer is "doing business" in his personal capacity in New York does not subject the corporation itself to jurisdiction. See Joseph Walker & Sons v. Lehigh Coal & Navigation Co., 167 N.Y.S.2d 632, 634 (Sup. Ct. 1957) ("[I]f a corporation is not doing business here the mere fact that its officers may be found in this State, and even reside here, does not bring the corporation within the State's jurisdiction.").

Nor do the indirect loans from Viscardi to SGI during the period from March 2007 until November 2007, when the Complaint was filed, amount to Viscardi's "doing business" in New York. Although Viscardi may have taken these actions with the expectation that at some point in the future it might wish to conduct business in New

18

York, such expansion had not yet occurred at the time the Complaint was filed. Even taking the very extreme view – a view not, in the Court's opinion, supported by the evidence received at the hearing – that this indirect involvement somehow transformed SGI into a subsidiary of Viscardi, under New York law the existence of a subsidiary in New York does not, standing alone, confer personal jurisdiction over the parent corporation. See Jazini by Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) ("Where, as here, the claim is that the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the state."). Duravest would have to show, in addition, that during that time period SGI acted either as the "agent" or a "mere department" of Viscardi, neither of which it could possibly establish on the facts here. Id.[13]

The only contacts between Viscardi and New York that even potentially could rise to the level of "doing business" in New York - Viscardi's acquisition of a controlling interest in SGI and the two companies' single joint project in June 2008 - occurred after the

---

[13] "To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.'" Jazini, 148 F.3d at 184 (citing Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 537 (1967) (alteration in Jazini)). Here, since SGI did no business during the relevant time period, Duravest could not possibly make this showing. In determining whether the subsidiary is a "mere department" of the parent, the court must find, among other factors, the "essential" element of common ownership. Id. at 184-85 (internal quotation marks omitted). At the time the Complaint was fired, SGI was owned by Göbel, not Viscardi.

Complaint was filed, and are therefore irrelevant to this inquiry. See Darby, 735 F. Supp. at 560.[14]

In short, despite the ample opportunity that the Court afforded Duravest to identify links between Viscardi and New York demonstrating Viscardi's "presence" here, the only connections that have any factual support are, as a legal matter, vastly insufficient to establish personal jurisdiction under New York law. Accordingly, the Court finds that Duravest has not carried its burden of proving personal jurisdiction over Viscardi, see Cutco Industries, 806 F.2d at 364, and grants Viscardi's motion to dismiss for lack of personal jurisdiction.

Having dismissed both the Markoll defendants and Viscardi, the only claims still pending against the remaining defendants, the O'Donnell defendants and the lawyer defendants, are grounded in state law. The Court declines to exercise supplemental jurisdiction over those claims, and accordingly dismisses the Complaint as to those defendants without prejudice to Duravest's refiling them in state court.

The Clerk is directed to close documents number 16, 33, 37 and 53 on the Court's docket, and to enter judgment in favor of defendants dismissing the complaint on the foregoing terms.

SO ORDERED.

---

[14]   The Court makes no finding, however, of whether such contacts would be sufficient to establish personal jurisdiction over Viscardi if a complaint were to be filed today.

Dated: New York, NY
       October 3, 2008

                              JED S. RAKOFF, U.S.D.J.